QUINN EMANUEL URQUHART & SULLIVAN, LLP
Michael B. Carlinsky (admitted *pro hac vice*)
michaelcarlinsky@quinnemanuel.com
295 Fifth Avenue
New York, New York 10016
Telephone:   (212) 849-7000
Facsimile:    (212) 849-7100

David A. Nelson (admitted *pro hac vice*)
davenelson@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone:   (312) 705-7400
Facsimile:    (312) 705-7401

*Attorneys for Defendants Procore Technologies, Inc. and Procore Payment Services, Inc.*

(A complete list of counsel appears in the signature block)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., ORACLE INTERNATIONAL CORPORATION, and TEXTURA CORPORATION,<br><br>Plaintiffs,<br>v.<br><br>PROCORE TECHNOLOGIES, INC., PROCORE PAYMENT SERVICES, INC., AND MARK MARIANO,<br><br>Defendants. | Case No. 4:24-cv-07457-JST<br><br>**PROCORE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  August 20, 2026<br>Time:  2:00 PM<br>Location:  Courtroom 6<br>Judge: Honorable Jon S. Tigar<br><br>ORAL ARGUMENT REQUESTED |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 20, 2026, at 2:00 PM or as soon thereafter as the matter may be heard in Courtroom 6 at the Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, Defendants Procore Technologies, Inc. and Procore Payment Services, Inc. (together, "Procore"), by and through their attorneys will, and hereby do, move for summary judgment that (1) Oracle's sole cause of action against Procore under the Defend Trade Secrets Act is barred by the applicable statute of limitations, and (2) Oracle has failed to identify protectable trade secrets, establish that they derive independent economic value from not being generally known or readily ascertainable through proper means, or establish that Procore misappropriated the asserted trade secrets.

This Motion is made on the grounds that there is no genuine dispute of material fact as to any of these issues and Procore is entitled to summary judgment under Federal Rule of Civil Procedure 56. Oracle knew or should have known of the alleged misappropriation more than three years before filing suit. Oracle's trade secret disclosures and expert reports rely on vague and formulaic templates that fail to identify or describe why any particular file is a trade secret, or what specific content within any file is secret, fail to distinguish the claimed secrets from information that is generally known or readily ascertainable through proper means, and fail to establish any individual trade secret has independent economic value. Because Oracle cannot identify its alleged trade secrets, it cannot establish misappropriation of the alleged trade secrets.

This Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Declaration of Robert Longtin and exhibits thereto; all pleadings and papers on file in this action; and such other matters as the Court may consider.

**TABLE OF CONTENTS**

Page

FACTUAL BACKGROUND ............................................................................................... 2

LEGAL STANDARD ....................................................................................................... 4

ARGUMENT .................................................................................................................. 5

    A.    Oracle's DTSA Claim Is Barred By The Statute Of Limitations .............................. 5

    B.    Oracle Has Not Adequately Identified Or Established The Existence Of Any Trade Secrets Or Misappropriation ................................................................. 10

        1.    Oracle's Categorical Identification Fails ....................................................... 12

        2.    Oracle Has Provided No Evidence of Independent Economic Value.......... 23

PROCORE'S MOTION FOR SUMMARY
JUDGMENT                                        Case No. 4:24-CV-07457-JST

**TABLE OF AUTHORITIES**

**Page**

<u>C</u><small>ASES</small>

*Alghusain v. Webb*,
  2025 WL 1643791 (N.D. Cal. June 10, 2025)............................................................... 16

*Alta Devices, Inc. v. LG Elecs., Inc.*,
  2019 WL 1924992 (N.D. Cal. Apr. 30, 2019).............................................................5, 10

*Am. Heart Techs., LLC v. Ansari*,
  2025 WL 2553140 (C.D. Cal. June 4, 2025) ................................................................. 12

*Applied Predictive Techs., Inc. v. Marketdial, Inc.*,
  2026 WL 218291 (Fed. Cir. Jan. 28, 2026) .................................................................. 11

*Arrivia Inc. v. Rowley*,
  2023 WL 7386384 (D. Ariz. Nov. 8, 2023).................................................................... 10

*Calendar Rsch. LLC v. StubHub, Inc.*,
  2020 WL 4390391 (C.D. Cal. May 13, 2020)................................................................ 15

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ......................................................................................................... 5

*Chung v. Intellectsoft Grp. Corp.*,
  2024 WL 813445 (N.D. Cal. Feb. 12, 2024) ......................................... 5, 11, 14, 18, 23, 24, 25

*Double Eagle Alloys, Inc. v. Hooper*,
  134 F.4th 1078 (10th Cir. 2025)..................................................................... 11, 12, 13

*Double Eagle Alloys, Inc. v. Hooper*,
  2024 WL 3166921 (N.D. Okla. June 25, 2024), *aff'd*, 134 F.4th 1078 (10th Cir.
  2025)................................................................................................................................. 12

*Freeman Inv. Mgmt. Co. v. Frank Russell Co.*,
  2016 WL 5719819 (S.D. Cal. Sept. 30, 2016), *aff'd*, 729 F. App'x 590 (9th Cir.
  2018)........................................................................................................................... 12, 23

*IDX Sys. Corp. v. Epic Sys. Corp.*,
  285 F.3d 581 (7th Cir. 2002) ............................................................... 12, 15, 16, 20

*Imax Corp. v. Cinema Techs., Inc.*,
  152 F.3d 1161 (9th Cir. 1998)................................................................................. 11, 12

*Insulet Corp. v. EOFlow, Co.*,
  2026 WL 1502238 (Fed. Cir. May 28, 2026) ................................................. 5, 6, 9, 10

*Int'l Med. Devices, Inc. v. Cornell*,
174 F.4th 64 (Fed. Cir. 2026) ............................................................................................. 14

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020) ........................................................................................ 11, 18

*Intelometry, Inc. v. Calpine Energy Sols., LLC*,
2026 WL 926870 (N.D. Cal. Apr. 6, 2026) ........................................................................ 15

*Keystone Fruit Mktg., Inc. v. Brownfield*,
352 F. App'x 169 (9th Cir. 2009) ...................................................................................... 11

*MedioStream, Inc. v. Microsoft Corp.*,
869 F. Supp. 2d 1095 (N.D. Cal. 2012) .............................................................................. 10

*NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*,
163 F.4th 1091 (7th Cir. 2026) ............................................................................. 15, 21, 24

*NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*,
2020 WL 2836778 (N.D. Ill. May 31, 2020), *aff'd*, 163 F.4th 1091 (7th Cir.
2026) ............................................................................................................................. 11, 16

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*,
210 F.3d 1099 (9th Cir. 2000) ............................................................................................. 5

*OTR Wheel Eng'n., Inc. v. West Worldwide Svcs., Inc.*,
2015 WL 11117430 (E.D. Wa., Nov. 30, 2015) ................................................................. 24

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*,
360 F. Supp. 3d 994 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020) .................... 11

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
606 F.3d 262 (6th Cir. 2010) ............................................................................................. 15

*Seatrax, Inc. v. Sonbeck Int'l, Inc.*,
200 F.3d 358 (5th Cir. 2000) ............................................................................................... 6

*Synopsys, Inc v. Risk Based Sec., Inc.*,
70 F.4th 759 (4th Cir. 2023) ......................................................................................... 24, 25

*Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*,
330 F. Supp. 2d 668 (E.D. Va. 2004) ................................................................................. 12

*United Auto Credit Corp. v. Stewart*,
2026 WL 638853 (C.D. Cal. Feb. 19, 2026) ...................................................................... 24

*Woodall v. Walt Disney Co.*,
2024 WL 5329913 (C.D. Cal. Nov. 1, 2024) .............................................................. 5, 6, 10

*Zirvi v. Flatley*,
   838 F. App'x 582 (2d Cir. 2020)..........................................................................................8

**Statutes**

18 U.S.C. § 1836(d).............................................................................................................5, 10

DTSA.........................................................................................1, 2, 3, 5, 8, 10, 11, 23

**Other Authorities**

Fed. R. Civ. P. 56.......................................................................................................................1

Fed. R. Civ. P. 56(a).................................................................................................................4

U.S. Patent 7,925,584 ...........................................................................................................14

U.S. Patent 10,621,566 .........................................................................................................14

Oracle filed its Complaint on October 25, 2024, asserting that a former employee, Mark Mariano, left Oracle with confidential "files" and brought them to Procore in violation of the Defend Trade Secrets Act ("DTSA"). But Mr. Mariano gave notice more than three years prior, *i.e.*, before October 25, 2021. At the time Mr. Mariano gave notice, Oracle employees immediately believed that he had ██████████████████████████████████████████████████████ ████████████ As a result, Oracle ███████████████████████████████████ ██████████████████" Notwithstanding these half-measures, Oracle personnel ███████████████ ████████████████████████████████████████████████ Oracle's interrogatory responses confirm that Oracle believed Mr. Mariano's conduct from that period constitutes misappropriation. Because Oracle suspected, or should have suspected, misappropriation before October 25, 2021, Oracle's claim is time-barred.

On the merits, Oracle has litigated this case through a strategy of volume over clarity. Having missed its window to file this case, it has nonetheless spent the time since obscuring that fact behind an avalanche of generic files. Oracle has consistently asserted and defined its trade secrets as files—at one point more than 450—in their entirety, describing each with the same recycled refrain that "██████████████████████████████████████ ████████████ to a competitor. *See, e.g.*, Ex. 1 (Oracle Initial Trade Secret Disclosures) at 10, 12. Oracle's approach to this entire litigation has been to put the cart before the horse: if it was in Mr. Mariano's possession, it must be a "trade secret," so in Oracle's view, specifically identifying what the *actual* trade secrets are, how any portion of them were not generally known, or how each derived independent economic value, do not matter. So long as it was in Mr. Mariano's possession, at any point, that is apparently enough for Oracle to skirt the actual requirements of a DTSA claim.

Whatever latitude Oracle enjoyed at the pleading stage and through fact discovery in its ability to maintain this case through identification of entire files and generic reference to undisclosed subject matter therein, that approach has now run out of road. Summary judgment demands what Oracle has never supplied: *properly identifying* each asserted trade secret with specificity, establishing each trade secret is not generally known or readily ascertainable by proper means, and confirming independent economic value is derived from its secrecy. Oracle never even attempted

to make this showing. Stripped of its volume, Oracle's case is built on a foundation of vague categories, boilerplate descriptions, and the hope that sheer mass will substitute for evidence. Because Oracle has failed to make even a threshold showing sufficient to meet its burden that Oracle complied with the statute of limitations and otherwise identified any protectable trade secret under the DTSA—summary judgment of no misappropriation should be granted.

**FACTUAL BACKGROUND**

This dispute concerns construction-payment software. Founded in 2002, Procore has long operated a cloud-based construction-management platform with financial-management tools and integrations with the construction industry's leading enterprise resource planning ("ERP") accounting systems. Ex. 2 (Almeroth Dep. Tr.) at 206:3-207:9; *see also* Ex. 3 (Dorrity (hh2 Cloud Services) Dep. Tr.) at 32:15–34:15, 66:12–67:5. In 2019, Procore released a beta Procore Pay—a payment management solution for its construction management platform. *See* Ex. 4 (Procore04808083) at -068; Ex. 5 (Procore04833631). ███████████████████ ███████████████████████████████████████████████████. *See* Ex. 6 (Procore01691066). Procore then set a roadmap sequencing the products needed before formal launch. Ex. 7 (Procore04832303) at -316 (██████████████████████ ██████ "in that order"). ██████████████████, Procore acquired Levelset, a cloud-based lien-rights-management and construction-payment-compliance platform, in November 2021. *See* Ex. 8 (Procore04806795) (noting Procore's evaluation of Levelset ████████████ █████████████████████"). ██████████████████████ ██████████████████ Procore Pay officially launched in November 2023. *See* ECF 1 ¶¶ 5, 66, 68. Procore Pay offers full payment management functionality and integrates with certain existing ERPs, a core, long-standing functionality that Procore and others in the industry built through ordinary engineering using publicly documented ERP interfaces. Ex. 2 (Dorrity (hh2 Cloud Services) Dep. Tr.) at 62:21-63:6; Ex. 9 (Ibbs Dep. Tr.) at 74:14-75:15; Ex. 10 (Ibbs Rpt.), ¶¶ 7-8.

In 2016, Oracle acquired Textura, the developer of Textura Payment Management ("TPM"), a construction-payment-solution. ECF 1 ¶ 3. For years, ████████████████████████ ███████████████████████████████████████████████████████

2

███████████. *See, e.g.*, Ex. 11 (ORC-PRC-00233679) ████████

███████████████████ Ex. 12 (ORC-PRC-00558634) ████████████████

████████████████

While ██████████████████, Oracle's case largely reduces to Procore's hiring of one former Oracle employee. Mark Mariano, a former defendant in this case, worked at Textura and then Oracle (after the 2016 Textura acquisition). ECF 1 ¶ 49. Mr. Mariano left Oracle in 2021 to work for Procore. Oracle now contends that after Mr. Mariano's notice of resignation on October 19, 2021, he retained Oracle materials on personal iCloud and Google Drive accounts and two laptops (which were voluntarily submitted for forensic examination in this case) and were ultimately provided to Oracle. *Id.* ¶ 51. Oracle neither flagged nor stopped the retention, despite knowing of it and where Mr. Mariano was going before he left. And apart from ██████ ████████████████████ (Ex. 13 (MARIANO 001265)), Oracle did not contact Mr. Mariano to seek the return of his Oracle laptops until more than a year later, in December 2022 (after which they were returned). ECF 1 ¶ 62.[1]

On October 25, 2024, more than three years after Mr. Mariano gave notice and Oracle became aware that Mr. Mariano was leaving for Procore, Oracle filed its Complaint, asserting a single DTSA claim alleging that Mr. Mariano left Oracle with thousands of trade secret documents on two personal cloud accounts and on two Oracle computers before joining Procore. *Id.* ¶ 1. Fact discovery proceeded on Oracle's contention that its trade secrets constituted a file identified by an MD5 hash, a sentence or two of categorical description, screenshots of contents without explanation, the verbatim recitation that the file "████████████████████████████████ █████," and a boilerplate statement that the file is "████████████████████ ██████." *See generally* Ex. 14 (7/11/25 TSD). Oracle never identified any particular lines of code, data elements, algorithms, or other content within any file they claimed is secret, what made

---

[1] Oracle also claims that certain paper files that David Kelly—Mr. Mariano's former manager at Oracle—delivered to Mr. Mariano in a banker's box months after his departure (and while he was already at Procore), constitute trade secrets. *See* Ex. 15 (Mariano 3-23-26 Dep. Tr.) at 85:8–86:10.

3

even the file as a whole a secret or its contents not generally known or readily ascertainable, or distinguishable from the public, generic, and industry-standard material surrounding it. *See id.*

Based on these disclosures, the parties' neutral forensic expert searched for these hashes and reported that only six purported trade-secret files were ever present on a Procore device (Mr. Mariano's first Procore laptop) and that even those reflected only system activity. ECF 174 at 7; Ex. 16 (Forensic Examiner's Aug. 27, 2025 Rpt.) at 12. In other words, the six files were automatically downloaded during system synchronization, rather than downloaded by an individual.

Because those findings undermined its file-based theory, Oracle changed tack. On September 17, 2025, Oracle sent Procore a letter asserting, for the first time, that its trade secrets were " ███████ " the identified files but also included the ███████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████. '" Ex. 17 (9/17/25 Letter) at 2, 9; ECF 174 at 7. Procore moved to compel a more particularized disclosure (ECF 174), but the Court denied it holding Oracle's file-level descriptions gave "reasonable notice" for discovery—expressly distinguishing that standard from a "merits adjudication." ECF 206 at 5.

Oracle served its opening expert reports on April 8, 2026, addressing 110 alleged trade secrets. Then, on June 5, 2026, the Court ordered Oracle to narrow its assertions to the approximately 34 secrets now at issue. ECF 331. Oracle has organized its disclosures into six purported categories: (A) TPM Solution (10 trade secrets); (B) Oracle ERP (3 trade secrets); (C) Third-Party ERP (10 trade secrets); (D) Cross-Platform (6 trade secrets); (E) Customer Information (3 trade secrets); and (F) Internal Business Information (2 trade secrets) (collectively, the "Asserted Trade Secrets"). Ex. 18 (6/5/26 Narrowed Trade Secret Disclosures). This narrowing has done nothing to remove the issues with Oracle's case.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the movant does not bear the burden of proof on an issue, it can secure summary judgment by "produc[ing] evidence negating an essential element of the nonmoving party's case,

4

or, . . . show[ing] that the nonmoving party does not have enough evidence of an essential element . . . to carry its ultimate burden" at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). "If the moving party satisfies its initial burden of production, the nonmoving party must then produce admissible evidence to show that a genuine issue of material fact exists." *Chung v. Intellectsoft Grp. Corp.*, 2024 WL 813445, at *2 (N.D. Cal. Feb. 12, 2024). "If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

## **ARGUMENT**

### **A.   Oracle's DTSA Claim Is Barred By The Statute Of Limitations**

Oracle filed this action on October 25, 2024. The DTSA bars any claim brought more than three years after misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). The DTSA further specifies that "a continuing misappropriation constitutes a single claim[.]" *Id.* Courts in the Ninth Circuit apply an inquiry-notice standard for triggering the running of the statute of limitations under the DTSA. *See, e.g.*, *Alta Devices, Inc. v. LG Elecs., Inc.*, 2019 WL 1924992, at *14 (N.D. Cal. Apr. 30, 2019) ("For statute of limitations purposes . . . inquiry notice triggered the start of the three-year statute of limitations period."); *Chung*, 2022 WL 20184655, at *13 ("[W]here a plaintiff suspects or has reason to suspect misappropriation, the plaintiff is said to be 'on notice' of a potential claim for misappropriation, the plaintiff is charged with a duty [to] exercise reasonable diligence to discover facts essential to that claim, and the statute of limitations on the claim begins to run."); *Woodall v. Walt Disney Co.*, 2024 WL 5329913, at *2 (C.D. Cal. Nov. 1, 2024) ("A plaintiff need not be aware of the specific facts necessary to establish the claim; that is a process contemplated by pretrial discovery."). The undisputed record establishes that Oracle had notice or reason to suspect facts sufficient to put a reasonable person on inquiry as to potential misappropriation before October 25, 2021 (three years before Oracle filed its complaint) (the "Critical Date").

The Federal Circuit's decision in *Insulet Corp. v. EOFlow, Co.*, 2026 WL 1502238 (Fed. Cir. May 28, 2026) confirms that Oracle's present claims are foreclosed under the same inquiry-notice standard applied in this circuit. *Insulet* holds that a prospective trade-secret plaintiff is on

notice—and the three-year statute of limitations clock begins to run—once the plaintiff has notice of or reason to suspect circumstances sufficient to put a reasonable person on inquiry as to, in no particular order: (1) the alleged misappropriator's access to the trade secrets through a former employee of the owner, and (2) similarity between the trade secrets and the alleged misappropriator's competing product. *Id.* at *6. Detailed knowledge of all underlying facts is not required; "[t]he relevant question is ultimately whether [the plaintiff] had sufficient knowledge to *state a claim . . .* , not whether it had sufficient evidence to *prove* misappropriation[.]" *Id.* (emphasis added); *see also Woodall*, 2024 WL 5329913, at *2 (granting summary judgment on plaintiff's trade secret claims as time-barred because the statute of limitations began to run when plaintiff suspected misappropriation). Once Oracle "ha[d] a suspicion of wrongdoing, and therefore an incentive to sue, [Oracle] must decide whether to file suit or sit on [its] rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; [it] cannot wait for the facts to find [it]." *Woodall*, 2024 WL 5329913, at *2. In other words, once Oracle became aware that Procore had both a competing product and access to alleged trade secrets, its duty to investigate potential misappropriation was triggered, and it had three years from then to file suit. It failed to do so here.

**The Access Prong.** Oracle knew Procore had access to Oracle's alleged trade secrets before the Critical Date because "it is not unexpected that a former employee will go to work for a competitor and that the competitor might thereby acquire trade secrets." *Insulet*, 2026 WL 1502238, at *10 (quoting *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 365 (5th Cir. 2000)). Knowledge that specific documents were taken is unnecessary; what matters is the competitor's access to a "veritable repository of information" on the owner's products via the employee. *Id.* at *10, *15. Here, Oracle had more than merely an expectation; it was aware before the Critical Date that Procore had access to Oracle's alleged trade secrets via multiple avenues.

First, Mr. Mariano, the functional lead for Oracle's TPM ERP integrations, gave notice of his departure on October 19, 2021. *See* Ex. 19 (ORC-PRC-00190936). At that time, Oracle understood the stakes: ███████████████████████████████████████████████████ . *See id.* For example, ███████████████ ████████████████████████████████████████████████████████████████████████

6

(Ex. 20 (ORC-PRC-01864661) at -663);

" (*Id.* at -663–64).

Ex. 19 (ORC-PRC-00190936); *see also* (Ex. 21 (ORC-PRC-00190937) (confirming Mr. Mariano's access would be terminated by end of day on October 19, 2021); Ex. 22 (ORC-PRC-00162243)

Discovery further confirms that Oracle was aware of facts sufficient to put a reasonable person on inquiry as to Procore's alleged misappropriation before the Critical Date. After Oracle , *see* Ex. 21 (ORC-PRC-00190937), . *See, e.g.*, Ex. 23 (MARIANO 001291) (October 20, 2021 email an Oracle employee); Ex. 24 (ORC-PRC-00162264) (October 20, 2021 ").

Oracle's misappropriation contentions show that, prior to the Critical Date, Oracle had notice of Mr. Mariano's alleged activity and reason to suspect potential misappropriation. For example, Oracle asserts that " " is a trade secret. Ex. 25 (Fifth Am. Trade Secret Disclosures) (hereafter "TSID"), at 554.[2] But Oracle's response to Procore's Interrogatory No. 4, which asks Oracle to identify alleged acts of misappropriation, points to

---

[2] Oracle asserted this alleged trade secret throughout fact discovery, but did not include it on its list of 110 trade secrets served on March 30. Nonetheless, the March 30 narrowing stated "discovery confirms that Procore misappropriated all of Oracle's asserted trade secrets." Ex. 26. The alleged misappropriation with respect to the files all stems from Mr. Mariano leaving Oracle, and therefore, these events from before the Critical Date are fatal to Oracle's claim. *See also infra.*



." Ex. 27 (Oracle's March 16, 2026 Response to Procore's Interrogatory No. 4) at 41-42. Then, on October 22, 2021—before the Critical Date but ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 28 (MARIANO 001310); *see also* Ex. 29 (MARIANO 001311); Ex. 30 (ORC-PRC-01993295).

That is textbook access notice under *Insulet*, and under Oracle's own case theory, the pre-Critical Date activity supplied not merely abstract access, but reason to suspect potential misappropriation and a duty to investigate before the Critical Date. *See also Zirvi v. Flatley*, 838 F. App'x 582, 586 (2d Cir. 2020) (finding the plaintiff's DTSA claims were time barred because a "person of ordinary intelligence" would have at least been on inquiry notice of the alleged claim).[3]

**The Similarity Prong.** The similarity prong is equally satisfied. The undisputed record shows Oracle knew, before the Critical Date, Procore was developing a directly competing payment-management product. *See* ECF 1 ¶ 66 (alleging that the misappropriation enabled Procore to launch "a competing TPM solution: Procore Pay" and a suite of ERP integrations).[4] For example, on

---

[3]    As another example, months before Mr. Mariano left, Oracle knew Procore had acquired INDUS.AI, a company with access to the Textura platform, in May 2021. ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, Procore's purchase of INDUS.AI, and Oracle's knowledge of it, gave Oracle notice that Procore could obtain Oracle's purported trade secrets (including user-facing features that Oracle contends are trade secrets, *see infra*, Section B.1.aii) through this customer channel well before the Critical Date, even independent of Mr. Mariano.

[4]    Oracle's misappropriation theory is not limited to Procore Pay. Ms. Bennis calculates ill-gotten profits and avoided R&D for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *See* Ex. 33 (Bennis Rpt.) ¶¶ 279-336. Much of this functionality existed in Procore Financials even before Mr. Mariano left Oracle, and Oracle was aware of it. Ex. 2 (Almeroth Dep.) at 205:9–207:9.

8

September 17, 2021—over a month before the Critical Date— ████████████

████████████████████████████████████████████████████

████████████ Ex. 34 (ORC-PRC-00163057) (emphasis added). ████████

████████████████████████████████████████████████████

████████████████████████████████████████████. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 35 (ORC-

PRC-00161222). ████████████████████████████████████

████████████████████████████ Ex. 36 (ORC-PRC-02421275).

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ Ex. 31 (ORC-PRC-01884753) at -755, -762, -765. ████████

████████████████████████████████████ See Ex. 11 (ORC-PRC-

00233679) ████████████████████████████████████████

████████████████████████████████████████████████; see

also Ex. 12 (ORC-PRC-00558634) ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ Cf. Insulet, 2026 WL 1502238, at *11 (company "paying consistent attention" to a competitor is charged with knowledge of the competitor's major announcements).

Thus, the access and similarity facts were not isolated or benign facts; taken together, they gave Oracle notice of circumstances sufficient to put a reasonable person on inquiry notice as to potential misappropriation no later than October 19, 2021—i.e., before the Critical Date. Oracle cannot avoid this by arguing misappropriation began only when Mr. Mariano joined Procore. Oracle's own interrogatory responses and experts assert the alleged exfiltration began *while he was*

*still at Oracle.* Oracle's Seventh Supplemental Response to Interrogatory No. 4 states that "███████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ Ex. 27

at 32. Oracle's technical expert, Dr. Almeroth, likewise dates the alleged misappropriation to before

the Critical Date, opining that "█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████ Ex. 37 (Almeroth Rpt.) ¶ 642.

By Oracle's own account, then, the alleged misappropriation it pleads was underway no later than October 15, 2021 (and certainly no later than October 19, 2021). Oracle both knew of Procore's potential access to its alleged trade secrets via Mr. Mariano and that Procore was building a competing payment management product before the Critical Date. And because "a continuing misappropriation constitutes a single claim," and the first discoverable misappropriation commences the limitations period, Oracle's claim accrued before the Critical Date and cannot be extended by subsequent acts. *See, e.g.*, *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1109-10 (N.D. Cal. 2012) (continuing-use allegations "do not restart the statute of limitations"); *Arrivia Inc. v. Rowley*, 2023 WL 7386384, at *4-5 (D. Ariz. Nov. 8, 2023) ("[A]n initial misappropriation of trade secrets and a subsequent continuing misappropriation constitute a single claim."); *see also* 18 U.S.C. § 1836(d); *Insulet*, 2026 WL 1502238, at *7–8. Oracle's DTSA claim is therefore time-barred, and summary judgment should be granted in Procore's favor. *See Woodall*, 2024 WL 5329913, at *2 (granting summary judgment on plaintiff's trade secret claims as time-barred); *Alta Devices*, 2019 WL 1924992, at *12–14 (dismissing DTSA claims with prejudice as time barred and finding that an amendment would be futile).

### B. Oracle Has Not Adequately Identified Or Established The Existence Of Any Trade Secrets Or Misappropriation

Oracle's trade secret theory suffers from a foundational defect: it has never identified ***what*** in (or about) any of its 34 asserted trade secrets is actually secret. But that approach—designating entire files as trade secrets and describing their contents with vague, formulaic templates—never separates the claimed secrets from publicly known information, general industry knowledge, and

10

material readily ascertainable by proper means.  This deficiency is not a technicality.  It is fatal to Oracle's claim because "[w]ithout enough specificity of what information constitutes the claimed trade secret, the Court cannot properly analyze the elements of a trade secret claim, such as whether a particular piece of information was sufficiently secret to have value."  *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 2020 WL 2836778, at *3 (N.D. Ill. May 31, 2020), *aff'd*, 163 F.4th 1091 (7th Cir. 2026) (internal quotation marks omitted); *see also Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1097 n.19 (10th Cir. 2025) ("At the summary-judgment stage, a plaintiff identifies a trade secret by producing sufficient evidence that could meet the definition of a trade secret under the DTSA . . . .  A failure to produce sufficient evidence amounts to a failure to identify a trade secret."); *Applied Predictive Techs., Inc. v. Marketdial, Inc.*, 2026 WL 218291, at *2 (Fed. Cir. Jan. 28, 2026) (affirming summary judgment because "cursory, high-level descriptions" do not "sufficiently identify and define the alleged trade secrets to meet the statutory definition").

Oracle "must identify the trade secrets and carry the burden of showing they exist," and must "describe the subject matter of the trade secret[s] with sufficient particularity to separate [them] from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade."  *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (internal quotation marks and emphasis omitted); *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998).  "It is not Defendants' obligation to affirmatively demonstrate that every possible permutation of features in Plaintiffs' [815]-page long trade secret description is publicly known.  Rather, it is Plaintiffs who must provide the Court [and Defendants] with a precise, concrete identification of what features or combinations of features it alleges are separate from matters of general knowledge."  *Chung*, 2024 WL 813445, at *7 (internal quotation marks omitted).  Information that is widely publicly known is not a trade secret.  *See Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1013 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020); *see also Keystone Fruit Mktg., Inc. v. Brownfield,* 352 F. App'x 169, 173 (9th Cir. 2009) (file not a trade secret because "all the information contained in [the file] was publicly available in well-known trade circulations").

For alleged trade secret files, Oracle must describe the secret content ***within*** the file (*e.g.*, a

11

particular algorithm that Oracle developed) and distinguish it from what is generally known or readily ascertainable. *See Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 330 F. Supp. 2d 668, 678 (E.D. Va. 2004) ("A written document is not information, but rather a vehicle for expressing information. Thus, a document itself cannot be a trade secret, although it may contain trade secrets."). Oracle "cannot simply point to a list of documents and say, 'the trade secrets can be found here'"; it "must, at a minimum, describe the boundaries of the trade secrets in a manner that would permit the Court to understand whether trade-secret . . . information (in whole or in combination) is publicly available." *Double Eagle Alloys, Inc. v. Hooper*, 2024 WL 3166921, at *2 (N.D. Okla. June 25, 2024), *aff'd*, 134 F.4th 1078 (10th Cir. 2025).

Oracle's formulaic description of all 34 remaining trade secrets is precisely what courts have rejected. *See, e.g.*, *Am. Heart Techs., LLC v. Ansari*, 2025 WL 2553140 (C.D. Cal. June 4, 2025); *Imax*, 152 F.3d at 1167; *Double Eagle Alloys*, 134 F.4th at 1088-97; *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002); *Freeman Inv. Mgmt. Co. v. Frank Russell Co.*, 2016 WL 5719819, at *9-12 (S.D. Cal. Sept. 30, 2016), *aff'd*, 729 F. App'x 590 (9th Cir. 2018).

The deficiencies Oracle was permitted to defer in discovery have come home to roost: it built its claims on a foundation that cannot bear the weight of summary judgment.

### 1. *Oracle's Categorical Identification Fails*

*Double Eagle Alloys* is squarely on point. There, an individual downloaded over 2,600 digital files onto a portable storage device before leaving the plaintiff to join a competing defendant. *Double Eagle Alloys*, 134 F.4th at 1084. The plaintiff generally grouped the alleged trade secret files into categories, including "PSQ specifications, pricing, margins, costs, and customer drawings." *Double Eagle Alloys*, 2024 WL 3166921, at *2. The district court held that to be insufficient because "the fact that certain information falls into categories that 'may' or 'can' include trade secrets does not mean that [the] information is entitled to trade-secret protection under the particular facts of this case." *Id.* The court held "a party's burden to clearly identify its trade secrets at the summary judgment stage is greater than its burden at the pleading stage" and is "intertwined with the ultimate question of whether a jury could find in the plaintiff's favor." *Id.* at *1 n.1 (collecting cases). Affirming, the Tenth Circuit similarly held: "It is inadequate for plaintiffs to cite

and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information. Long lists of general areas of information containing unidentified trade secrets, catchall phrases, and categories of trade secrets that the plaintiff intends to pursue at trial fail to identify the trade secret with sufficient particularity." *Double Eagle Alloys*, 134 F.4th at 1089 (citations and internal quotations omitted).

Oracle identifies its trade secrets in the same deficient way as the *Double Eagle* plaintiff—grouping them into vague categories without identifying what in the alleged trade secret files is secret versus generally known or readily ascertainable. *See, e.g.*, Ex. 33 (Bennis Rpt.) ¶¶ 106, 127, 311 (referring to the categories as individual trade secrets: "this relates to Oracle's TPM Solution trade secret"; "for the Internal Business Information trade secret"; "Oracle's Cross-Platform Integrations trade secret"). As shown below, Oracle's categorical, file-level designation is legally deficient and cannot carry Oracle's burden to identify any protectable trade secret.

**Category A(ii): TPM Solution (Non-Source Code) (ATS Nos. 6-10).**[5] This category includes a "catchall" entry, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 18 (Narrowed disclosures). Oracle fails to identify why any of these files, or their specific contents, constitute a trade secret. *See* Ex. 25 (TSID Disclosures) at 200-213, 426-427, 475-486, 589-590, 527-528; Ex. 37 (Almeroth Rpt.) ¶¶ 230-243, 256-260, 267-271, 292-99; Ex. 10 (Ibbs Rpt.) ¶¶ 80, 85, 88, 95-96.

Oracle's "catch-all" trade secret (ATS 6)—"▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ exemplifies Oracle's failure to identify its trade secrets. Unlike the rest of Oracle's alleged trade secrets, ATS 6 is not even a file but a catch-all list of general concepts—workflows, functionality, structure, architecture, user interfaces, and interconnections—which Oracle tries to anchor to three disparate items: a▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 38 (Procore04650983)); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 39 (Procore05128449)). Ex. 10 (Ibbs Rpt.) ¶ 80; Ex. 37 (Almeroth Rpt.) ¶¶ 230-243.

---

[5] "ATS" means Asserted Trade Secrets as identified in Oracle's June 5 disclosures. *See* Ex. 18

13

Oracle's expert confirmed ███████ is merely a recording of "███████ ████████████████████████████." Ex. 2 (Almeroth Dep.) at 134:11-20, 135:7-15.  Oracle's experts similarly treat the "███████████" Procore obtained through INDUS.AI only as part of an undifferentiated "██████ trade secret, identifying no analysis distinguishing the product's customer-facing operation from what any user could see. Ex. 9 (Ibbs Dep.) at 247:1–248:7.

There is no genuine dispute, however, that Oracle has long publicly disclosed TPM's workflows, functionality, structure, architecture, user interfaces, and interconnections.  For example, Oracle has filed **dozens** of patent applications detailing TPM.  *See* Ex. 40 (list of TPM published patents and applications).  One example, U.S. Patent 10,621,566, titled "Construction payment management system and method with automatic notification workflow features," includes over 170 figures illustrating the overall system architecture, specific workflows, and user interfaces for a construction payment-management system.  Ex. 41; *see also* Ex. 42 (U.S. Patent 7,925,584) (over 200 figures).  This extensive disclosure is incongruent with Oracle's contention that TPM's user-facing features are trade secrets, and these disclosures in Oracle's own patents foreclose trade secret protection.  *See Int'l Med. Devices, Inc. v. Cornell*, 174 F.4th 64, 71-72, 76 (Fed. Cir. 2026) (reversing a jury verdict where the subject matter of the trade secrets was generally known, having been disclosed in patents granted to two unrelated third parties); *Chung*, 2024 WL 813445, at *7 ("It is well established that publicly known information, including information that is disclosed in a published patent or patent application, cannot be protectable as a trade secret.").

Oracle has also published over fifty video demonstrations on its public website and YouTube channel showing TPM's customer-facing features.  *See* Ex. 43 (Procore04105534) (available at **Error! Hyperlink reference not valid.**) (publishing 50 demonstration videos concerning TPM); *see also* Ex. 44 (screenshots of user interfaces and user-facing features from 9 exemplary videos, identified therein).  Oracle's witness Lucie Trepanier testified that "████████████ ████████████████████████████████ ██████████. Ex. 45 (Trepanier Dep.) at 133:15-25, 129:16-19.

Portions of the ████████████████ were also published on the open Internet since at

14

least 2021 (*see* Ex. 46 (ORC-PRC-02475901)), and Dr. Almeroth concedes Oracle requested it be taken down during this litigation ██████████████████████████████████ ████████████ Ex. 37 (Almeroth Rpt.) ¶ 243. Neither expert makes any effort to separate the "trade secrets" of this ████████████████████████████ from what is publicly known or readily ascertainable about the TPM software. *Id.* ¶¶ 238–243; Ex. 10 (Ibbs Rpt.) ¶ 80. Dr. Ibbs could not identify anything he did to "████████████████████████████████████ ████████████████████████████████ and "████████████████" of what within the manual was "████████████████████████████████"—resting instead on the document's "confidentiality banner." Ex. 9 (Ibbs Dep.) at 248:5-17, 249:7-250:14, 253:7-24.

Courts have routinely held that public-facing subject matter cannot be protected as trade secrets, including on summary judgment. *See NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1091, 1099 (7th Cir. 2026) ("[W]e are not aware of any authority holding that "not readily ascertainable" or "not generally known" means not accessible to the public writ large. NEXT sold its software to clients such as CLEAResult, and the functions performed by that software (scheduling appointments, managing inventory, etc.) would be obvious and apparent to any client that was using the internal web application. That the functions are obvious to any user means they do not qualify for protection."); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 276–77 (6th Cir. 2010) (affirming summary judgment where the "user interface was not a trade secret"); *IDX*, 285 F.3d at 584 ("[T]he appearance of data-entry screens[] are exceedingly hard to call trade secrets: things that any user or passer-by sees at a glance are 'readily ascertainable by proper means.'"); *Calendar Rsch. LLC v. StubHub, Inc.*, 2020 WL 4390391, at *10 (C.D. Cal. May 13, 2020) (finding "outward-facing features that every user of an app can see and experience" are not trade secrets) (internal citation omitted); *see also Intelometry, Inc. v. Calpine Energy Sols., LLC*, 2026 WL 926870, at *5 (N.D. Cal. Apr. 6, 2026) (denying preliminary injunction because "presentments, including … user interfaces, are not trade secrets" and noting that "this sort of information cannot constitute a trade secret").

Oracle has also failed to identify the alleged trade secret material for the four other files in this category. For example, the construction accounting principles in "Construction Accounting

15

101.pptx," such as Percent Complete Accounting, Work in Progress Reports, Budgets, Contracts, Projects, General Ledger, Costs, and Change Orders, and Retainage Release (Ex. 47 (ORC-PRC-00378134)) are ██████████████████████████ (*see* Ex. 9 (Ibbs Dep.) at 134:25-135:18), ████████████████████████████████████████████ ██████████ " (*see* Ex. 48 (Procore04728596)); *see also* Ex. 49 (Austin Robertson Dep.) at 125:5-14. Oracle's experts were unable to articulate what in this file is allegedly a trade secret. *See, e.g.,* Ex. 2 (Almeroth Dep.) at 273:3-19, 277:23-278:5 (insisting that the "████████████ ████████████████████████ ' but refusing to go slide-by-slide to identify anything actually confidential or proprietary to Oracle); Ex. 9 (Ibbs Dep.) at 108:11-18 (refusing to parse the document for trade secret contents, insisting he "████████████████████████ ██████████████ .").

Similar failures pervade the other alleged trade secrets in this category. Oracle generically describes ATS 7 as "████████████████████████████████ ." Ex. 25 (TSID) at 426; *see also* Ex. 37 (Almeroth Rpt.) ¶ 259 ("████████████████████ ████████████████████████████████████ ████████████████████████████ ATS 9 is merely described as ██ ████████████████████████ ," (Ex. 25 (TSID) at 589), and ATS 10 is "a███████████████████████ " that Procore received from a customer, (Ex. 25 (TSID) at 527). Oracle never explains what within any of these documents is the purported secret. Summary judgment is therefore warranted.[6]

---

[6] Oracle's insufficient identification also infects any proper misappropriation analysis: having never isolated what within any file is secret, Oracle can only compare the functions of Textura and Procore; this is legally insufficient. *See Alghusain v. Webb*, 2025 WL 1643791, at *11 (N.D. Cal. June 10, 2025) ("Moreover, Plaintiff's lack of specificity in identifying the trade secrets is exacerbated by a lack of specificity regarding when and by what means [defendants] acquired and/or disclosed these documents."). Oracle cannot rely merely on similarities between the parties' products to show use of the alleged trade secrets. *See, e.g., IDX*, 285 F.3d at 584 (finding allegations that defendant shared "details that ordinary users of the software could observe without reverse engineering" to be insufficient); *NEXT Payment*, 2020 WL 2836778, at *13 (describing "what [the] alleged trade secrets *do*, not what they *are*" cannot support a claim) (emphases in original).

**Category A(i): TPM Solution (Source Code) (ATS Nos. 1–5).** In this sub-category, Oracle asserts five source code files as trade secrets. *See* Ex. 18 (Narrowed disclosures). For each, Oracle's disclosures identify the file by name, provide a sentence describing its functionality (*e.g.,* ███████) ██████████████████████████████████") and parrot the same template opinion with minimal variation stating, for example, "████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████████." *See* Ex. 25 (Oracle's 5th Am. TSD) at *e.g.,* 43-45, 53, 57, 58, 71-72, 78–79. Dr. Almeroth relies on this same vague description, stating the "████████████████████████████████████ ████████████████████████████████ *See* Ex. 37 (Almeroth Rpt.) ¶¶ 95-111, 124-127, 144-148. Dr. Ibbs provides the same verbatim opinion for each source code file in this category (except for the generic descriptions of what each file does). *See* Ex. 10 (Ibbs Rpt.) ¶¶ 60-62, 66, 71.

Oracle never identifies what within these files—what algorithms, logic, data structures, or implementation choices—is not generally known. Dr. Almeroth admitted ██████████ ████████████████████████████████████ ████████████████████████████████████. Ex. 2 (Almeroth Dep.) at 174:7-20. Moreover, Procore's software language (Ruby) and iPaaS platform (Boomi) are not compatible with Oracle's ████ code. *See* Ex. 2 (Almeroth Dep.) at 47:21-48:9, 45:2-21. Oracle's theory thus depends on some "secret" in the source code files that is necessarily *less than the full file*—yet Oracle never identifies what that something is. This is fatal to its claims.

**Category B: Oracle ERP Integrations (ATS Nos. 11–13).** This category contains three files related to ████████████. *See* Ex. 18 (Narrowed disclosures). But Oracle has not met its burden to describe with sufficient particularity what content within these files is not generally known. *See* Ex. 25 (TSID) at 50, 308–310, 781–790; Ex. 37 (Almeroth Rpt.) ¶¶ 310–323 (stating that "████████████████████████████████████ ████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████ "); Ex. 10 (Ibbs Rpt.) ¶¶ 129–131 (similar).

For example, ATS 13 is illustrative. Oracle's experts reproduce select screenshots from the file and say nothing about their contents, beyond that they pertain to an "████████████████ ███████████████████." *See* Ex. 37 (Almeroth Rpt.) ¶ 321; Ex. 10 (Ibbs Rpt.) ¶ 131. But the screenshots include catalogs of public information, such as the URLs of NetSuite's publicly published SOAP Web Services WSDL (Ex. 50) and Purchases XSD Files (Ex. 51) that Oracle itself publishes and instructs integrators to use. Ex. 37 (Almeroth Rpt.) ¶ 321. Oracle's experts do not explain how any information in the file qualifies as a trade secrets.

Furthermore, responding to evidence that Oracle publishes TPM-Netsuite integration information on its public help site, Dr. Almeroth states ████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ." *Id.* ¶ 85. Dr. Almeroth (and Oracle) then improperly try to flip the burden of proof, stating: ██████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* But Procore does not bear the burden of identifying what is not publicly available and therefore a trade secret; Oracle does. *See IntelliClear, LLC*, 978 F.3d at 658 ("*The plaintiff* should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.") (citation and quotation omitted) (emphasis added); *Chung*, 2024 WL 813445, at *7 ("It is not Defendants' obligation to affirmatively demonstrate that every possible permutation of features in Plaintiffs' 30-page long trade secret description is publicly known."). Dr. Almeroth's generic explanation that ███████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

██████ Ex. 37 (Almeroth Rpt.) ¶ 81, is woefully inadequate to tell Procore or the Court what the alleged trade secret is.[7]

**Category C: Third-Party ERP Integrations (ATS Nos. 14–23).** Oracle and its experts generally describe this category as relating to ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.” Ex. 25 (TSID) at 49, 192, 226, 467, 525, 547, 549, 593, 596, 657; *see also* Ex. 17 (Narrowed Disclosures); Ex. 37 (Almeroth Rpt.) ¶ 86 ("Oracle used these trade secrets as part of its development of Oracle's third party ERP integrations."). █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 37 (Almeroth Rpt.) ¶¶ 342–347, 354–357, 373–375, 401–403, 407–409, 416–422, 429–434, 455–457. Oracle's treatment of each file is nearly identical to that in the Oracle ERP Integrations Category. *Compare* Ex. 37 (Almeroth Rpt.) ¶ 81 *with id.* ¶ 85. In responding to Procore's contention that these are not trade secrets "█████████████████████████████████████████████████████████████████████████████ attempts to flip the burden. *Id.* ¶¶ 81–85. For the same reasons, his (and Oracle's) approach contravenes the governing law. Dr. Ibbs's opinions fare no better, vaguely stating it covers "████████████████████████████████████████████████████████," spanning different ERP systems (*e.g.*, █████████████████████████████████████████████████████. Ex. 10 (Ibbs Rpt.) ¶ 137; *see also id.* ¶¶ 141, 143, 149, 158, 160, 163, 164, 167, 168, 173 (for example, broadly stating the "███████████████████████████").

ATS 22 exemplifies this failure. Oracle says this file reflects "████████████████████████████████████████████████████████████████████████████████████████████."

---

[7] Oracle's misappropriation theory for these trade secrets is equally untethered. Procore has no ████ integration of its own; its ████ integration was built and is maintained by Calance, a third-party integrator, not by Procore's engineers. Ex. 52 (Procore05770458); Ex. 53 (Mariano Mar. 24, 2026 Dep.) at 420:21-23.

19

Ex. 37 (Almeroth Rpt.) ¶¶ 432–434; *see also* Ex. 10 (Ibbs Rpt.) ¶ 168 (same). However, the file plainly describes ███████ publicly available information (not Oracle's). *See* Ex. 54 (ATS 22) (ORC-PRC-00005632). For example, pages 4 through 8 of the file are tables of ██████ data fields that mirror ██████ own publicly published API documentation—for example, the identically formatted ████████████████████████████████████████ sets out in its public developer portal. *See* Ex. 55 (█████ ████████████████████████████

Integrating with third-party ERPs is indisputably a well-understood practice in the SaaS industry, and ERP providers publish extensive public documentation, provide developer resources, and encourage third parties to build integrations with their software. *See, e.g.*, Ex. 56 (Procore05770634) (CMiC API bundles); Ex. 57 (Procore05771572) (CMiC public integrations); Ex. 55 ([CMiC Schedule of Values API Codes](#)); Ex. 58 (Procore05771620) (Spectrum); Ex. 59 ([Spectrum Developer Information](#)) Ex. 60 ([Vista API documentation](#)). Oracle also publishes its own API endpoints and integration guide materials for ERPs (*see*, *e.g.*, Ex. 61 ([TPM Public API Endpoints](#)); Ex. 62 ([TPM ERP Integration Guide](#) for, *inter alia*, Sage 300/100, Viewpoint Vista, Yardi, CMiC)). Oracle's experts do not dispute that these ERPs' APIs, endpoints, and integration documentation are publicly available; they contend only that public availability "██████████████ ████████████████████████." Ex. 63 (Almeroth Rebuttal Rpt.) ¶¶ 111, 127, 135, 157, 163, 169. But that point is immaterial because neither Oracle nor its experts identify or explain what in the alleged trade secret files is Oracle's trade secret.[8]

**Category D: Cross-Platform Integrations (ATS Nos. 24–29).** According to Oracle, this category contains ████████████████████████████████████ ████████████████████████████████████████████ ████████████████ Ex. 25 (TSID) at 33; *see also id.* at 264, 350, 422, 757, 779, 796. Dr. Almeroth describes these files as "████████████████████████████████████

---

[8] With respect to this category, Oracle's misappropriation allegations boil down to the fact that Procore "has" an integration with the same ERPs. But the fact that Procore and Oracle both built ████ integrations proves nothing: a plaintiff cannot establish a trade secret, or its use, by pointing to similar product functionality. *See, e.g., IDX*, 285 F.3d at 584.



." Ex. 37 (Almeroth Rpt.) ¶ 87. But his description of each file and his explanation of why the files qualify as a trade secret are *identical* and generic for five of the six: ▮▮▮▮

▮▮▮▮ Ex. 37 (Almeroth Rpt.) ¶¶ 479, 486, 490, 499, 507. ▮▮▮▮

▮▮▮▮ *See id.* ¶ 504.

Dr. Ibbs provides no further detail on what the claimed secrets are. Instead, he generally describes these files as ▮▮▮▮

▮▮▮▮ Ex. 10 (Ibbs Rpt.) ¶¶ 194, 196–200.

Oracle never explains why these files or their contents qualify as trade secrets, much less what within them is claimed to be secret.[9]

**Category E: Customer Information (ATS Nos. 30–32).** Oracle categorizes three alleged trade secrets as ▮▮▮▮

▮▮▮▮ Ex. 25 (TSID) at 33; *see also id.* at 303, 362, 512. Dr. Almeroth describes these files the exact same way (replacing "▮▮" with "▮▮▮▮ Ex. 37

_____

[9] Moreover, Procore does not even have the integrations Oracle describes—it has no ▮▮▮ ▮▮▮ integration at all. And the functionalities Oracle gestures at existed natively in Procore's platform years before Mr. Mariano arrived. And even if Procore's products performed similar functions, similar functionality is not misappropriation; Oracle must still properly identify the secret and show its use. *See, e.g., NEXT Payment Sols.*, 163 F.4th at 1099. It has done neither.

(Almeroth Rpt.) ¶ 90. Dr. Almeroth also gives the same opinion as for the Cross-Platform Integrations, except that he modifies the "███████ ██" language to "██████████████████████████████████████████████████████████████████████████████████████████████████." Ex. 37 (Almeroth Rpt.) ¶¶ 516 (adding some additional source code directories), 519, 522. Dr. Ibbs also provides a one- or two-sentence high-level overview for each file and then generically opines, "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." Ex. 10 (Ibbs Rpt.) ¶¶ 208, 209, 210.

More specifically, Oracle's own expert refers to ATS 30 (Ex. 64) as a "█████████████" yet its substantive "█████" are transient status markers like "█████████" and "█████████." Ex. 37 (Almeroth Rpt.) ¶ 822; *see also* Ex. 10 (Ibbs Rpt.) ¶ 208 (same). ATS 31 (Ex. 65) is an █████████████████████████████████████████████████████████████. *See* Ex. 75 (A Guide to G702 and G703 Forms). And ATS 32 ("████████████") is a ████████████████████████████████████████████████████████████████████████ *See* Ex. 66 (ATS 32). Branding such everyday project-tracking artifacts "trade secrets," without identifying anything specific secret within them, is the same issue that pervades Oracle's identification throughout.

**Category F: Internal Business Information (ATS Nos. 33–34).** Oracle claims two files containing Textura Payment Management's basic rate card are trade secrets. *See* Ex. 67 (Oracle's 6/1/2026 Narrowed List of Trade Secrets); Ex. 25 (TSID) at 313–315; Ex. 37 (Almeroth Rpt.) ¶¶ 524–534; Ex. 10 (Ibbs Rpt.) ¶¶ 214, 216. ███████████████████████████████████ ████████████████████████████████ Ex. 68 (Procore00745467). ████████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 69 (Procore01593214); Ex. 70 (Procore01593219).

It is undisputed that the information in these alleged trade secrets is publicly available. *See* Ex. 37 (Almeroth Rpt.) ¶ 526. For example, the City & County of Denver published a Textura rate

card ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Compare* Ex. 69 (Procore01593214) and Ex. 70 (Procore01593219) *with* Ex. 71 (Procore00698317). And Oracle itself has publicized other aspects of the rate cards. *See* Ex. 72 (Procore00698367) (Oracle webpage explaining Textura pricing structure and listing subcontractor usage fee). ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *See* Ex. 73 (ORC-PRC-00187579) (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Oracle's former product marketing director also testified that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮." Ex. 45 (Trepanier Dep.) at 144:22–25. ▮▮▮▮▮▮ r

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ *Id.* at 169:21–23. As such, Oracle has not separated that which is known from anything that is allegedly secret.

Overall, the high-level, categorical, formulaic descriptions Oracle has deployed across all these categories fall woefully short of the DTSA and controlling law. These deficiencies leave Procore, the Court, and the Jury to "parse through" the files to discern what the supposed secrets are. The Court should grant summary judgment in Procore's favor. *See Freeman*, 2016 WL 5719819, at *10–12 (granting summary judgment, affirmed by the Ninth Circuit, where the disclosure "resembles an effort to categorize every piece of information or know-how that could potentially have value" and "impermissibly . . . shifts its burden onto [defendant] (and the Court) to sift through" it—the court noting defendant had twice-before raised this deficiency during discovery and now, on summary judgment was inclined to agree).

> 2.    ***Oracle Has Provided No Evidence of Independent Economic Value***

Oracle also bears the burden of demonstrating that its "purported trade secrets derive independent economic value, actual or potential, from not being generally known in the public or to other persons who can obtain economic value from its disclosure or use." *Chung*, 2024 WL 813445, at *8. The information "must be sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Id.* (internal quotation marks omitted). Thus, Oracle must show

that the asserted trade secret information itself derives value from its secrecy—not merely that the files associated with that information have some value.

Courts routinely grant summary judgment when plaintiffs fail to prove that their alleged trade secrets derive their value from not being generally known. *See, e.g., id.* at *8–9 (granting summary judgment because plaintiff did not demonstrate independent economic value); *United Auto Credit Corp. v. Stewart*, 2026 WL 638853, at *8–9 (C.D. Cal. Feb. 19, 2026) (same); *Synopsys, Inc v. Risk Based Sec., Inc.*, 70 F.4th 759, 771 (4th Cir. 2023) (same). Here, Oracle's evidence fails because it relies entirely on boilerplate untethered to the secrecy of any individual trade secret.

For all 34 Asserted Trade Secrets, Dr. Almeroth offers the verbatim conclusion that each " ██████████████████████████████████████████████████████████████ ██████████████████████████████████████. *See* Ex. 74 Johnson Dep. Tr. at 115:16-117:5 ████████████████████████████████████ *See* Ex. 37 (Almeroth Rpt.)████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████ Dr. Ibbs's opinions are similarly boilerplate. He does not even attempt to show, trade secret by trade secret, that the information " ████ ██████████████████████████████████████████████████████████████ ██████████████████████ Ex. 10 (Ibbs Rpt.) ¶ 20. Instead, over an eight-paragraph span, he discusses the 110 trade secrets in his report on a categorical, wholly conclusory basis. Ex. 10 (Ibbs Rpt.) ¶¶ 223-230.

That a digital file was not made available to the public at large does not, without more, give that file or its contents "not readily ascertainable" or "not generally known" status. *NEXT Payment Sols.*, 163 F.4th at 1099. Dr. Almeroth's and Dr. Ibbs's opinions therefore fail because they identify no facts supporting each secret's independent value, and conclusory assertions cannot create a genuine issue of material fact to avoid summary judgment. *See OTR Wheel Eng'n., Inc. v. West Worldwide Svcs., Inc.*, 2015 WL 11117430, at *3 (E.D. Wa., Nov. 30, 2015) ("Plaintiffs resort to the same conclusory arguments which are inadequate to create an issue of material fact that Plaintiffs have legally protectable trade secrets.").

Ms. Bennis's opinions fail as well because she devotes just two paragraphs to independent economic value for all Asserted Trade Secrets, stating that value is ███████████ ███████████████████████████████████████████████████ Ex. 33 (Bennis Rpt.) ¶ 145. ██████████████████████████ ███████████████████████████████ ████████████████████████. Ms. Bennis's approach is indistinguishable from the evidence the Fourth Circuit rejected in *Synopsys*. There, the plaintiff sought to establish independent economic value for 75 alleged trade secrets using the company's acquisition price and licensing revenue. 70 F.4th at 771. The Fourth Circuit held that this evidence was "not particularized to its seventy-five alleged trade secrets whether they are viewed individually, in smaller groupings, or as a whole." *Id.* at 773. Evidence of the company's overall value "cannot substitute for evidence about the seventy-five alleged trade secrets' value" because "[p]ermitting evidence of the value of the whole entity to substitute as value of a particular component part (the trade secrets) would defeat the obligation of proving that the alleged trade secrets themselves have independent economic value." *Id.* at 771–72. Otherwise, a plaintiff could "circumvent its burden of proof and redefine 'trade secret.'" *Id.* at 772. Thus, any value Oracle ascribes to its asserted trade secrets is insufficient if it "does not concern the cost of developing an alleged trade secret *itself*; rather, it shows the cost of developing something that was intended to *use* the trade secret." *Chung*, 2024 WL 813445, at *8 (emphases in original). As this Court put it, Plaintiffs are "like that of a restauranteur arguing that his recipe is independently valuable as a trade secret, but presenting evidence only of how much it costs to construct a kitchen." *Id.* Oracle likewise points only to entire product valuations, which do not suffice. *See id.* at *8–9.

25

DATED:  June 17, 2026                    Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By: */s/ Brianne M. Straka*

Michael B. Carlinsky (admitted *pro hac vice*)
michaelcarlinsky@quinnemanuel.com
Alexander Rudis (admitted *pro hac vice*)
alexanderrudis@quinnemanuel.com
Robert F. Longtin (admitted *pro hac vice*)
robertlongtin@quinnemanuel.com
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
Fax: (212) 849-7100

David A. Nelson (admitted *pro hac vice*)
davenelson@quinnemanuel.com
Brianne M. Straka (admitted *pro hac vice*)
briannestraka@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Fax: (312) 705-7401

David Elihu (Bar No. 303043)
davidelihu@quinnemanuel.com
Erin K. Freeman (Bar No. 333462)
erinfreeman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100

Brian L. Saunders (admitted *pro hac vice*)
briansaunders@quinnemanuel.com
Patrick Stafford (admitted *pro hac vice*)
patrickstafford@quinnemanuel.com
555 13th St. NW, Suite 600
Washington, DC 20004
Telephone: (202) 538-8000
Fax: (202) 538-8100

*Attorneys for Defendants*
*Procore Technologies, Inc. and*
*Procore Payment Services, Inc.*

26

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 17th day of June 2026, all counsel of record who are deemed to have consented to electronic services are being served with a copy of this Document via email.

/s/ *Brianne M. Straka*
Brianne M. Straka

PROCORE'S MOTIONS FOR SUMMARY
JUDGMENT                                                    Case No. 4:24-CV-07457-JST