Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
adam.alper@kirkland.com
akshay.deoras@kirkland.com
Telephone: (415) 439-1400

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
695 Town Center Drive, Suite 1700
Costa Mesa, California 92626
michael.devries@kirkland.com
Telephone: (714) 982-8822

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
leslie.schmidt@kirkland.com
Telephone: (212) 446-4800

*Attorneys for Plaintiffs Oracle America, Inc., Oracle International Corporation, and Textura Corporation*

*[Additional counsel listed on signature page]*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| ORACLE AMERICA, INC., ORACLE INTERNATIONAL CORPORATION, and TEXTURA CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>PROCORE TECHNOLOGIES, INC., and PROCORE PAYMENT SERVICES, INC.<br><br>Defendants. | C.A. No. 4:24-cv-7457-JST<br><br>**PLAINTIFFS' OPPOSITION TO PROCORE'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 20, 2026<br>Time: 2:00 pm<br>Location: Courtroom 6<br>Judge: Honorable Jon S. Tigar<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**[PUBLIC REDACTED VERSION]** |

# TABLE OF CONTENTS

Page


**I. INTRODUCTION ........ 1**

**II. RESPONSE TO PROCORE'S FACTUAL BACKGROUND ........ 3**

**III. LEGAL STANDARD ........ 5**

**IV. ARGUMENT ........ 6**

A. Procore's Statute Of Limitations Argument Should Be Rejected ........ 6

1. Procore's Failure To Plead A Statute Of Limitations Defense Or Provide A Timely Disclosure Of This Defense In Discovery Constitutes Waiver ........ 6

2. Procore's Statute Of Limitations Argument Is Wrong On The Merits ........ 8

3. Procore Fraudulently Concealed Its Theft ........ 12

B. Oracle Sufficiently Identified The Asserted Trade Secrets ........ 13

C. Oracle Provided More Than Sufficient Evidence Of Independent Economic Value ........ 23

**V. CONCLUSION ........ 25**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....5, 6

*Asia Vital Components Co. v. Asetek Danmark A/S*,
377 F. Supp. 3d 990 (N.D. Cal. 2019)....7

*Auris Health v. Noah Med. Corp.*,
No. 22-cv-08073, 2024 WL 5294698 (N.D. Cal. Nov. 23, 2024)....14

*Brocade Comms. Sys., Inc. v. A10 Networks, Inc.*,
873 F. Supp. 2d 1192 (N.D. Cal. 2012)....8

*Calendar Research LLC v. StubHub, Inc.*,
No. 17-cv-04062, 2017 WL 10378336 (C.D. Cal. Aug. 16, 2017)....23

*Calendar Rsch. LLC v. StubHub, Inc.*,
No. 17-cv-04062, 2020 WL 4390391 (C.D. Cal. May 13, 2020)....17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....5

*Chung v. Intellectsoft Grp. Corp.*,
No. 21-cv-03074, 2024 WL 813445 (N.D. Cal. Feb. 12, 2024) (Tigar, J.)....6, 7, 8

*Cisco Sys., Inc. v. Chung*,
No. 19-CV-07562-PJH, 2021 WL 427293 (N.D. Cal. Feb. 8, 2021)....6

*Double Eagle Alloys, Inc. v. Hooper*,
134 F.4th 1078 (10th Cir. 2025)....14, 15

*Double Eagle Alloys, Inc. v. Hooper*,
No. 19-cv-243, 2024 WL 3166921 (N.D. Okla. June 25, 2024)....14, 15

*Eyster v. City of Los Angeles*,
131 F.3d 146 (9th Cir. 1997)....6

*Guerrero v. Gates*,
442 F.3d 697 (9th Cir. 2006)....12, 13

*IDX Sys. Corp. v. Epic Sys. Corp.*,
285 F.3d 581 (7th Cir. 2002)....18

*Insulet Corp. v. EOFlow, Co.*,
176 F.4th 1347 (Fed. Cir. 2026)....*passim*

*InteliClear, LLC v. ETC Global Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020) ....................14

*Intelometry, Inc. v. Calpine Energy Sols., LLC*,
No. 25-cv-2796, 2026 WL 926870 (S.D. Cal. Apr. 6, 2026) ....................17

*Khoros, LLC v. Lenovo (United States), Inc.*,
2020 WL 12655516 (N.D. Cal. Oct. 5, 2020)....................20

*LivePerson, Inc. v. [24]7.ai, Inc.*,
No. 17-cv-01268, 2018 WL 5849025 (N.D. Cal. Nov. 7, 2018) (Tigar, J.) ....................14, 19

*Lopez v. G.A.T. Airline Ground Support, Inc.*,
No. 09-CV-2268, 2010 WL 2839417 (S.D. Cal. Jul. 19, 2010) ....................8

*Magana v. Com. of the N. Mariana Islands*,
107 F.3d 1436 (9th Cir. 1997) ....................8

*NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*,
163 F.4th 1096 (7th Cir. 2026) ....................17

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*,
149 F.4th 1081 (9th Cir. 2025) ....................14, 15, 18

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
606 F.3d 262 (6th Cir. 2010) ....................18

*Raytheon Co. v. Indigo Sys. Corp.*,
688 F.3d 1311 (Fed. Cir. 2012)....................10, 13

*Religions Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
923 F. Supp. 1231 (N.D. Cal. 1995)....................24

*Sensoren GmbH v. NVIDIA Corp.*,
No. 23-cv-05721, 2025 WL 2505115 (N.D. Cal. Aug. 28, 2025)....................14, 16

*Stemcell Techs. Canada Inc. v. StemExpress, LLC*,
No. 21-cv-01594, 2022 WL 4021905 (N.D. Cal. Sept. 3, 2022) (Beeler, J.) ....................20, 22

*UA Local 343 v. Nor-Cal Plumbing, Inc.*,
48 F.3d 1465 (9th Cir. 1994) ....................12

*United States v. Diebold, Inc.*,
369 U.S. 654 (1962)....................5

*Yield Dynamics, Inc. v. TEA Sys. Corp.*,
154 Cal. App. 4th 547 (2007) ....................23

**Statutes**

18 U.S.C. § 1836(d) ....................................................................................................8

**Rules**

Fed. R. Civ. P. 8 ........................................................................................................6

## I. INTRODUCTION

Oracle filed this trade secret case after discovering that its former employee, Mark Mariano ("Mariano"), took thousands of highly confidential files when he left to join Procore. The stolen materials contain trade secrets that Oracle (and its predecessor Textura) developed over a decade for its payment management software and enterprise resource planning ("ERP") integrations—functionality essential for any company entering the construction payment management market. Like Oracle, Procore recognized the critical importance of payment management software. But unlike Oracle, Procore had tried and failed for years to develop its own construction payment management software. And even though Procore illegally obtained Oracle trade secrets during its initial development phases, as its own documents acknowledge, [redacted] Procore therefore pursued a new tactic: acquiring Oracle's trade secrets by recruiting Oracle employees. When Mariano joined Procore, he brought thousands of Oracle's confidential materials with him, including source code, technical and product documentation, and business and customer materials related to Oracle's Textura Payment Management ("TPM") solution and its associated ERP integrations. Armed with a massive volume of Oracle's trade secrets, Procore developed competing software products and targeted Oracle's customers. Procore has no answer for this unlawful conduct and has taken no responsibility for it; instead, Procore attempts to evade liability for its actions. Its summary judgment motion is, at best, another such dodge, including by raising, for the first time, an illogical statute of limitations defense never previously asserted, along with yet another repeat of its complaint about Oracle's trade secret identification which has already been rejected twice. Procore's arguments are wrong on the facts and the law, and none come close to meeting the summary judgment standard.

***First***, Procore contends that the statute of limitations bars Oracle's trade secret claims. This argument is both waived and meritless. At the outset, Procore ***never*** raised this defense before its summary judgment motion. Because a statute of limitations defense is an affirmative defense that a defendant must plead in its answer, this failure is fatal to Procore's motion. And on the merits, the argument also fails. Procore fashions a new legal test—based on a misreading of the Federal Circuit's *Insulet* decision—which improperly substitutes well-established legal standards for a purported two-prong "access" and "similarity" test. But its reasoning on both points is fundamentally flawed, and in

no way resembles the facts in *Insulet*. On access, Procore asserts that Oracle should have been on notice of its misappropriation claim on October 19, 2021—the date Mariano gave notice. But Mariano did not leave Oracle until October 29, 2021, less than three years before Oracle filed suit, and Procore cites nothing suggesting Oracle could have known of Mariano's misappropriation before his departure. On similarity, Procore points to Oracle's alleged knowledge of similarities between the companies' products ***before*** Mariano left. But by definition, Procore could not have used trade secrets Mariano stole to implement a similar product ***before*** Mariano brought them to Procore. Even setting all of this aside, substantial fact issues preclude summary judgment. Specifically, fact issues exist regarding Oracle's alleged knowledge of Mariano's theft before he departed. Fact issues also exist as to whether the statute of limitations has been tolled due to Procore's concealment of its theft from Oracle. After Oracle received Mariano's computers in December 2023, Oracle wrote to Mariano and Procore outlining its trade secret concerns. In the ensuing correspondence, in an apparent attempt to avoid litigation, Procore inaccurately claimed Oracle files were not found on Procore's systems or Mariano's computer. Procore reversed course in discovery, admitting the files had in fact been found, and has offered no explanation for its prior false statement. Thus, even if Procore had a cognizable statute of limitations defense—which it does not—the limitations period was tolled due to Procore's fraudulent concealment. At a minimum, these factual disputes certainly preclude summary judgment.

***Second***, Procore contends that Oracle failed to identify its trade secrets with "sufficient particularity." This argument does not come close to meeting the standard for summary judgment: even putting aside that the Court has now found ***twice*** that Oracle's trade secret identification is sufficient—in rejecting Procore's motion to dismiss and separately its motion to compel—Oracle has since provided even more extensive detail regarding its trade secrets through hundreds of pages of disclosures, interrogatory responses, and expert reports. Moreover, Oracle's witnesses were questioned at length about these trade secrets during depositions, and Procore never sought additional time to examine them further. At best, this issue presents factual disputes for the jury to resolve, as the Ninth Circuit recently confirmed and cannot support summary judgment.

***Third***, Procore makes a half-hearted argument in a handful of sentences that Oracle purportedly has not provided evidence of independent economic value for its trade secrets. This

argument wholly disregards the record in this case. Oracle has provided significant evidence of economic value in its expert reports, deposition testimony, and discovery responses. Procore's disagreement with that valuation is not a basis for summary judgment; it is a fact issue for the jury.

## II. RESPONSE TO PROCORE'S FACTUAL BACKGROUND

Oracle filed this lawsuit on October 25, 2024, after discovering that its ex-employee Mark Mariano took thousands of Oracle documents when he left to join Procore. Discovery revealed that Procore used those trade secrets—along with others solicited from Oracle customers—to develop Procore Pay, integrations for Procore Pay, and upgrades to its Project Financials software.

***Oracle and Procore Development.*** The development of Oracle's TPM product began at Textura in approximately 2006, and Oracle acquired Textura in 2016 for $663 million. Ex. A, Johnson Dep. Tr. 52:16-53:11; Ex. 37, Almeroth Rep. ¶ 39. Oracle continued to invest in TPM after the acquisition, developing TexturaLink Cloud in 2018 and launching new ERP integrations. Ex. 37, Almeroth Rep. ¶¶ 536-540. In contrast, Procore struggled to develop a competitive solution—its first attempt at Procore Pay in 2019 was internally branded a [redacted]—and thus took a variety of steps to learn all it could about Textura, whether or not that information was public. *See, e.g.*, Ex. 37, Almeroth Rep. ¶ 648; Ex. C, Procore04803152 at -160; Ex. 6, Procore01691066 at -068-069; Ex. D, Sandoval Dep. Tr. 78:11-21. Through that process, Procore acquired and used confidential Textura documentation, set up secret meetings with Textura customers to learn non-public information, solicited confidential Textura materials from customers, and hired ex-Textura employees such as Mariano to bring confidential material to Procore. *See, e.g.*, Ex. 37, Almeroth Rep. ¶ 648.

***Mariano's Departure from Oracle.*** Mariano departed Oracle on October 29, 2021. Ex. 37, Almeroth Rep. ¶ 51. Oracle subsequently sent Mariano his separation package on November 5, 2021, reminding him of his obligations to maintain the confidentiality of all Oracle proprietary information (including trade secrets) under his Oracle Proprietary Information Agreement and return his Oracle-issued devices. Ex. 13, MARIANO 001265. Instead of following his legal obligations, Mariano exfiltrated Oracle trade secrets including by improperly keeping and using Oracle's laptops (and the Oracle trade secrets on them), and uploading Oracle files to his cloud accounts including Google Drive. Dkt. 341-3, Crain Rep. ¶¶ 56-69, 87-120.

***Oracle's Notice to Procore and Mariano.*** In December 2022, when Oracle realized that Mariano had not sent back his Oracle laptops, an employee at Oracle contacted Mariano regarding their return. Ex. R, ORC-PRC-02432421. Mariano initially told Oracle that he no longer had the laptops and thought he had returned them. *Id.*; Ex. S, ORC-PRC-02432422. He later admitted that he knew these statements were inaccurate when he made them, because he knew he had the Oracle laptops and had not returned them. Ex. E, M. Mariano Dep. Tr. 556:9-557:3. Once Oracle was eventually able to retrieve the laptops, Oracle's forensic analysis revealed that, while at Procore, Mariano had accessed and used Oracle's trade secrets. Dkt. 341-3, Crain Rep. ¶¶ 14-17. On July 13, 2023, Oracle wrote to Mariano and Procore regarding its concerns. *See* Ex. J, July 13, 2023 Ltr to Procore. Procore refused to provide fulsome information concerning the full scope of access and use of Oracle materials at Procore, and made incorrect representations concerning the acquisition and use of Oracle trade secrets, including by denying in August 2023 that Oracle files had been found on Procore's systems or Mariano's computer—a fact which Procore later conceded in discovery. Ex. K, Aug. 17, 2023 Ltr to Oracle; Ex. M, Procore's Supp. Resp. to Oracle's First Set of Interrogs. (Interrog. No. 7) at 138-139.

***Procore and Mariano Used Oracle's Trade Secret Information at Procore.*** Mariano's last day at Oracle was October 29, 2021, and on November 1, 2021, Mr. Mariano joined Procore as a Director in a role highly similar to his job at Oracle. Ex. 37, Almeroth Rep. ¶ 51; Ex. 10, Ibbs Rep. ¶¶ 314-16. He wasted no time accessing the stolen Oracle information. Just weeks after joining Procore, Mariano [redacted]. *See, e.g.*, Ex. 37, Almeroth Rep. ¶¶ 814, 834-836. The next day, Procore employees announced that Mariano [redacted] and noted that this development would [redacted] *Id.*; *see also* Ex. F, Procore00253266. This is just one example of Procore's extensive misappropriation: over the course of several years, Mariano shared confidential Oracle trade secrets widely throughout Procore on everything from Procore Pay's development to integrations and new projects mirroring his

Oracle work.[1] *See, e.g.*, Ex. 37, Almeroth Rep. ¶¶ 648-650, §§ VI.E-VI.F.

Procore contends that "only six purported trade-secret files were ever present on a Procore device." Mot. at 4. This is incorrect. Mariano downloaded at least 15 Oracle trade secret files to his Procore laptops, viewed Oracle trade secrets on a MacBook he retained containing at least hundreds of Oracle trade secrets for purposes of his work at Procore before wiping that device, retained extensive paper copies of Oracle trade secrets, and also had access to thousands of Oracle files on his cloud accounts—and, critically, shared the information from all these sources throughout Procore. *See, e.g.*, Dkt. 341-3, Crain Rep. ¶ 16; Ex. 37, Almeroth Rep. § VI.D. Any lack of additional forensic evidence results from Mariano's factory reset of his Oracle MacBook—which he indisputably used to access Oracle trade secrets while at Procore—thereby deleting additional forensic evidence of access. *See* Dkt. 305-3 (Oracle's Motion for Adverse Inference). Moreover, in evidence that Procore entirely ignores, Procore also received extensive trade secret information from Oracle customers subject to NDAs, and then used those materials to develop its products. Ex. 37, Almeroth Rep. ¶¶ 590-591.

## III. LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if under governing substantive law it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view all underlying facts and reasonable inferences in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). To defeat summary judgment, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *Anderson*, 477 U.S. at 249 (internal quotation omitted). The key inquiry is whether "a fair-minded jury ***could***

---

[1] Procore's contention that discovery "proceeded on Oracle's contention that its trade secrets constituted a file identified by an MD5 hash" (Mot. at 3) is wholly incorrect. Oracle has consistently maintained that its trade secrets include confidential files ***and their contents***, as the Court specifically found in denying Procore's motion to dismiss ("Oracle . . . lists specific documents and ***describes the alleged trade secret nature of their contents***") and Procore's motion to compel ("***The weight of authority supports the conclusion that this identification is sufficiently particular.***"). Dkt. 76 at 10-11; Dkt. 206 at 4; Dkt. 242.

return a verdict for the plaintiff on the evidence presented." *Id.* at 252.

## IV. ARGUMENT

### A. Procore's Statute Of Limitations Argument Should Be Rejected

#### 1. Procore's Failure To Plead A Statute Of Limitations Defense Or Provide A Timely Disclosure Of This Defense In Discovery Constitutes Waiver

Procore's statute of limitations defense is waived because Procore never pleaded it in its Answer, let alone disclosed a factual basis for the defense it now pursues in discovery. Fed. R. Civ. P. 8(c) requires a party to "affirmatively state any avoidance or affirmative defense, including: . . . statute of limitations . . . ." Fed. R. Civ. P. 8(c); *see also Eyster v. City of Los Angeles*, 131 F.3d 146 (9th Cir. 1997) ("The general rule is that a defendant should assert in his first responsive pleading that the plaintiff has failed to comply with the statute of limitations."). When a defendant fails to plead such a defense, the remedy is waiver. *See Chung v. Intellectsoft Grp. Corp.*, No. 21-cv-03074, 2024 WL 813445, at *2, 5-6 (N.D. Cal. Feb. 12, 2024) (Tigar, J.) (denying summary judgment on statute of limitations where defendants failed to plead defense and barring defendants from raising defense). None of the seven affirmative defenses in Procore's Answer mentions statute of limitations. Dkt. 86 at 22-25. Procore's third affirmative defense—"laches"—asserts that Oracle "delay[ed]" in bringing suit, "prejudic[ing] Procore given the significant efforts and resources Procore has expended in developing its technology during such time period." Dkt. 86 at 23. But a laches defense is distinct from a statute of limitations defense (*see Cisco Sys., Inc. v. Chung*, No. 19-CV-07562-PJH, 2021 WL 427293, at *8 (N.D. Cal. Feb. 8, 2021)), and pleading laches is thus insufficient to provide fair notice of a statute of limitations defense. Procore also asserted a catch-all sixth affirmative defense of "[o]ther [a]ffirmative [d]efenses," purporting to "reserve[] any and all other defenses." Dkt. 86 at 25. To the extent Procore relies on this catch-all to support its argument, that too fails. Under Fed. R. Civ. P. 8, Procore must affirmatively plead its statute of limitations defense—not merely reserve the possibility that other defenses might become apparent. *See Chung*, 2024 WL 813445, at *6 (rejecting contention that a catch-all "failure to state a claim" defense supported statute of limitations defense).

Procore's discovery responses likewise confirm that this defense is untimely. Procore never even mentioned the statute of limitations until its supplemental responses on March 16, 2026—***the***

***last day of fact discovery***—when it amended its responses to Oracle's interrogatories seeking the bases for Procore's affirmative defenses. Ex. G, Procore's March 16, 2026 Supp. Resps. to Oracle's Second Set of Interrogs. at 57. But even those untimely responses failed to include any facts or legal theories supporting the defense Procore now presents for adjudication. First, in its response regarding its "laches" defense, Procore contended that "***Oracle's claim is barred by laches*** to the extent it relies on conduct that occurred prior to October 25, 2021, as any such conduct is outside the limitations period." *Id.* at 58. This response—which says nothing about the statute of limitations—is conditional at best, and at most supports a laches defense by reference to Oracle's "reliance" on certain conduct; not a statute of limitations defense. Second, Procore referred to a ***potential*** statute of limitations defense in its response regarding its catch-all sixth affirmative defense. *Id.* Once again, Procore cannot evade its failure to plead a statute of limitations defense by shoehorning it into a discovery response for a catch-all defense on the last day of discovery. *See Chung*, 2024 WL 813445, at *6 (rejecting attempt to use catch-all defense for statute of limitations); *Asia Vital Components Co. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990, 1003–05 (N.D. Cal. 2019) (granting motion to strike defense not disclosed in defendant's interrogatory responses). But even then, the "theory" in Procore's last-day-of-discovery interrogatory response is completely different than the one Procore presents for the first time here. In its interrogatory response, Procore contended that Oracle's claims were barred "to the extent [Oracle] relies on conduct that occurred prior to October 25, 2021," which, according to the response, referred to Procore's gathering of Oracle information in early 2021, "months before Procore ever communicated with Mark Mariano." Ex. G, Procore's March 16, 2026 Supp. Resps. to Oracle's Second Set of Interrogs. at 57-58. That purported "theory"—which conditionally relies on Procore's separate misappropriation of Oracle trade secrets ***before*** Mariano joined Procore[2]—is entirely different from what it argues here, *i.e.*, that Oracle should have been on notice of a potential trade secret misappropriation claim on October 19, 2021—the day Mariano gave notice, ***after*** he had accepted employment at Procore. Mot. at 1. Nowhere in any of Procore's responses does it ***ever*** raise this theory or even mention October 19, 2021, as the date Oracle purportedly should have been on

---

[2] Tellingly, Procore does not raise that theory in its motion, for good reason: there is zero evidence in the record that anyone at Oracle knew Procore misappropriated Oracle trade secrets in that time.

notice. *Asia Vital Components*, 377 F. Supp. 3d at 1003–05.

Although the Ninth Circuit has found in certain situations that raising an affirmative defense for the first time at summary judgment may be excused "only if the delay does not prejudice the plaintiff," *Chung*, 2024 WL 813445, at *5 (citing *Magana v. Com. of the N. Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997)), Oracle is significantly prejudiced here. *Id.* (finding prejudice where plaintiffs were unable to "conduct discovery into these defenses"). Because Procore never pleaded the defense and referred to it only vaguely by way of a different theory on the last day of discovery, Procore prevented Oracle from taking discovery on the defense and "deprived Plaintiffs of the opportunity to fully litigate the issue." *Chung*, 2024 WL 813445, at *5-6 (quoting *Lopez v. G.A.T. Airline Ground Support, Inc.*, No. 09-CV-2268, 2010 WL 2839417, at *8 (S.D. Cal. Jul. 19, 2010)). Had Procore raised this defense as required, Oracle could have conducted discovery into Oracle's lack of knowledge, Mariano's concealment of his theft, Procore's concealment of its theft and use of the trade secrets, and Mariano's activities between his notice date and his departure.

The Court should deny Procore's motion for summary judgment on statute of limitations grounds and bar Procore from raising this defense at trial. *See Chung*, 2024 WL 813445, at *6.

### 2. Procore's Statute Of Limitations Argument Is Wrong On The Merits

Procore's statute of limitations argument also fails on the merits. Under the DTSA, an action for trade secret misappropriation "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). Mariano left Oracle on October 29, 2021, and joined Procore on November 1, 2021. Ex. 37, Almeroth Rep. ¶ 51. Oracle filed suit ***less than three years later***, on October 25, 2024. Unsurprisingly, Procore's motion does not identify any evidence that Oracle discovered or "should have" discovered Procore's misappropriation of its trade secrets before the expiration of the limitations period, and the motion should therefore be denied. *See, e.g.*, *Brocade Comms. Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1217 (N.D. Cal. 2012) (denying summary judgment on defendants' statute of limitations defense).

Faced with these facts, Procore attempts to construct an all-new "two prong" test based on the decision in *Insulet Corp. v. EOFlow, Co.*, 176 F.4th 1347 (Fed. Cir. 2026). Mot. at 5-6 (referring to

an "access prong" and a "similarity prong"). To the extent Procore suggests that *Insulet* represents a change in the law, it is mistaken. In fact, the Court in *Insulet* confirmed that it would have reached the same conclusion under any of the proposed legal standards—not just an "inquiry notice" standard, as Procore suggests—given that the plaintiff had actual notice of misappropriation more than three years before filing suit. *Id.* at 1354. The Court explained that "[t]he relevant question is ultimately whether Insulet had sufficient knowledge to state a claim for trade secret misappropriation before the critical date." *Id.* at 1356. Insulet did have the required knowledge: Insulet "plainly had at least a cause for concern that defendants had engaged in prohibited conduct" before the critical date of August 3, 2020, because internal emails from March 2019 showed that Insulet "knew its [former employee] worked with EOFlow on the [accused product]." *Id.* at 1353, 1359. Evidence further showed that Insulet knew "EOFlow had developed a similar, competing product before the critical date." *Id.* at 1360.

Neither circumstance is present here, and regardless of which legal test is employed (the "inquiry notice" standard or the "discovery" standard), Procore cannot demonstrate that the statute of limitations bars Oracle's claims. ***First***, Procore contends Oracle knew or should have known of Procore's misappropriation on October 19, 2021, at the time Mariano gave notice of his departure. Mot. at 6. That is nonsense: at the time he gave notice, Mariano was still working for Oracle, and Procore identifies no evidence that anyone at Oracle knew or should have known that Mariano would ***in the future*** take confidential materials with him when he left for use at his future employer. Nor does Procore cite any evidence indicating that anyone at Oracle knew or should have known that Mariano would not return his Oracle computers as instructed when he departed. These facts are entirely unlike *Insulet*, where Insulet ***knew*** that its employees had "access" to the trade secrets when they departed ***four years*** before the critical date, and also ***knew*** that the products they later worked on at EOFlow incorporated the trade secrets ***four years*** before the critical date.

Faced with this incongruity, Procore attempts to argue that, at the time of Mariano's departure, Oracle employees understood "the potential risk" because they urged locking down Mariano's Oracle access when he gave notice. Mot. at 6-7. But as Oracle's witness Mike Antis explained, terminating access is standard procedure for any Oracle employee who leaves to join a competitor. Ex. H, Antis Dep. Tr. 59:8-60:25. And the mere fact that Oracle employees were unhappy that Mariano departed

to join a competitor (*see* Mot. at 6-7) does not indicate a belief that Mariano had or would misappropriate Oracle materials in the future. As Oracle's employee Mark Webster explained, Oracle was simply unhappy that it was losing a valued employee and did not expect trade secret theft: [redacted] Ex. I, Webster Dep. Tr. 187:6-188:3, 190:16-191:3 [redacted]. At a minimum, the question of what Oracle employees knew or should have known presents factual issues unsuitable for summary judgment. *See, e.g.*, *Raytheon Co. v. Indigo Sys. Corp.*, 688 F.3d 1311, 1318-19 (Fed. Cir. 2012) (reversing summary judgment on statute of limitations grounds because of genuine issues of fact).

Procore also argues that Oracle was on notice of Mariano's activity because Mariano used his Gmail account to communicate with Oracle employees after he gave notice. Mot. at 7. This argument also is meritless. In the documents Procore cites (*e.g.*, Ex. 23, MARIANO 001291; Ex. 24, ORC-PRC-00162264), Oracle employees reached out to Mariano ***while he was still employed at Oracle*** to troubleshoot an error relating to a project Mariano was working on before he gave notice. Oracle has never asserted that this activity was improper or constituted misappropriation. Accordingly, this communication does not indicate that anyone at Oracle was on notice of Mariano's theft, and at a minimum, presents substantial fact disputes for the jury.

Procore next contends that Mariano's activity relating to [redacted] gave Oracle reason to suspect misappropriation. Mot. at 7. Here again, Procore cannot demonstrate that Oracle knew or should have known that Mariano had this file on his iCloud account or that Mariano modified this file. That information was not revealed until discovery in this litigation. Ex. 27 (Oracle's March 16, 2026 Response to Procore's Interrogatory No. 4) at 41-42. And Mariano's emailing of that file to an Oracle employee while employed by Oracle (Ex. 28 (MARIANO

001310)) could not have put Oracle on notice that Mariano would use this file at Procore.[3]

***Second***, when it comes to Procore's "similarity" prong, Procore does not identify any evidence that Oracle knew or should have known that Mariano was working with Procore on a competing product by October 19, 2021, before Mariano left Oracle's employment. Here, Procore's arguments and purported evidence are simply bizarre and at best reflect an extremely strained attempt by Procore to fit the facts of this case into its made-up "two prong" test from *Insulet*. Mariano joined Procore in November 2021, yet all of the evidence Procore cites of Oracle's alleged knowledge of "similarity" in Procore's competing product relates to events ***before*** Mariano's arrival. *See* Mot. at 8-10. It makes no sense to argue that Oracle was on notice of Procore's potential misappropriation because it knew Procore was working on a similar product ***before*** the alleged acquisition of trade secrets through Mariano. Specifically, Procore cites documents from September 2021 allegedly suggesting that Oracle knew Procore was developing a competing payment management solution. *See* Ex. 34 (ORC-PRC-00163057 (Procore August 25, 2021 earnings call transcript)); Ex. 35 (ORC-PRC-00161222) (September 2021 email); Ex. 12 (ORC-PRC-00558634) (September 2021 email). Each of these documents relates to events or features that occurred ***before*** Mariano gave notice, and critically, ***before*** Procore alleges that Oracle knew or should have known of Procore's access. Likewise, Procore cites a document from July 2020 (Ex. 11 (ORC-PRC-00233679)) allegedly indicating that Oracle knew Procore was working on a payment management solution at that time. Again, this document far predates Mariano's notice date, and Procore has not shown any evidence suggesting that Oracle knew or should have known that Procore had accessed Oracle trade secrets when it was working on a payment management solution in July 2020. Procore next refers (again) to Oracle's alleged knowledge of Procore's purchase of INDUS.AI, which occurred in July 2021 (Ex. 31 (ORC-PRC-01884753)), but Procore does not identify any reason to suggest that Oracle knew or should have known that

---

[3] Procore also contends in a footnote that Oracle should have known of Procore's access due to Procore's acquisition of INDUS.AI, a Textura customer. Mot. at 8 n.3. Procore cites no evidence to indicate that anyone at Oracle knew or should have known that INDUS.AI provided Procore with access to its instance of Textura—a fact that Oracle did not uncover until discovery in this litigation. *See* Ex. 37, Almeroth Rep. ¶ 235. Procore's argument boils down to an assertion that any time a competitor acquires another company's customer, it is on notice of potential misappropriation. This is not the law, and Procore does not cite any authority holding otherwise.

INDUS.AI gave Procore access to Oracle trade secrets. Indeed, the document Procore cites [redacted], without any indication that anyone at Oracle had any reason to suspect that INDUS.AI would give Procore access in violation of its customer agreements with Oracle.

Lastly, Procore contends that Oracle's claims should be time-barred because Oracle's interrogatory responses state that Mariano's exfiltration began while he was working at Oracle. Mot. at 9-10. Critically, however, Procore does not cite ***any*** evidence indicating that Oracle knew or should have known at the time that Mariano was exfiltrating these materials; rather, that only became apparent through the discovery process in this litigation, when Procore and Mariano produced documents and made devices available for forensic discovery. Ex. 37, Almeroth Rep. ¶ 642.

### 3. Procore Fraudulently Concealed Its Theft

Procore's fraudulent concealment provides an additional basis to reject Procore's argument. The statute of limitations for bringing a claim under the DTSA can be tolled if the trade secret misappropriator engages in "fraudulent concealment." *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1475 (9th Cir. 1994). Fraudulent concealment requires "active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time." *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir. 2006). Here, at least Procore's actions during the pre-suit period qualify as fraudulent concealment. Specifically, after Oracle sent Procore a letter outlining its concerns that Oracle information had been used or disseminated, Procore assured Oracle that no Oracle proprietary files or information was found in Procore's systems:

[redacted]

Ex. K, Aug. 17, 2023 Ltr to Oracle. Procore continued its concealment well into 2024: following additional correspondence from Oracle identifying Oracle files it believed Mariano took, Procore asserted that [redacted]

[redacted] Ex. L, Sept. 12, 2024 Ltr to Oracle. These statements—which were clearly intended to stop Oracle from pursuing its investigation—were inaccurate. Indeed, as Procore itself admitted in an interrogatory response after litigation was filed, confidential Oracle files that Oracle identified ***had been found*** on Mariano's Procore laptop. *See, e.g.*, Ex. M, Procore's Supp. Resp. to Oracle's First Set of Interrogatories (Interrogatory No. 7) at 138-139 [redacted]. Procore and its witnesses have provided no explanation for Procore's counsel's inaccurate pre-suit assertion that no files were found. *See, e.g.*, Ex. N, Courtemanche Dep. Tr. 146:12-148:7. Because Procore engaged in active conduct to conceal its theft—above and beyond Procore's wrongdoing in acquiring and using Oracle's trade secrets—the doctrine of "fraudulent concealment" applies to toll the statute of limitations. *Guerrero*, 442 F.3d at 706. This too at a minimum creates material fact issues for the jury to decide. *Raytheon*, 688 F.3d at 1316-17 (Fed. Cir. 2012) (noting that application of fraudulent concealment is question of fact).

**B. Oracle Sufficiently Identified The Asserted Trade Secrets**

Procore next argues—for the third time in this case—that Oracle has not "adequately identified" its trade secrets. Mot. at 10-11. This Court has already rejected that argument twice: first in denying Procore's motion to dismiss, and again in denying Procore's motion to compel. Dkt. 76 at 10-12 (denying Procore's motion to dismiss and noting that "Oracle identifie[d] specific categories of alleged trade secret materials" and "[t]he complaint then lists ***specific documents and describes the alleged trade secret nature of <u>their contents</u>***."); Dkt. 206 at 3-5 (Judge Beeler denying Procore's motion to compel particularized trade secret disclosures, noting that "[t]he weight of authority supports the conclusion that [Oracle's] identification is sufficiently particular."); Dkt. 242 at 1-2 (denying Procore's motion for relief from Judge Beeler's Order, noting that "Procore has identified no basis for the Court to conclude that Judge Beeler's factual finding that the trade secret disclosures at issue satisfied the 'sufficient particularity' standard was clearly erroneous"). Nothing in Procore's renewed argument warrants a different result. In fact, Procore simply resorts to its same playbook: it once again mischaracterizes Oracle's trade secret disclosures and disregards the detailed descriptions Oracle

provided in its discovery responses, deposition testimony, and expert reports. For each trade secret, Oracle describes its contents and explains why those contents merit trade secret protection, including through specific quotes and screenshots of the files. The law does not require more. Dkt. 206 at 3-5.

Tellingly, Procore's motion fails to acknowledge that, as the Ninth Circuit recently confirmed, "[w]hether a trade secret is identified with 'sufficient particularity' is a question of fact." *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1085, 1087 (9th Cir. 2025). This principle applies not only "at the pleading stage and through fact discovery," as Procore suggests (Mot. at 1), but at summary judgment as well. At summary judgment, Oracle need only raise a genuine issue of material fact as to whether it "describe[d] the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those parties … skilled in the trade." *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658-59 (9th Cir. 2020) (reversing grant of summary judgment because of genuine issues of fact as to trade secret particularity) (quotation omitted). To satisfy this standard, trade secret plaintiffs need not "compose their identifications as if they were patent claims," nor must they parse "what parts of the cited document are being claimed." *Auris Health v. Noah Med. Corp.*, No. 22-cv-08073, 2024 WL 5294698, at *2 (N.D. Cal. Nov. 23, 2024); *see also LivePerson, Inc. v. [24]7.ai, Inc.*, No. 17-cv-01268, 2018 WL 5849025, at *10 (N.D. Cal. Nov. 7, 2018) (Tigar, J.) (denying summary judgment and holding that plaintiff need not parse out portions of a trade secret XML file to sufficiently identify the trade secret); *Valeo Schalter und Sensoren GmbH v. NVIDIA Corp.*, No. 23-cv-05721, 2025 WL 2505115, at *4 (N.D. Cal. Aug. 28, 2025) (denying summary judgment where plaintiffs' disclosures "include[d] references to specific source code files, documents, and figures that illustrate particular functionalities are protectable trade secrets"). Oracle's approach satisfies this standard. Oracle identified specific trade secret files, described their contents (including with screenshots), explained why they qualify as trade secrets, and categorized the files by their contents. Courts routinely hold that such identifications—and even far less detailed ones—are sufficient. *See, e.g.*, *Valeo*, 2025 WL 2505115, at *4; *InteliClear*, 978 F.3d at 658-59.

Procore's reliance on *Double Eagle Alloys, Inc. v. Hooper*, No. 19-cv-243, 2024 WL 3166921 (N.D. Okla. June 25, 2024), *aff'd*, 134 F.4th 1078 (10th Cir. 2025), is misplaced, as that case concerned

an entirely different situation. There, Double Eagle "point[ed] to the information downloaded by [the former employee] and argue[d] that some or all of it falls into categories that may be protected," without explaining the trade secret nature of its information. 2024 WL 3166921, at *1. As the court explained, this is insufficient, because "the fact that certain information falls into categories that 'may' or 'can' include trade secrets does not mean that Double Eagle's information is entitled to trade-secret protection under the particular facts of this case." *Id.* at *2. Moreover, Double Eagle never explained the trade secret nature of its information, *i.e.*, whether the trade secrets were documents "as a whole" or some specific aspect. 134 F.4th at 1092. Oracle's trade secret identification is far more particular: Oracle concretely identified the asserted trade secret files and described their contents in detail.

Procore purports to walk through each category of Oracle's asserted trade secrets to show why Oracle has failed to describe them with sufficient particularity, Mot. at 13-23, but its analysis fails to address each asserted trade secret. For the trade secrets Procore does address, it mischaracterizes Oracle's disclosures, ignoring large swaths of information Oracle provided and cherry-picking phrases divorced from context. Instead, Procore raises a hodgepodge of highly factual assertions that do not come close to the kinds of arguments that would justify summary judgment, including disagreements over secrecy, unsupported claims of public availability and challenges to detailed misappropriation evidence. *Quintara*, 149 F. 4th at 1085. For the reasons explained below, Procore fails to demonstrate that summary judgment is warranted with respect to any particular trade secret; to the contrary, Oracle's descriptions are far more than sufficient to raise genuine issues of material fact.

**Category A(i): TPM Solution (Source Code) (ATS Nos. 1–5):** This category contains source code files related to Oracle's Textura Payment Management ("TPM") solution that Procore misappropriated. Procore contends that "Oracle never identifies what within these files . . . is not generally known," Mot. at 17, but Procore never seriously engages with Oracle's descriptions of these files or explains why those descriptions are deficient. Instead, Procore asserts in conclusory fashion that Oracle "parrot[s] the same template opinion with minimal variation." *Id.* This is simply incorrect. Oracle and its experts provide a narrative description of what each source code file is, describe the contents of the file and explain why trade secret protection is warranted, and explain why the file derives independent economic value from not being generally known. For example, for the [redacted]

source code file, Oracle explains that it is [redacted] Ex. 25, Oracle's 5th Amended Trade Secret Disclosures at 43. Oracle further explains that this file [redacted] and [redacted] *Id.* Dr. Almeroth further explains that the file [redacted] Ex. 37, Almeroth Rep. ¶ 95. He further explains that this file [redacted] (also claimed as trade secrets), [redacted], citing evidence from Oracle's fact witness explaining the same. *Id.* ¶¶ 97-98 (citing testimony from Steve Chin). Procore never addresses—or even acknowledges—this discussion, let alone explains why it is insufficient. Oracle and its experts provide similar detail for the other trade secrets in this category. *See*, *e.g.*, *id.* ¶¶ 106-111 (describing [redacted]).

Procore's argument that Dr. Almeroth never identified evidence of direct copying of code from Oracle's source code trade secret files to Procore's source code files is irrelevant: Oracle does not need to show direct copying to establish misappropriation. *See Valeo*, 2025 WL 2505115, at *4-5 ("[m]isappropriation includes . . . not only wholesale pirating of an idea[], but also the unauthorized utilization of an idea as a starting point or guide"). Oracle provided evidence that Procore acquired and used these trade secrets in developing its products by analyzing the files Mariano acquired and comparing those files with Procore's development work. *See, e.g.*, Ex. 37, Almeroth Rep. ¶¶ 990-995.

**Category A(ii): TPM Solution (Non-Source Code) (ATS Nos. 6-10):** This category contains non-source code files related to Oracle's TPM solution. Procore's contention that Oracle "fails to identify why any of these files, or their specific contents, constitute a trade secret" (Mot. at 13) is incorrect, as is its designation of this trade secret as a "catchall." Mot. at 13. This is not a "catchall"—

it is a specific trade secret relating to confidential aspects of Oracle's TPM software that Procore obtained through three illicit sources: [redacted]. *See, e.g.*, Ex. 37, Almeroth Rep. ¶¶ 76, 230-232. As set forth in detail in Oracle's discovery responses and expert reports, these sources gave Procore access to non-public aspects of TPM that no one else would have without signing an Oracle NDA, including specifics regarding [redacted] *See, e.g.*, Ex. 37, Almeroth Rep. ¶¶ 76, 230-232.

Procore's arguments fail, and at best present material fact issues. ***First***, Procore is wrong that alleged "customer-facing features" of TPM are not protectable. Oracle's customers agree to confidentiality provisions prohibiting them from "access[ing] or us[ing] the Services to build or support, directly or indirectly, products or services competitive to Oracle." Ex. O, ORC-PRC-00001575 §§ 3.4, 4.1-4.3. These provisions prohibit precisely the conduct that occurred here. Ex. O, ORC-PRC-00001575 § 3.4 ("You may not, and may not cause or permit others to . . . access or use the Services to build or support, directly or indirectly, products or services competitive to Oracle"); *see also id.* §§ 4.1-4.3; Ex. 37, Almeroth Rep. ¶ 577. These customer agreements prohibit precisely the conduct that these customers engaged in with Procore—namely, using Oracle's TPM software to "build or support . . . products . . . competitive to Oracle." Ex. O, ORC-PRC-00001575 § 3.4. [redacted] Ex. B, Lewis Dep. Tr. 76:18-77:7, 82:9-18.

Procore's cited cases are inapposite because they involved plaintiffs who failed to impose confidentiality restrictions on customers or who defined trade secrets in "vague and generic language." *See NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1096, 1096-97 (7th Cir. 2026). Likewise, both *Calendar Rsch. LLC v. StubHub, Inc.*, No. 17-cv-04062, 2020 WL 4390391, at *10 (C.D. Cal. May 13, 2020), and *Intelometry, Inc. v. Calpine Energy Sols., LLC*, No. 25-cv-2796, 2026 WL 926870, at *5 (S.D. Cal. Apr. 6, 2026), involved situations where plaintiffs attempted to claim broadly that their publicly available user interfaces were trade secrets, with no indication that

dissemination or distribution was limited or that confidentiality protections existed. In *IDX Sys. Corp. v. Epic Sys. Corp.*, the plaintiff "effectively assert[ed] that all information in or about its software is a trade secret." 285 F.3d 581, 583-84 (7th Cir. 2002). Because the plaintiff failed to provide any further explanation, the court rejected its trade secret claims, even for internal algorithms that were not readily ascertainable. *Id.* The other case Procore cites, *R.C. Olmstead, Inc. v. CU Interface, LLC*, illustrates that the key distinction is whether the trade secret owner imposes confidentiality restrictions on customers or not. 606 F.3d 262, 276–77 (6th Cir. 2010). In *R.C. Olmstead*, a software developer attempted to claim its user interface as a trade secret but was unable to show any confidentiality restrictions reasonably designed to maintain its secrecy. *Id.* (noting that the plaintiffs testified that the customer contract "did not contain any confidentiality provisions preventing third parties from viewing the interface"). Here, the situation is the opposite: Oracle has identified specific confidential portions of its interfaces and has NDA provisions restricting customer use.

***Second***, Procore is also wrong that Oracle disclosed this material in patents or public videos. *See* Mot. at 14. In its trade secret disclosures and expert reports, Oracle highlighted specific confidential aspects not disclosed publicly, and Dr. Almeroth confirmed that none of that material was publicly disclosed. Ex. 37, Almeroth Rep. ¶¶ 75-76. Procore never maps any alleged public disclosure to any Oracle trade secret, and certainly does not demonstrate that the specific confidential material Oracle highlighted in its disclosures and expert reports was disclosed. At most, Procore has raised a factual dispute as to whether the material Oracle has identified was publicly disclosed, not resolvable on summary judgment. *Quintara*, 149 F. 4th at 1085.

For the [redacted] trade secret in this category, Oracle and its experts explain that this file reflects [redacted] Ex. H, Antis Dep. Tr. 173:4-13; Ex. 37, Almeroth Rep. ¶¶ 267-271. Procore's assertion that [redacted] but the specific information in this file reflects ***Oracle's*** confidential approach to [redacted]. Ex. 9, 113:20-114:9; Ex. 10, Ibbs Rep. ¶ 88. Likewise, although Procore contends this presentation was disclosed [redacted]

[redacted], Procore provides no evidence that [redacted], and Oracle's experts disagree with Procore's conclusions. *See, e.g.*, Ex. 37, Almeroth Rep. ¶ 270. Procore is also incorrect that Oracle's experts "were unable to articulate what in this file is allegedly a trade secret." Mot. at 16. Both of Oracle's experts articulated why this file constituted a trade secret, as noted above. And while the experts refused to "[redacted]" (Ex. 9 at 108:5-24), that is not required, and Procore identifies no authority requiring Oracle to parse each line or slide. *See LivePerson*, 2018 WL 5849025, at *10.

For the remaining trade secrets in this category, Oracle and its experts explain in detail why each constitutes a trade secret, contrary to Procore's assertions. *See, e.g.*, Ex. 37, Almeroth Rep. ¶¶ 256-60 (for [redacted]); ¶¶ 292-295 (for [redacted] and noting that the value of the presentation was demonstrated by the fact that Mariano kept a laminated copy on his desk); ¶¶ 296-299 (for [redacted] and is not publicly available information).

**Category B: Oracle ERP Integrations (ATS Nos. 11–13).** This category concerns integrations with ERP software provided by Oracle, such as [redacted]. Procore again fails to address Oracle's and its expert's actual description of these trade secrets, instead relying upon individual quotes without context. Mot. at 17-18. Contrary to Procore's assertions, Oracle provided significant detail regarding these trade secrets, including by providing a description of each file and its contents and explaining why the file qualifies as a trade secret. *See, e.g.*, Ex. 37, Almeroth Rep. ¶¶ 310-323.

Procore contends that ATS 13 is "illustrative" and alleges that "Oracle's experts reproduce select screenshots from the file and say nothing about their contents." Mot. at 18. Not so. Oracle's disclosures and expert reports describe in detail the contents of ATS 13, noting it [redacted] Ex. 37, Almeroth Rep. ¶¶ 321-323. That some public material appears in screenshots does not disqualify the file as a trade secret.

*Khoros, LLC v. Lenovo (United States), Inc.*, 2020 WL 12655516, at *5 (N.D. Cal. Oct. 5, 2020) ("trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources") (quotation omitted); *Stemcell Techs. Canada Inc. v. StemExpress, LLC*, No. 21-cv-01594, 2022 WL 4021905, at *2 (N.D. Cal. Sept. 3, 2022) (Beeler, J.) ("Although 'portions of [that process] may be publicly available,' the process 'as a whole [is not] publicly known[.]'").

Procore's "burden-flipping" argument (Mot. at 18) is also wrong. Dr. Almeroth independently analyzed whether Oracle had publicized the trade secrets and did not find any public disclosures with the claimed information. Ex. 37, Almeroth Rep. ¶¶ 75-76. Procore, however, has not performed any comparison between any public disclosures and the trade secrets.[4]

**Category C: Third-Party ERP Integrations (ATS Nos. 14–23).** This category concerns integrations with ERPs provided by third parties, such as [redacted]. Procore contends Oracle has not identified these with sufficient particularity, but fails to address Oracle's or its experts' actual explanations. Mot. at 19. Oracle provided significant detail, including descriptions of each file's contents and explanations of why each is confidential. *See, e.g.*, Ex. 37, Almeroth Rep. ¶¶ 342-347, 354-357, 373-375, 401-403, 407-409, 416-419, 420-422, 429-434, 455-457.[5]

Procore uses ATS 22 as its example for this category, contending that this information is not Oracle's, but [redacted]. Mot. at 20. This is wrong. As Dr. Almeroth explains, although [redacted] does make some information publicly available regarding [redacted], how Oracle [redacted] and is Oracle's trade secret.[6] Ex. 37, Almeroth Rep. ¶ 860. This is set forth in Oracle's expert reports (*see id.*) and

---

[4] Procore contends that Oracle's misappropriation allegations are "untethered" because Procore used a contractor named Calance to develop its [redacted] integration. Mot. at 19 n.7. This is irrelevant; Oracle has marshalled significant evidence illustrating that Procore used Oracle's trade secrets as part of its [redacted] development efforts. *See, e.g.*, Ex. 37, Almeroth Rep. ¶¶ 963-966 (Procore sharing Oracle trade secrets with employees responsible for [redacted] integration).

[5] Procore contends that "Oracle's misappropriation allegations boil down to the fact that Procore 'has' an integration with the same ERPs." Mot. at 20 n.8. Although Procore includes the word "has" in quotes, it does not cite anything, with good reason: this is not what Oracle alleges. Instead, Oracle has set forth detailed allegations that Procore accessed and used Oracle's trade secrets documents to guide its development of these specific integrations, and those allegations are supported in detail by forensic and technical evidence. *See, e.g.*, Ex. 37, Almeroth Rep. § VI.E.3.

[6] This is not flipping the burden: Dr. Almeroth performed his own analysis to confirm that Oracle had not publicized these trade secrets. Ex. 37, Almeroth Rep. ¶ 860.

demonstrated by the fact that Procore was unable to develop a [redacted] integration on its own until Mariano joined. *Id.* ¶¶ 814, 836, 865. Had development of the integration been as simple as using publicly available information from [redacted], Procore would not have accessed multiple Oracle trade secret [redacted] documents and mimicked Oracle's [redacted] implementation. *Id.* ¶¶ 834-872.

Procore's assertion that "[i]ntegrating with third-party ERPs is indisputably a well-understood practice in the SaaS industry" (Mot. at 20) is beside the point. That is not what happened here. Procore was unable to develop these integrations on its own until Mariano arrived, and the undisputed evidence demonstrates that immediately upon his arrival, Mariano used Oracle's integration-related trade secret files to develop Procore's corresponding integrations and assist Procore employees in developing new features and troubleshooting problems they were facing. Ex. 37, Almeroth Rep. ¶¶ 860, 865.

**Category D: Cross-Platform Integrations (ATS Nos. 24–29).** This category of materials concerns files that Mariano took regarding Oracle's efforts to integrate Textura with two other Oracle construction software products, [redacted]. Although Procore contends that these files are irrelevant because Procore does not sell [redacted] (Mot. at 21 n.9), they are directly applicable to Procore's business, as Dr. Almeroth explains, because Procore offers competing software and wanted to integrate Procore Pay into those products. Ex. 37, Almeroth Rep. ¶¶ 87, 1616-1621.

Procore contends that Oracle never explains why these files or their contents qualify as trade secrets. Mot. at 21. Not so. Oracle provides significant detail in its trade secret disclosures and expert reports regarding these trade secrets, and Oracle's description is not limited to the one introductory sentence Procore cites and claims is identical and generic. The remainder of the description—which Procore entirely ignores—is not identical and explains why the file qualifies as a trade secret and what is confidential about it. For example, for the trade secret [redacted] Dr. Almeroth explains that the file describes a [redacted] and [redacted] *Id.* ¶ 476. He also notes that the file [redacted] *Id.* As another example, for the trade

secret [redacted] Dr. Almeroth explains that the file [redacted] *Id.* ¶¶ 484-487. Procore never cites or addresses this additional explanation.

**Category E: Customer Information (ATS Nos. 30–32).** These files relate to [redacted]. It is unclear what Procore's concern is regarding these trade secrets. Procore never asserts that Oracle's descriptions lack particularity or that Oracle failed to identify what is confidential about these trade secrets. To the extent Procore intended to raise that argument, however, it would be wrong. These trade secrets relate to [redacted]. *See, e.g.*, Ex. 37, Almeroth Rep. ¶ 523 (explaining, for the [redacted]).

For ATS 30, Procore contends that it contains "transient status markers" such as [redacted] Mot. at 22. While those notes appear in the document, it is improper to extract isolated notes from a broader file and argue that those notes alone are not trade secrets. Oracle's trade secret files do not rise and fall on the secrecy of each "alleged snippet" or "asserted fragment," but rather the trade secret file as a whole. *Stemcell*, 2022 WL 4021905, at *2 ("Although 'portions of [that process] may be publicly available,' the process 'as a whole [is not] publicly known[.]'"). The document as a whole is a trade secret, as Dr. Almeroth explains, given that it includes a [redacted] Ex. 37, Almeroth Rep. ¶ 515. For ATS 31, Procore contends that the information tracks [redacted]. Mot. at 22. Not so. In fact, the document contains significant non-public information warranting trade-secret protection, including [redacted], as Dr. Almeroth explains. Ex. 37, Almeroth Rep. ¶¶ 518-520. For ATS 32, Procore contends that it is a [redacted] regarding a Textura customer. Mot. at 22. Procore offers no reason why these

internal Oracle notes [redacted]—should not be considered confidential. *See* Ex. 37, Almeroth Rep. ¶ 523.

**Category F: Internal Business Information (ATS Nos. 33–34).** This category relates to Oracle confidential pricing information. Procore incorrectly contends that it is "undisputed" that the information in these alleged trade secrets is publicly available, citing paragraph 526 of Dr. Almeroth's report. Mot. at 22. In that paragraph, however, Dr. Almeroth explains that the allegedly public document Procore cites is ***not*** the same as the document that Oracle claims as a trade secret. None of the other documents Procore cites includes the information that is provided within these trade secret files. *See* Ex. 72 (Procore00698367); Ex. 73 (ORC-PRC-00187579). Further, while Procore contends that Lucie Trepanier, a former Oracle employee, testified that [redacted] (Mot. at 23 (citing Ex. 45 (Trepanier Dep.) at 144:22–25)), she did not indicate that [redacted].

That this information is not publicly available is demonstrated by the surreptitious manner in which Mariano shared it with Procore. Rather than circulate a publicly available document or link, Mariano used his phone to photograph his screen with the document, and then sent that picture via text message to others at Procore. *See, e.g.*, Ex. 37, Almeroth Rep. ¶ 1682. Had this information merely been public, Mariano would not have needed to go to such lengths to share it with Procore employees.

**C. Oracle Provided More Than Sufficient Evidence Of Independent Economic Value**

Procore's third argument should be rejected because Oracle has provided substantial evidence of independent economic value—far more than required to create a genuine issue of material fact precluding summary judgment.

To establish independent economic value, a plaintiff must demonstrate that its trade secret is "sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Calendar Research LLC v. StubHub, Inc.*, No. 17-cv-04062, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017) (quoting *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 564 (2007)). Critically, "[t]he standard to show that trade secrets derive economic value is not a high standard." *Id.* at *4. A trade secret owner may demonstrate independent economic value through "circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its

secrecy, and the willingness of others to pay for its access." *Religions Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1253 (N.D. Cal. 1995).

Procore incorrectly contends that Oracle's only evidence of value consists of "boilerplate" conclusions from Oracle's experts. Mot. at 24. This assertion ignores the hundreds of paragraphs of detailed trade secret-by-trade secret analysis contained in Oracle's expert reports and trade secret disclosures—none of which Procore addresses. ***First***, Dr. Almeroth's report provides extensive, trade secret-by-trade secret analysis of value. As just one example, for the [redacted] trade secret, Dr. Almeroth explains that the file contains [redacted] that, among other things, [redacted] Ex. 37, Almeroth Rep. ¶ 95. He identifies the employees who worked on this trade secret and explains that [redacted] *Id.* Further, he explains that the value of this file extends beyond its specific purpose at Oracle: [redacted] *Id.* ¶ 96. Dr. Almeroth also explains that this source code file is [redacted] *Id.* He further explains why the file [redacted]." *Id.* ¶ 99. Dr. Almeroth provides comparable analysis for the other trade secrets. *See, e.g.*, *id.* ¶¶ 101-111. Procore does not address any of this analysis, let alone explain why the Court should disregard it.

***Second***, Dr. Ibbs's report also provides detailed, trade secret-by-trade secret analysis of value. Procore contends that Dr. Ibbs "does not even attempt to show, trade secret by trade secret, that the information derives independent economic value" and asserts that "over an eight-paragraph span, he discusses the 110 trade secrets in his report on a categorical, wholly conclusory basis." Mot. at 24 (citing Ex. 10 ¶¶ 223-230). This misrepresents the report. The eight paragraphs Procore cites are

***summary conclusions***—not the underlying analysis—as to whether the trade secrets are generally known or readily ascertainable. *See* Ex. 10 ¶¶ 223-230. The detailed bases for those conclusions are set forth in the nearly 180 ***preceding*** paragraphs, where Dr. Ibbs systematically walks through each trade secret and discusses its contents and value. *See* Ex. 10, Ibbs Rep. ¶¶ 47-231. Dr. Ibbs also explains that Procore's dissemination of the trade secrets demonstrates their value. For example, regarding the [redacted] trade secret, Dr. Ibbs explains that the dissemination [redacted] and notes that Procore (and ex-Oracle) employee Megan Rast believed [redacted] *Id.* ¶¶ 216-220; Ex. P, Rast Dep. Tr. 137:7-11.

***Third***, Oracle's fact witnesses also testified to the trade secrets' value. For example, Oracle witness Mike Antis explained the value of the [redacted]" trade secret:

[redacted]

Ex. H, Antis Dep. Tr. 176:2-17. Lucie Trepanier, an Oracle marketing director, similarly testified that this file was [redacted] Ex. Q, Trepanier Dep. Tr. 238:1-4, 247:1-22. Oracle's trade secret disclosures likewise detail the value of each trade secret. For example, as to the source code trade secret file [redacted] Oracle explains that the file [redacted] which [redacted] Ex. 25, Oracle's 5th Amended Trade Secret Disclosures at 226-27. Procore addresses none of this evidence.

## V. CONCLUSION

For the foregoing reasons, Procore's motion should be denied.

DATED: July 9, 2026

Respectfully submitted,

/s/ Akshay S. Deoras

Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
adam.alper@kirkland.com
akshay.deoras@kirkland.com
Telephone: (415) 439-1400

Michael W. De Vries (SBN 211001)
Yimeng Dou (SBN 285248)
Ingrid Petersen (SBN 313927)
Kevin X. Wang (SBN 318024)
KIRKLAND & ELLIS LLP
695 Town Center Drive, Suite 1700
Costa Mesa, California 92626
michael.devries@kirkland.com
yimeng.dou@kirkland.com
ingrid.petersen@kirkland.com
kevin.wang@kirkland.com
Telephone: (714) 982-8822

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
leslie.schmidt@kirkland.com
Telephone: (212) 446-4800

Christopher M. Lawless (SBN 268952)
Kendra Delaney (SBN 339102)
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
christopher.lawless@kirkland.com
kendra.delaney@kirkland.com
Telephone: (310) 552-4200

*Attorneys for Plaintiffs Oracle America, Inc., Oracle International Corporation, and Textura Corporation*