Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
adam.alper@kirkland.com
akshay.deoras@kirkland.com
Telephone: (415) 439-1400

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
695 Town Center Drive, Suite 1700
Costa Mesa, California 92626
michael.devries@kirkland.com
Telephone: (714) 982-8822

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
leslie.schmidt@kirkland.com
Telephone: (212) 446-4800

*Attorneys for Plaintiffs Oracle America, Inc., Oracle International Corporation, and Textura Corporation*

*[Additional counsel listed on signature page]*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| ORACLE AMERICA, INC., ORACLE INTERNATIONAL CORPORATION, and TEXTURA CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>PROCORE TECHNOLOGIES, INC., and PROCORE PAYMENT SERVICES, INC.<br><br>Defendants. | C.A. No. 4:24-cv-7457-JST<br><br>**PLAINTIFFS' OPPOSITION TO PROCORE'S MOTION TO EXCLUDE OPINIONS OF MELISSA A. BENNIS**<br><br>Date: August 20, 2026<br>Time: 2:00 pm<br>Location: Courtroom 6<br>Judge: Honorable Jon S. Tigar<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**PUBLIC REDACTED VERSION** |

## TABLE OF CONTENTS

Page


**I. INTRODUCTION ..... 1**

**II. FACTUAL BACKGROUND ..... 2**

**III. LEGAL STANDARD ..... 3**

**IV. ARGUMENT ..... 3**

- A. Ms. Bennis's Damages Opinions Are Properly Apportioned Among Trade Secrets ..... 3
  - 1. Unjust Enrichment ..... 5
    - a. Ill-gotten profits ..... 5
    - b. Avoided R&D ..... 7
  - 2. Lost Profits ..... 9
  - 3. Reasonable Royalty ..... 10
- B. Ms. Bennis's Price Erosion Opinions Are Reliable ..... 10
  - 1. Procore Mischaracterizes Ms. Bennis's Price Erosion Opinions ..... 11
  - 2. Price Elasticity's Applicability Is a Fact Question ..... 13
- C. Ms. Bennis's Reasonable Royalty Opinions Are Reliable ..... 14
  - 1. Procore's Disagreements with Ms. Bennis's Analysis Are for Cross ..... 14
  - 2. Procore Mischaracterizes Ms. Bennis's Royalty Analysis ..... 15
- D. Ms. Bennis's Damages Period Has A Reliable Basis ..... 15

**V. CONCLUSION ..... 15**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ajaxo v. E*Trade Fin.*,
48 Cal. App 5th 129 (2020) ....................15

*Anesta.AG v. Mylan Pharms.*,
2014 WL 3976456 (D. Del. Aug. 14, 2014) ....................13

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
377 U.S. 476 (1964) ....................9

*Atl. Inertial Sys. v. Condor Pac. Indus. of Cal.*,
2015 WL 3825318 (C.D. Cal. June 18, 2015) ....................14

*Canty v. DePuy Orthopaedics*,
2024 WL 2852213 (N.D. Cal. June 5, 2024) ....................2, 3

*Caudill Seed & Warehouse v. Jarrow Formulas*,
53 F.4th 368 (6th Cir. 2022) ....................3, 5, 7

*Comet Techs. USA v. XP Power*,
2022 WL 2442810 (N.D. Cal. Mar. 2, 2022) ....................8

*Comet Techs. USA v. XP Power*,
2023 WL 3565070 (N.D. Cal. Mar. 22, 2023) ....................5, 8

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l*,
246 F.3d 1336 (Fed. Cir. 2001) ....................9

*DiscoverOrg Data v. Bitnine Glob.*,
2020 WL 6562333 (N.D. Cal. Nov. 9, 2020) ....................14

*EchoSpan v. Medallia*,
2025 WL 3046753 (9th Cir. Oct. 31, 2025) ....................5

*Elosu v. Middlefork Ranch*,
26 F.4th 1017 (9th Cir. 2022) ....................3

*Ericsson. v. Harris Corp.*,
352 F.3d 1369 (Fed. Cir. 2003) ....................13

*Est. of Jimenez v. Wexford Health Sources*,
2026 WL 622662 (D.N.M. Mar. 5, 2026) ....................14

*Exeltis USA v. First Databank*,
2020 WL 7025089 (N.D. Cal. Nov. 30, 2020) ....................12

*GlobeRanger Corp. v. Software AG U.S.*, 836 F.3d 477 (5th Cir. 2016) ....................7

*Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019 WL 12074086 (C.D. Cal. July 1, 2019)....................13

*Hostetler v. Driscoll*, 2026 WL 608585 (N.D. Cal. Mar. 4, 2026)....................13

*Huawei Techs. v. Yiren Huang*, 2019 WL 2395276 (E.D. Tex. June 6, 2019)....................5

*In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005 (C.D. Cal. 2003) ....................12

*Int'l Med. Devices v. Cornell*, 2023 WL 4295157 (C.D. Cal. Feb. 13, 2023)....................15

*LivePerson v. [24]7 AI*, 2018 WL 6256460 (N.D. Cal. Nov. 30, 2018) ....................7

*LivePerson, v. 24[7].ai*, 2018 WL 6257460 (N.D. Cal. Nov. 30, 2018) ....................4

*LivePerson, v. 24[7].ai*, 2019 WL 3254226 (N.D. Cal. July 19, 2019)....................3, 7

*Micro Chem. v. Lextron*, 317 F.3d 1387 (Fed. Cir. 2003)....................14

*Neural Magic. v. MetaPlatforms*, 659 F. Supp. 3d 138 (D. Mass. 2023) ....................12

*O2 Micro Intern. Ltd. v. Monolithic Power Sys*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005) ....................4

*PPG Indus. v. Jiangsu Tie Mao Glass*, 47 F.4th 156 (3d Cir. 2022) ....................7

*Rambus v. Hynix Semiconductor*, 254 F.R.D. 597 (N.D. Cal. 2008)....................12

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997) ....................12

*Sprint Commc'ns v. Charter Commc'ns*, 2021 WL 982732 (D. Del. Mar. 16, 2021) ....................10

*Stanacard, LLC v. Rubard LLC*, 2016 WL 6820741 (S.D.N.Y. Nov. 10, 2016)....................13

*Stephens v. Union Pac. R.R. Co.*,
935 F.3d 852 (9th Cir. 2019) ....................13

*Steves & Sons v. JELD-WEN*,
2018 WL 2172502 (E.D. Va. May 10, 2018) ....................15

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group*,
2026 WL 852567 (S.D.N.Y. Mar. 27, 2026) ....................9, 10, 13

*Tex. Adv. Optoelectronic Sols. v. Renesas Elec. Am.*,
895 F.3d 1304 (Fed. Cir. 2018)....................4

*Trinseo Europe GmbH v. Kellog Brown & Root*,
165 F. 4th 399 (5th Cir. 2026) ....................4

*Univ. Comp. v. Lykes-Youngstown*,
504 F.2d 518 (5th Cir. 1974) ....................5

*W.L. Gore & Assocs.. v. GI Dynamics*,
872 F. Supp. 2d 883 (D. Ariz. 2012) ....................4, 7

*Willis Elec. v. Polygroup*,
166 F.4th 1363 (Fed. Cir. 2026) ....................14

*Zucchella v. Olympusat*,
2023 WL 2628107 (C.D. Cal. Jan. 10, 2023) ....................12

**Rules**

Fed. R. Evid. 702 ....................3, 14

# I. INTRODUCTION

Procore saw an opportunity to make [redacted]—if only it could offer a construction payment management solution. Procore could not do so on its own, so it chose to misappropriate Oracle's trade secret technology. Oracle's three technical experts set forth significant evidence of Procore's unauthorized acquisition and use of Oracle's trade secrets in the development of Procore Pay, related integrations, and tools in Procore's Project Financials. Oracle's damages expert, Melissa Bennis, analyzed the financial and economic harm Procore's misappropriation caused, and applied well-recognized methodologies to quantify that harm for each trade secret, including analysis of Procore's ill-gotten profits and avoided R&D, the well-established *Panduit* test for lost profits, and the cost and income approaches, along with the *University Computing* factors.

Faced with overwhelming evidence of its theft, through this motion, Dkt. 345-2 ("Mot."), Procore seeks to avoid compensating Oracle for its willful and malicious misappropriation. Procore's lead assertion—that Ms. Bennis "offers no opinion on what damages should be if liability is found on fewer than all 110 [trade secrets] (or fewer than all trade secrets in any purported category)"—is false. Ms. Bennis's report could not be clearer that she provided opinions on the amount of damages specific to each of the six trade secret categories, and to trade secrets within each category, and that the amount of damages depends on which trade secrets are misappropriated and which approach applies. *See* Ex. 5 ¶¶ 118–119 (lost profits), 120–121 (ill-gotten profits), 123–125 (avoided R&D), 127–128 (royalty). Ms. Bennis's opinions and schedules are transparent in this regard, and she details why she concluded that her apportionment was appropriate and fully supported, including based on unchallenged technical expert opinions. Procore's mischaracterizations of her opinions do not warrant exclusion.

Procore's other arguments also mischaracterize Ms. Bennis's opinions. Ms. Bennis did not simply adopt an Oracle calculation for price erosion; rather, she performed a *Panduit* analysis, and analyzed additional economic evidence to reach her conclusion. Procore's complaints about Ms. Bennis's royalty largely rehash other arguments, and are wrong for the same reasons. Ms. Bennis also reliably calculated damages through trial because Oracle's technical expert explained that Procore still has not, and could not within any commercially reasonable time, develop Oracle's trade secrets.

At bottom, Procore asks the Court to transform factual disputes and disagreements with

Ms. Bennis's opinions into grounds for exclusion. That is not the purpose of *Daubert*. At this stage, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether [their] testimony has substance such that it would be helpful to a jury." *Canty v. DePuy Orthopaedics*, 2024 WL 2852213, at *2 (N.D. Cal. June 5, 2024) (cleaned up). Accordingly, Oracle respectfully requests that the Court reject Procore's arguments and deny its motion in its entirety.

## II. FACTUAL BACKGROUND

In 2006, Textura (which was acquired by Oracle in 2016) launched the "industry's first online payment management solution." Ex. 5 ¶ 44; Ex. A at -5196. Oracle's Textura Payment Management ("TPM") "automates and streamlines construction payment management processes" in core areas like invoicing, compliance management, and disbursement. Ex. 5 ¶ 46; Ex. B at -3535. Oracle also developed "integrations" or "connectors" that allow customers to integrate TPM with enterprise resource management ("ERP") and other Oracle software. General contractors, owners, and subcontractors have used TPM for more than $1 trillion in projects. Ex. C. Oracle (and Textura before it) developed TPM through significant R&D investments, which it protected as trade secrets. Oracle's Asserted Trade Secrets, as described in its Trade Secret Disclosure, are categorized as follows: (1) the core TPM solution; (2) Oracle ERP Integrations; (3) Third-Party ERP Integrations; (4) Cross-Platform Integrations; (5) Customer Information; and (6) Internal Business Information. *See, e.g.*, Ex. 1.

For years, Procore tried, and failed, to develop a competing construction payment management solution. Ex. 5 ¶ 67; Ex. D at -1078 [redacted] Ex. E at 243:8–13 [redacted] Ex. F at 189:11–192:4 [redacted] So, Procore decided to steal the technology it needed from Oracle, and encouraged former Oracle employees and Oracle customers to disclose Oracle's trade secrets for use in developing Procore Pay, critical integrations, and certain functionality in Procore's Project Financials, and to undercut Oracle on price. *E.g.*, Dkt. 348-10 at 72–245. Procore has made good on its plan to [redacted] taking at least [redacted] in the last few years through its misappropriation. Ex. 5, Appendix C; *see also* Ex. D at -1078; Ex. G at -2342; Ex. I ¶ 123.

Ms. Bennis set forth opinions under the statutory trade-secret damages categories: lost profits,

unjust enrichment, and reasonable royalty. After analyzing the parties, their financial information, the construction payment management industry, the relevant products and other competitors in the market, Ex. 5 ¶¶ 14–86, and describing her understanding of Oracle's trade secrets and Procore's misappropriation, *id.* ¶¶ 87–112, Ms. Bennis determined what damages theories applied for each trade secret category, and apportioned damages by trade secret category and trade secrets within categories, providing the jury multiple options depending on which trade secrets are found to be misappropriated.

## III. LEGAL STANDARD

"If the proposed testimony meets the thresholds of relevance and reliability," the jury should "decide upon its credibility, rather than the judge." *Elosu v. Middlefork Ranch*, 26 F.4th 1017, 1024 (9th Cir. 2022) (cleaned up). Under the "flexible" inquiry into admissibility of expert opinion, "[t]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Canty*, 2024 WL 2852213, at *2. "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu*, 26 F.4th at 1026.

## IV. ARGUMENT

### A. Ms. Bennis's Damages Opinions Are Properly Apportioned Among Trade Secrets

Procore's assertion that Ms. Bennis "assumes Procore misappropriated all 110 alleged trade secrets" and has no "opinion on fewer than all 110 alleged trade secrets," Mot. 3, 5, is flat out wrong. As her report makes clear, Ms. Bennis did not take an all-or-nothing approach, but instead provided multiple methodologies and calculations so the jury could award different damages depending on which trade secrets are misappropriated. *See, e.g.*, Ex. 5 ¶ 280 (Ms. Bennis "considered what should occur in the event that fewer than all the Oracle trade secrets are found to be misappropriated and [has] provided calculations for those scenarios."). Ms. Bennis structured her opinions and calculations so that if particular trade secrets within a category or entire categories are dropped, any adjustment can be transparently made. Ex. 5 ¶¶ 280, 297–298, 306, 313, 316, 332–334, 336; Ex. 6 at 248. Courts have repeatedly approved of methodologies like Ms. Bennis's. *See Caudill Seed & Warehouse v. Jarrow Formulas*, 53 F.4th 368, 389 (6th Cir. 2022) (expert "gave the jury options" to calculate damages if fewer than all the trade secrets were found misappropriated); *LivePerson, v. 24[7].ai*, 2019 WL

3254226, at *2 (N.D. Cal. July 19, 2019) (denying *Daubert* where expert allocated damages "among the three trade secret categories" and "between individual trade secrets within the same category"); *W.L. Gore & Assocs.. v. GI Dynamics*, 872 F. Supp. 2d 883, 892–93 (D. Ariz. 2012) (denying SJ where expert divided trade secret value among categories).

None of Procore's cases exclude an opinion like Ms. Bennis's, and instead address an entirely inapposite scenario: experts who provide only a single damages number by assuming all trade secrets were misappropriated. *Trinseo Europe GmbH v. Kellog Brown & Root*, 165 F. 4th 399, 412 (5th Cir. 2026) (affirming damages JMOL where expert based damages on misappropriation of all 10 trade secrets but only 4 misappropriated); *LivePerson, v. 24[7].ai*, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018) (excluding expert who "offer[ed] no methodology … to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets"); *O2 Micro Intern. Ltd. v. Monolithic Power Sys*, 399 F. Supp. 2d 1064, 1076–78 (N.D. Cal. 2005) (granting damages JMOL where damages were based on misappropriation of all trade secrets and only some misappropriated); *Tex. Adv. Optoelectronic Sols. v. Renesas Elec. Am.*, 895 F.3d 1304, 1317 (Fed. Cir. 2018) (vacating damages where liability could "rest on only one of the three grounds" and expert "assigned all profits to the misappropriation of all trade secrets"). That is not what Ms. Bennis did.

And contrary to Procore's suggestion, there is no rule that damages must change with every trade-secret narrowing. While Procore's own experts opined the trade secrets' value can be [redacted] Ex. I ¶ 97, Ms. Bennis reached a different conclusion by applying well-established damages methodologies, and relying on the factual and expert record regarding the extent of apportionment needed, including Procore's lack of alternatives, Dr. Almeroth's unobjected-to analyses, the nature of the trade secrets at issue, their development, and Procore's misappropriation of them. Ex. J at 156:15–25; *see also* Ex. 18 §§ V.A–C, VI.D–G; Ex. 5 §§ IV.D–E, VI.B–E. Here, Oracle's remaining trade secrets at this juncture continue to support the full amount of damages under Ms. Bennis's analyses because Procore still has no alternatives to the remaining trade secrets (lost profits, royalty); and trade secrets related to all accused functionality in Procore Pay, Project Financials, and all of the integrations, and for the full relevant time period, still remain asserted as of the latest narrowing (ill-gotten gains, unjust enrichment,

royalty). § IV., *infra*. That could certainly change with further narrowing, however, e.g., if trade secrets for an accused functionality are no longer at issue, or the time period implicated by the remaining trade secrets is reduced. In that event, Ms. Bennis's report explains how damages would change, too. Ex. 5 ¶¶ 280, 297–298, 306, 313, 332–336. Nothing different or more is required under the law, and it is for the jury to decide whose damages theory to credit. *See EchoSpan v. Medallia*, 2025 WL 3046753, at *1 (9th Cir. Oct. 31, 2025) (error to overturn jury verdict where only one trade secret misappropriated because jury was presented with evidence of relative importance of trade secrets and could reliably apportion); *Comet Techs. USA v. XP Power*, 2023 WL 3565070, at *1-2 (N.D. Cal. Mar. 22, 2023) (damages reliable where same amount applied to categories and sub-categories of trade secrets); *cf. Univ. Comp. v. Lykes-Youngstown*, 504 F.2d 518, 538 (5th Cir. 1974) (trade secret cases "require[] a flexible and imaginative approach to the problem of damages."). At bottom, Procore's disagreement is that Ms. Bennis should have performed more apportionment among trade secrets (there's no dispute that she did apportion, Ex. H at 107:11–19). Procore's criticisms are a matter for cross, not exclusion. *Huawei Techs. v. Yiren Huang*, 2019 WL 2395276, at *4 (E.D. Tex. June 6, 2019).

**1. Unjust Enrichment**

For unjust enrichment, Ms. Bennis calculates Procore's ill-gotten profits and avoided R&D costs for the trade secrets with 5 categories (not Internal Business Information). Ex. 5 ¶¶ 280-336.

a. Ill-gotten profits

For ill-gotten profits, Ms. Bennis identified the Procore product(s) implicated by each trade secret category, determined the relevant revenues for each product, deducted Procore's gross margin and further apportioned for Procore's alleged contributions using its R&D margin, to arrive at separate ill-gotten profits for each of the 5 categories. Ex. 5 ¶¶ 280–317. Then, within each trade-secret category, Ms. Bennis determined the amount of damages depending on which particular trade secrets are found to be misappropriated. *Id.* ¶¶ 285–317. Ms. Bennis summarizes these amounts in the table at Paragraph 316 in her report, as further detailed in her supporting schedules (*Id.* Scheds. 1.1–1.5), and provided a total amount across all five categories of [redacted], ensuring no double counting. *Id.* ¶ 316.[1] This type of methodology is reliable. *Caudill*, 53 F.4th at 392-393 (affirming ill-gotten profits).

[1] Ex. 6 at 248 contains the updated table referenced in Ex. 5 ¶ 316.

Procore nonetheless asserts that Ms. Bennis provides "no basis for modifying" her damages calculation if trade secrets within a category are dropped, pointing to TPM Solution and Third-Party Integrations. Mot. 5. That is untrue. For example, in the TPM Solution category, Ms. Bennis separately calculated ill-gotten profits for trade secrets related to Procore Pay [redacted] and for trade secrets related to Project Financials [redacted] Ex. 5 ¶¶ 281–298, 307–317. Ms. Bennis then analyzed damages if only certain trade secrets related to Procore Pay and Project Financials were misappropriated. As Dr. Almeroth explains, Procore's misappropriation directly implicates the [redacted] Procore Pay [redacted] he further provided a technical value analysis (which is unchallenged) that each [redacted] Ex. 18 § VI.G. Ms. Bennis thus concluded it would be appropriate to apportion Procore Pay profits by [redacted] if only the trade secrets related to one of the three [redacted] (e.g., invoicing) are misappropriated. Ex. 5 ¶¶ 297–298; Ex. 18 § VI.G. For Project Financials, only 3 of 11 tools [redacted] are implicated by Procore's misappropriation, so Ms. Bennis relied on Dr. Almeroth's unchallenged analysis of when the trade-secret functionality was implemented in each tool and the relative technical importance of all eleven tools. Ex. 5 ¶ 309; Ex. 18 § VI.G.3. While [redacted] Ms. Bennis did not apply an additional weighting to the those features [redacted] Ex. 5 ¶ 313. Thus, Ms. Bennis concluded it would be appropriate to apportion the Project Financials profits by [redacted] should only the trade secrets related to [redacted] (for example) be misappropriated, or up to [redacted] should trade secrets related to all three functionalities be misappropriated.[2] *Id.* ¶¶ 280, 316. Further apportionment was not warranted based on Ms. Bennis's understanding from Dr. Almeroth and Oracle witnesses of the integrated nature of the trade secrets and their iterative development, Procore's lack of alternatives, and the nature of the misappropriation. *E.g.*, *id.* ¶¶ 297, 313, 318–335; Ex. J at 156:15–25; *see also* § IV.A.2, *infra.*

Similarly, for the Third-Party ERP Integrations Category, Ms. Bennis separately calculated profits for misappropriation of trade secrets related to Procore Pay [redacted] functionality (described

[2] Total Project Financials ill-gotten profits are not 3X the [redacted]-specific ill-gotten profits because the use of the trade secrets in [redacted] began later than [redacted] *Id.* ¶¶ 280, 316.

above) and each of the eight connectors, supported by Dr. Almeroth's analysis. Ex. 5 ¶¶ 299–306, 313, Scheds. 2.1, 5; Ex. 18 § VI.G.1–2. Ms. Bennis thus provides multiple bases for modifying her damages opinions depending on which trade secrets are found to be misappropriated. *Caudill*, 53 F.4th at 389 (expert "gave the jury options" to calculate damages if fewer than all the trade secrets were found misappropriated); *LivePerson*, 2019 WL 3254226, at *2; *W.L. Gore*, 872 F. Supp. 2d at 892–93.

Procore next wrongly claims that Ms. Bennis gave "nearly identical" testimony to the excluded expert in *LivePerson*. Mot. 4. There, the expert initially provided a single number on the assumption all trade secrets were misappropriated and said he needed to speak with the technical expert before saying what damages would be if the jury found a single trade secret misappropriated. *LivePerson*, 2018 WL 6257460, at *3. Unlike that expert, Ms. Bennis provided multiple, different calculations depending on what trade secrets are misappropriated or asserted at trial, and testified that it was "not clear to [her] that there would be a need . . . for anything [about her opinions] to change" should Oracle narrow its trade secrets. Ex. J at 37:20–38:7. While indicating she would "perhaps" speak to Dr. Almeroth if trade secrets were dropped before trial, that is simply prudent: Ms. Bennis needs to know what trade secrets remain asserted, so she knows what calculations to present. *Id.*

Finally, contrary to Procore's assertion, Mot. 6, Ms. Bennis expressly explains how to total ill-gotten profits to avoid double counting, Ex. 5 ¶ 316 & n.807, which she re-affirmed at her deposition. Ex. J at 155:15–156:1 (NetSuite profits counted only once if misappropriated under two categories); 134:13–17 (ill-gotten gains "only intended to count profits on any individual sale one time.").

b. Avoided R&D

Based on Dr. Almeroth's unchallenged analysis and Oracle witness testimony, Ms. Bennis determined that Oracle's R&D costs were a reasonable proxy for the costs Procore saved through its misappropriation. *Id.* ¶¶ 318–336. Ex. 18 § V.C; *see PPG Indus. v. Jiangsu Tie Mao Glass*, 47 F.4th 156, 163 (3d Cir. 2022) ("costs a plaintiff spent in development can be a proxy for the costs that the defendant saved") (cleaned up); *GlobeRanger Corp. v. Software AG U.S.*, 836 F.3d 477, 499 (5th Cir. 2016) (same). Specifically, Dr. Almeroth and Oracle's witnesses explained that development of the TPM technology was an iterative process, such that the TPM components and integrations build on each other and earlier R&D. Ex. 18 ¶ 543; Ex. K at 137:20–139:16; Ex. L at 104:21–105:10, 109:18–

22, 141:4–16; Dkt. 348-10 at 343–346. Ms. Bennis also relied on evidence that Procore benefitted from having the option of using any of the hundreds of misappropriated files that were stolen from Oracle. Ex. 18 ¶ 547; *id.* § VI.G. Although the iterative nature of the trade secrets support including R&D investments dating back to 2004 (when TPM was first developed), Ms. Bennis focused on Oracle's [redacted] in TPM R&D from March 2016 through August 2021. Ex. 5 ¶¶ 318–331; *see also id.* Ex. 6, Sched. 2. The end date is based on the dates of the particular misappropriated files (i.e., the latest date for TPM Solution trade secrets was August 2021, and she made date adjustments for categories where trade secrets had earlier document dates). *Id.* ¶ 326. Based on Oracle documents with project-specific R&D entries and discussion with Oracle fact witnesses, Ms. Bennis removed R&D work that was unrelated to the trade secrets, and allocated the total amount [redacted] between trade secret categories and trade secrets within the category, as summarized in Paragraph 336. *Id.* ¶¶ 328–331. Moreover, Ms. Bennis's schedules allow for the amount of R&D in each category to be adjusted if, e.g., only trade secrets files from 2020 in the TPM Solution category are misappropriated, by removing post-2020 R&D. *Id.* at n.870, Ex. 6, Sched. 1. This is a reliable methodology. *Comet Techs. USA v. XP Power*, 2022 WL 2442810, at *4-5 (N.D. Cal. Mar. 2, 2022) (approving avoided R&D theory in trade secret case).

Neither of Procore's disagreements with this methodology warrant exclusion. First, Procore disagrees with that it was appropriate to include avoided R&D for the TPM Solution trade secrets [redacted] with the connectors in Third-Party Integrations [redacted]. Mot. 6–7. Ms. Bennis, however, explained why she did so for two independent reasons: (i) Procore Pay uses trade secrets in the Third-Party Integrations category; and (ii) the unchallenged fact and expert testimony that the trade secrets related to the connectors built upon the TPM Solution trade secrets. Ex. 5 ¶¶ 332, 336. But, if the jury disagrees, she further specifies amounts if only certain trade secrets within the category are misappropriated ([redacted] for each of CMiC, NetSuite, and Sage, [redacted] for Viewpoint, and [redacted] for Yardi). *Id.* ¶¶ 328–333. Second, Procore claims Ms. Bennis did not adequately apportion because the amount of avoided R&D does not necessarily change when certain trade secrets are dropped. Mot. 7. Given that Oracle continues to assert trade secret files created in 2021, no adjustment is needed because those later files build upon the prior years of Oracle's R&D work, as described above. *Comet*,

2023 WL 3565070, at *1-2. If, however, 2021 files are dropped (or not misappropriated), the 2021 R&D spend can be removed from Ms. Bennis's calculation. *Id.* ¶¶ 326, 334, 336, n.870.

### 2. Lost Profits

Under the four-factor *Panduit* test, which Ms. Bennis applied, Ex. 5 ¶¶ 193–278. "a trade secret owner must prove (1) demand for the [product using the trade secrets], (2) absence of acceptable non-infringing substitutes, (3) the owner's manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit the owner would have made." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group*, 2026 WL 852567, at *8 (S.D.N.Y. Mar. 27, 2026) (affirming trade secret damages analyzed under *Panduit*) (cleaned up). Ms. Bennis concluded that the misappropriation of trade secrets in the following categories justify lost profits *only* to the extent they relate to Procore Pay: TPM Solution, Third-Party ERP Integrations, Customer Information, and Internal Business Information (price erosion only). Ex. 5 ¶ 230. Based on her *Panduit* analysis, Ms. Bennis determined Oracle was entitled to [redacted] to [redacted] in lost sales and price erosion of [redacted].[3] *Id.* ¶¶ 118–119.

Procore makes no arguments specific to Ms. Bennis's lost profits based on lost sales analysis, ("*Panduit*" appears nowhere in its brief). That is for good reason: "[l]ost profit damages do not depend on the number of [trade secrets misappropriated] by one single product." *See Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l*, 246 F.3d 1336, 1357 (Fed. Cir. 2001). Rather, the overarching question for lost profits is "but for" the misappropriation, what would the trade-secret owner have made. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964). Ms. Bennis's *Panduit* analysis answers that question. There is no dispute that *Panduit* factors 1 (demand) or 3 (capacity) are met. Ex. H at 167:20–172:16 [redacted] For factor 2 (alternatives), Ms. Bennis relied on Dr. Almeroth's unchallenged opinion that to this day, Procore has no alternatives because it has been unable to independently develop the trade secrets related to Procore Pay. Ex. 18 §§ VI.A, VI.G; Ex. 5 ¶¶ 204–220. Ms. Bennis also relied on Procore's prior failure to develop Procore Pay on its own (over [redacted]), and Dr. Ibbs' analysis of features important to

[3] The lost sales range is because Ms. Bennis provided an alternative analysis based on Oracle's "but for" market share. Ex. 5 ¶¶ 204–220, 233–238; *see also* Dkt. 339-3 § X.

customers. Ex. 5 ¶¶ 67, 207-218. Because Procore could not offer Procore Pay without *any one* of the Procore Pay-related trade secrets, misappropriation of any one of those trade secrets justifies the full amount of lost profits; further apportioning is not "economically logical" because Oracle "cannot lose a portion of a sale." *See Sprint Commc'ns v. Charter Commc'ns*, 2021 WL 982732, at *13 (D. Del. Mar. 16, 2021). To the extent Procore disagrees, Procore can present that argument to the jury. *See id.*

Procore addresses price erosion in a single sentence, claiming that Ms. Bennis offers "no opinion on how each category contributed to the alleged price erosion." Mot. 6. Even if the Court considers that throwaway assertion, it misses the entire point of Ms. Bennis's *Panduit* analysis, which answers that question under the law as explained above. Indeed, Ms. Bennis specifically opined that "Procore has demonstrated that any alternative pricing, e.g., that would be in line with Oracle's, is not acceptable, as Procore designed its Procore Pay business model." Ex. 5 ¶ 205. As explained above, each category (and trade secret within the category) on its own justifies lost profits, whether lost sales or price erosion, under *Panduit*, *TriZetto*, 2026 WL 852567 at *8, and Ms. Bennis buttresses her *Panduit* analysis with further economic analysis (§ IV.B., *infra*).

**3. Reasonable Royalty**

Ms. Bennis also calculated a reasonable royalty by performing quantitative (cost, income, and market) and qualitative (hypothetical negotiation, *University Computing* factors) analyses. Ex. 5, ¶¶ 353–374. For all but Internal Business Information, Ms. Bennis relies on Procore's avoided R&D (the cost approach), for which the same apportionment principles in § IV.A.1.b, *supra*, apply; and for Internal Business Information, she relies on price erosion, § IV.A.2, *supra*; § IV.B., *infra*. Ex. 5 ¶¶ 378–379. Procore contends there is a "contradiction" between Ms. Bennis's royalty and price-erosion analyses because she does not include price erosion damages for all applicable trade-secret categories in her royalty. Mot. 6. While Ms. Bennis could have done so, Ex. 5 ¶ 386, she was not required to offer a *higher* royalty opinion than she concluded was reasonable. Nor is there any per se prohibition, as Procore suggests, on different trade secrets justifying the same amount of damages.

**B. Ms. Bennis's Price Erosion Opinions Are Reliable**

Having applied *Panduit*, Ms. Bennis determined that Oracle suffered price erosion from Procore's misappropriation. Ex. 5 ¶¶ 249–278. Procore's documents showed that [redacted]

[redacted] *Id.* ¶¶ 249–259; Ex. M at -1509. Oracle considered a price increase in 2023, according to Mike Antis, Global VP of the Textura business, but chose only to increase the subcontractor maximum contract fee, and not the subcontractor percent-of-contract value fee [redacted] the potential increase was [redacted] ([redacted] to [redacted] or [redacted]). Ex. 5 ¶¶ 260–273; Ex. L at 285:17–287:20; Ex. N at 72:23–76:4, 90:12–25; Ex. O; Ex. P.

Ms. Bennis thus considered the [redacted] increase to be the ceiling, and analyzed marketplace dynamics and other data points to determine what, if any, price increase Oracle would have made but for the misappropriation. Ex. 5 ¶¶ 267–273. In 2011, 2014, and 2019 (prior to Procore Pay, but while other companies like GCPay and Flashtract were on the market), Oracle increased its percent-of-contract-value pricing [redacted] *Id.* ¶¶ 260–262. Oracle had [redacted] as confirmed by Mr. Antis, [redacted] *Id.* ¶¶ 262, 270; *see also id.* ¶¶ 50, 268 [redacted] *see also* Ex. N at 103:8–104:4 [redacted] Ex. J at 116:2–9, 118:17–119:17 (Ms. Bennis aware of [redacted] but not [redacted] Ms. Bennis thus concluded that [redacted] Ex. 5 ¶ 268. Ms. Bennis further considered external economic conditions, and found that an increase to [redacted] *Id.* ¶ 271. Although both were reasonable, Ms. Bennis limited the price erosion to [redacted] increase to account for other considerations affecting price. *Id.* ¶ 271. For the additional revenue Oracle would have earned, Ms. Bennis relied on data from Oracle, which applied the proposed price increases to Oracle's actual sales data. *Id.* ¶¶ 264–266. Ms. Bennis analyzed the data and interviewed the Oracle employee (Mike Russo) who prepared it; Procore also deposed him. *Id.* ¶¶ 260–273; Ex. N at 80:2–113:20.

**1. Procore Mischaracterizes Ms. Bennis's Price Erosion Opinions**

Procore wrongly asserts that Ms. Bennis did not perform an "independent analysis" of price erosion and "merely adopts" Oracle's, pointing to ORC-PRC-01660165. Mot. 8. As an initial matter,

"[t]he fact that [Ms. Bennis's] opinions are based on data collected by others is immaterial" and is not grounds for exclusion. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997). Regardless, ORC-PRC-01660165 is not Ms. Bennis's price-erosion analysis. Ms. Bennis analyzed *Panduit*, and performed a further analysis of relevant facts and economic indicators. *See* § II.B, *supra*. Ms. Kindler (Procore's expert) even agrees that at least [redacted] Ex. H at 155:16-156:2. Only after reaching a conclusion on the amount of price increase that would have been possible "but for" Procore's misappropriation, does Ms. Bennis use Oracle's calculations in ORC-PRC-0166165 applying the [redacted] increase. § II.B.1, *supra*. Even Procore acknowledges that file is just multiplication, applying the [redacted] and [redacted] price increase to Oracle's actual sales data. Mot. 11; Ex. J at 110:3–18. Ms. Bennis nonetheless "scrutinized" those calculations, Mot. 8, and considered the four spreadsheets underlying them (Ex. 5 at n.704; *see also* Ex. J at 109:22–110:2) and discussed the calculations with Mr. Russo, who prepared them. Ex. J at 107:17–110:2; Ex. N at 91:4–15. Ms. Bennis also considered whether these additional revenues would have resulted in any additional expenses. Ex. 5 ¶ 272.

Thus, Ms. Bennis's analysis is nothing like those in Procore's cases. *See Neural Magic. v. MetaPlatforms*, 659 F. Supp. 3d 138 (D. Mass. 2023) (expert relied on third-party valuation with "assumed" market share, did not attempt to verify reliability or speak to anyone about it); *Rambus v. Hynix Semiconductor*, 254 F.R.D. 597 (N.D. Cal. 2008) (technical expert lacked expertise and opined there was "commercial success" without analysis). Ms. Bennis's methodology is reliable and Procore can cross her on her assumptions at trial. *See, e.g.*, *Zucchella v. Olympusat*, 2023 WL 2628107, at *19 (C.D. Cal. Jan. 10, 2023) (admitting expert who "accepted the spreadsheet [summarizing damages that plaintiff] prepared at face value" because it was a matter for cross); *Exeltis USA v. First Databank*, 2020 WL 7025089, at *5 (N.D. Cal. Nov. 30, 2020) (denying *Daubert* where expert applied expertise).

ORC-PRC-01660165 also does not "lack[] 'independent indicia of reliability'" simply because it was prepared in connection with this litigation. Mot. 9; *see Zucchella*, 2023 WL 2628107, at *19 (endorsing expert reliance on spreadsheet created during litigation). Procore deposed Mr. Russo about the calculations in depth, yet it identifies nothing unreliable or inaccurate in them. Ex. N at 80:2–113:20. That makes Procore's cases irrelevant. *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F.

Supp. 2d 1005, 1012 (C.D. Cal. 2003) (expert relied on excerpts of another expert's report prepared for another litigation); *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 857 (9th Cir. 2019) (expert's opinions rested on assumptions that were undisputedly wrong); *Hostetler v. Driscoll*, 2026 WL 608585, at *1 (N.D. Cal. Mar. 4, 2026) (same); *Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019 WL 12074086, at *3 (C.D. Cal. July 1, 2019) (expert relied on witness who lacked "sufficient personal knowledge" of information conveyed).

Finally, contrary to Procore's assertion, Ms. Bennis's *Panduit* and further economic analysis did, in fact, "isolate" the impact of the misappropriation and she considered the impact of customer attrition, reduced usage, or lawful competition. Mot. 8-9; *See* § IV.A.2, IV.B, *supra*; *TriZetto*, 2026 WL 852567 at *8 (approving price erosion analysis that relied on *Panduit*). While Oracle has provided discounts to customers in the past, Mot. 9, Oracle was nonetheless able to increase its prices on a regular cadence *until* Procore Pay. *See* § IV.B., *supra*. It is also unsurprising that a 2024 Oracle competitive analysis (Procore Pay launched in Sept. 2023) did not reveal the extent of its impact, given that it takes [redacted] as Ms. Bennis acknowledges. Ex. 5 ¶ 140. Procore has now impacted at least [redacted] Oracle customers, and continues to do so. Ex. I ¶123. Regardless, Ms. Bennis did account for the possibility of other price-erosion causes "by utilizing the lower [[redacted]] proposed increase[.]" Ex. 5 ¶ 271.

### 2. Price Elasticity's Applicability Is a Fact Question

Procore argues Ms. Bennis's price-erosion opinion "violate[s] the principle of elasticity of demand." Mot. 10–12. Ms. Bennis considered evidence that prior to Procore Pay, the market was inelastic, § B., *supra*, and regardless did not assume a perfectly inelastic market, applying a price increase of [redacted], not the maximum increase Oracle considered. Ex. 5 ¶ 271. Procore does not cite a single case supporting its argument (or its insistence that a specific type of analysis was required, Mot. 12) because the applicability of demand elasticity is a matter for cross. *Ericsson. v. Harris Corp.*, 352 F.3d 1369, 1379 (Fed. Cir. 2003) (no requirement for elasticity analysis, and defendant could have presented its own); *Stanacard, LLC v. Rubard LLC*, 2016 WL 6820741, at *3 (S.D.N.Y. Nov. 10, 2016) (where expert performed *Panduit*, criticism that price erosion was due to other factors was for cross); *Anesta.AG v. Mylan Pharms.*, 2014 WL 3976456, at *3 (D. Del. Aug. 14, 2014) ("reject[ing]

argument that price elasticity is always in play; that is fodder for cross examination"). Procore's arguments confirm as much. For example, Procore points to Oracle's market share decrease from 2021 and 2022, but Ms. Bennis explained that [redacted] and she wasn't [redacted] Ex. J at 116:24–117:19, 118:17–119:2. Ms. Bennis's analysis also took into account other competitors (which had no impact on pre-Procore Pay increases), § IV.B.1, *supra*, and Procore's assertion that Ms. Bennis improperly analyzed inflation because TPM offered no additional value is contradicted by contemporaneous Oracle documents. Ex. 5 ¶ 269 (citing Ex. P); Ex. O. All of this can be addressed on cross.

## C. Ms. Bennis's Reasonable Royalty Opinions Are Reliable

### 1. Procore's Disagreements with Ms. Bennis's Analysis Are for Cross

Procore's disparate arguments regarding Ms. Bennis's royalty fail. *First*, Ms. Bennis's royalty for the Internal Business Information category is based on her price erosion analysis, and Procore's disagreements with that calculation fail as explained in § IV.B., *supra*. *Second*, Procore contends that Ms. Bennis's royalty based on avoided R&D is flawed because she did not "independently confirm[]" the accuracy of Oracle's R&D or apportion to specific trade secrets. Mot. 13. Not so, as explained in § IV.A.1.b, *supra*. *Third*, Procore claims that Ms. Bennis's "*Georgia-Pacific* analysis" is conclusory because it does not alter her quantitative inputs. Mot. 13. No such requirement exists, *Willis Elec. v. Polygroup*, 166 F.4th 1363, 1385–86 (Fed. Cir. 2026) ("sufficient for an economic expert to explain" influence of "qualitative considerations"); *Micro Chem. v. Lextron*, 317 F.3d 1387, 1393–94 (Fed. Cir. 2003) (qualitative adjustments to royalty without assigned numerical value "did not run afoul of Rule 702"), and Ms. Bennis provide multiple pages explaining her qualitative analysis, including references to earlier discussions in her report. Ex. 5 ¶¶ 353–374. Courts routinely find similar methodologies reliable, and not, as Procore suggests, "work[ing] backwards" to arrive at an answer.[4] Mot. 13. *See, e.g.*, *DiscoverOrg Data v. Bitnine Glob.*, 2020 WL 6562333, at *9 (N.D. Cal. Nov. 9, 2020); *Atl.*

[4] That also did not happen in the case Procore cites, *Est. of Jimenez v. Wexford Health Sources*, 2026 WL 622662, at *3 (D.N.M. Mar. 5, 2026), where the expert began by analyzing an autopsy report and then engaged in a reliable analysis to determine the deceased's prognosis.

*Inertial Sys. v. Condor Pac. Indus. of Cal.*, 2015 WL 3825318 (C.D. Cal. June 18, 2015). Procore can raise these disagreements on cross.

**2. Procore Mischaracterizes Ms. Bennis's Royalty Analysis**

Procore's next hodgepodge of arguments fares no better. Ms. Bennis's royalty opinion is not, as Procore claims, [redacted] Mot. 14. As she makes clear, the maximum total royalty is nearly two-thirds lower [redacted] Ex. 5 ¶ 379. Ms. Bennis's opinion is also unlike *Int'l Med. Devices v. Cornell*, 2023 WL 4295157, at *5 (C.D. Cal. Feb. 13, 2023). There, the expert opined that his lump-sum royalty should be allocated between trade secrets and that the full lump-sum was justified by only one trade secret. *Id.* at *5. Ms. Bennis did not opine a single trade secret supports the full royalty; rather; she specifies the royalty by category, and how the royalty should be adjusted if fewer than all trade secrets are misappropriated. §§ IV.A.3, *supra*; Ex. J at 156:15–25; *Steves & Sons v. JELD-WEN*, 2018 WL 2172502, at *15 (E.D. Va. May 10, 2018) (framework adequate where royalty apportioned equally between two groups of trade secrets). Procore's assertion that Ms. Bennis should have added price erosion to avoided R&D in her royalty, Mot. 14, fails for the same reasons described above. *See* §IV.A.4, *supra*. Finally, *Ajaxo* is inapposite, because Ajaxo had "lost or destroyed the evidence needed for reliable apportionment." *Ajaxo v. E*Trade Fin.*, 48 Cal. App 5th 129, 169, 185 (2020). Oracle did not destroy any evidence.

**D. Ms. Bennis's Damages Period Has A Reliable Basis**

Procore's argument that Ms. Bennis's damages period lacks a reliable basis, Mot. 15, is another factual dispute. Dr. Almeroth opined that Procore to this day has not independently developed the trade secrets, has no alternatives to them, and would not have been able to achieve Procore Pay in a "commercially reasonable time" without the trade secrets. *See* Ex. 18 §VI.A., § VI.G. Ms. Bennis also explained the significant, ongoing harm from the misappropriation that her damages do not capture, which Procore does not challenge. Ex. 5 § VI.A. Procore's own documents show that it took [redacted] to launch Procore Pay, and that was *with* the misappropriation. *See, e.g.*, *id.* ¶ 67. Ms. Bennis reasonably calculated damages through trial, and Procore can cross her on that opinion if it disagrees.

## V. CONCLUSION

For the foregoing reasons, Procore's motion to exclude Ms. Bennis should be denied.

DATED: July 9, 2026

Respectfully submitted,

/s/ *Akshay S. Deoras*
Adam R. Alper (SBN 196834)
Akshay S. Deoras (SBN 301962)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
adam.alper@kirkland.com
akshay.deoras@kirkland.com
Telephone: (415) 439-1400

Michael W. De Vries (SBN 211001)
Yimeng Dou (SBN 285248)
Ingrid Petersen (SBN 313927)
Kevin X. Wang (SBN 318024)
KIRKLAND & ELLIS LLP
695 Town Center Drive, Suite 1700
Costa Mesa, California 92626
michael.devries@kirkland.com
yimeng.dou@kirkland.com
ingrid.petersen@kirkland.com
kevin.wang@kirkland.com
Telephone: (714) 982-8822

Leslie M. Schmidt (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
leslie.schmidt@kirkland.com
Telephone: (212) 446-4800

Christopher M. Lawless (SBN 268952)
Kendra Delaney (SBN 339102)
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
christopher.lawless@kirkland.com
kendra.delaney@kirkland.com
Telephone: (310) 552-4200

*Attorneys for Plaintiffs Oracle America, Inc., Oracle International Corporation, and Textura Corporation*