UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ORACLE AMERICA, INC., et al.,
Plaintiffs,

v.

PROCORE TECHNOLOGIES, INC., et al.,
Defendants.

Case No. 24-cv-07457-JST

**ORDER GRANTING IN PART, DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

Re: ECF Nos. 337, 342

Before the Court is a motion for summary judgment filed by Defendants Procore Technologies, Inc., and Procore Payment Services, Inc. ("Defendants"). ECF No. 342. The Court will grant the motion in part and deny it in part. Because the summary judgment briefing relies on the Expert Reports of William Ibbs and Kevin Almeroth, this order also resolves Procore's motion to strike those reports, which is also granted in part and denied in part. ECF No. 337.

## I. BACKGROUND

Plaintiffs Oracle America, Inc., Oracle International Corporation, and Textura Corporation filed the complaint on October 25, 2024. ECF No. 1. It alleges a single count of trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b), 1839 et seq.[1] *Id.* ¶¶ 73–92. In short, Oracle alleges that Procore misappropriated its trade secrets related to Textura Payment Management ("TPM"), construction project payment software, to develop a competitor product called Procore Pay. *Id.* ¶¶ 47, 66, 74. The alleged misappropriation largely stems from an Oracle employee named Mark Mariano's move to Procore in October and November of 2021. ECF No. 349-34 ¶¶ 51, 639.

[1] A second count for breach of contract was originally alleged against an individual defendant named Mark Mariano, but he has since been dismissed. ECF No. 1 ¶¶ 93–105

United States District Court
Northern District of California

United States District Court
Northern District of California

Oracle's most recent list of asserted trade secrets ("ATS"), served on June 5, 2026, asserts 34 trade secret files in six categories: (A) Textura Payment Management Solution (10 trade secrets); (B) Oracle Enterprise Resource Planning ("ERP") Integrations (3 trade secrets); (C) Third-Party ERP Integrations (10 trade secrets); (D) Cross Platform Integrations (6 trade secrets); (E) Customer Information (3 trade secrets); and (F) Internal Business Information (2 trade secrets). ECF No. 349-15. The ATSs include Python source code, PowerPoint presentations, Excel spreadsheets, Word documents, OneNote notebooks, a photo, and conceptual secret not tied to a specific file.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III. MOTION TO EXCLUDE IBBS AND ALMEROTH EXPERT REPORTS

### A. Legal Standard

Under Federal Rule of Evidence 702, the District Court acts as a "gatekeep[er]," preventing expert testimony from reaching the jury that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). To survive a *Daubert* challenge, "[t]he expert's testimony must be 'based upon sufficient facts or data,' 'the product of reliable principles and methods,' and the expert must 'appl[y] the principles and methods reliably to the facts of the case.'" *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1191–92 (9th Cir. 2007) (quoting Fed. R. Evid. 702). "Expert opinion testimony is . . . reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (citation omitted). Reliability of opinions based on knowledge and experience "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (emphasis removed).

"Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th

United States District Court
Northern District of California

Cir. 2010), *as amended* (Apr. 27, 2010). "Simply put, '[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether [their] testimony has substance such that it would be helpful to a jury.'" *Canty v. DePuy Orthopaedics Inc.*, No. 14-CV-05407-JSW, 2024 WL 2852213, at *2 (N.D. Cal. June 5, 2024) (*quoting Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013)).

It is Oracle's burden to establish that its expert testimony is admissible under FRE 702. *See Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

**B. Discussion**

Oracle served the Opening Reports of both Dr. William Ibbs and Dr. Kevin Almeroth on April 8, 2026. ECF No. 338-2 at 8. Ibbs describes himself as an expert on "construction financials" and "construction management," while Almeroth is Oracle's designated software expert. ECF No. 338-4 at 7–8.

**1. Scope of Expertise**

An expert's opinion is limited to the scope of their expertise. *See Foshee v. Zuniga*, No. 20-CV-00132-VKD, 2021 WL 1947560, at *5 (N.D. Cal. May 14, 2021) (citing Fed. R. Ev. 702). When an expert offers "opinions beyond the scope of his expertise," those opinions "should be excluded." *Kesler v. Puget Sound & Pac. R.R.*, No. 3:20-CV-06075-RJB, 2022 WL 298775, at *1 (W.D. Wash. Feb. 1, 2022).

**a. Overlap**

Procore first objects to the Ibbs and Almeroth expert reports because they opine on many of the same trade secrets "without regard to the technical or industry-related nature of any individual alleged trade secret." ECF No. 338-2 at 10. Procore responds that "Ibbs and Almeroth offer different perspectives based on their differing expertise (in many cases addressing different issues)." ECF No. 379-3 at 8. The parties agree that expert testimony that merely restates or purports to bolster the expert testimony of another is improper. *See Huawei Techs., Co. v. Samsung Elecs. Co.*, 340 F. Supp. 3d 934, 993–94 (N.D. Cal. 2018) (collecting cases); *Scientific Applications & Research Associates (SARA), Inc. v. Zipline Int'l, Inc.*, No. 22-cv-04480-JSC, 2025 WL 4108875, at *5–6 (N.D. Cal. Apr. 11, 2025). There is likewise no dispute that an

industry and a technical expert may present complementary, non-duplicative opinions on different aspects of asserted trade secrets. *In re Toyota Motor Corp.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) ("In a complex case, the opinions of multiple experts may be presented" and "expert opinions may find a basis in part 'on what a different expert believes on the basis of expert knowledge not possessed by the first expert.'" (citation omitted)); *Montgomery v. Wal-Mart Stores, Inc.*, No. 12CV3057-AJB (DHB), 2015 WL 11233382, at *4 (S.D. Cal. Sept. 24, 2015) ("The mere presence of overlap [or] reference to another expert's report or a similar conclusion . . . does not render an expert report unnecessarily 'cumulative' pursuant to [Federal Rule of Evidence] 403.").

As such, this dispute turns on the nature of the evidence offered by each expert, to which the Court now turns.

**b. Ibbs**

Ibbs is Oracle's construction-management industry expert. He has over 45 years of experience, including as a UC Berkeley civil engineering professor since 1981, a practicing engineer with his own consulting firm, and as a creator of construction management software that Autodesk eventually purchased. ECF No. 338-3 ¶¶ 7-8, 11-12. He researched and worked on construction management issues that are addressed by the trade secrets and competing software in this case, including "invoicing, payments, compliance management, project cost estimating, cost control, scheduling, and the use of software platforms . . . including enterprise-resource-planning ('ERP') integrations." *Id.* ¶ 7. He is not a software engineer or an expert in computer programming, nor does he read Python (the language in which the bulk of Oracle's source code ATSs are written). ECF No. 338-4 at 20, 23. In his startup work, however, he collaborated with software engineers and reviewed and tested source code, including code related to ERP integrations. ECF No. 378-2 at 4–5.

Based on his industry experience and independent analysis, Ibbs opines that Oracle's trade secrets are confidential and have independent economic value as defined by industry standards. He examines the contents of the trade secret files, applies his experience to assess confidentiality and value, and ties the information to Procore's features. *See generally* ECF No. 338-3 ¶¶ 56-216.

United States District Court
Northern District of California

Procore argues that Ibbs should not be allowed to opine on the source code ATSs because he is not a software expert. ECF No. 338-2 at 12. To do so, Ibbs relies on fact witness Steve Chin to describe the contents and function of the various source code ATSs, which Procore contends is improper. Contrary to Procore's position, Chin need not be qualified as an expert because he has firsthand experience concerning the files at issue by virtue of his role as Oracle's Director of Software Engineering and Implementation for Textura. ECF No. 379-3 at 12. "An expert may base an opinion on facts or data in the case that the expert has been made aware of." Fed. R. Evid. 703; *see Claar v. Burlington*, 29 F.3d 499, 501 (9th Cir. 1994). "[E]xpert reliance on foundational facts supplied by [the company's] engineers can be proper so long as they testify to the foundational facts with firsthand knowledge." *Oracle v. Google*, No. C 10–03561 WHA, 2011 WL 5914033, at *1 (N.D. Cal. Nov. 28, 2011). Informed by Chin's description of the file's contents, Ibbs's report properly opines whether the file at issue would generally be considered in the industry to derive value from its secrecy. ECF No. 379-3 at 12–13 (citing ECF No. 338-3 ¶¶ 60-62, 66, 71, 131, 141, 143).[2]

Procore also attempts to impeach Ibbs with quotes from his deposition which, while imprudently phrased, are taken out of context. For instance, Ibbs described the interplay between his report and Almeroth's as follows: "he's saying that the source code is a trade secret, and I'm saying that if it's a secret, then it should be kept confidential in the industry." ECF No. 338-4 at 39–40. But Ibbs went on to clarify that he contributes knowledge about what kinds of information are considered in the industry to be independently valuable from not being generally known or readily ascertainable. *Id.* at 41. Likewise, Ibbs's statement that his testimony does not "differ in any material or consequential way" from Dr. Almeroth's appears intended to capture the lack of

[2] Procore also suggests that Ibbs's opinion seeks to admit Chin's testimony as impermissible hearsay, ECF No. 338-2 at 13, but (1) Procore has deposed Chin twice and (2) doesn't presently contest the accuracy of Chin's factual account. In addition, "experts may offer opinions based on otherwise inadmissible testimonial hearsay if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, and if they are applying their training and experience to the sources before them and reaching an independent judgment, as opposed to merely acting as a transmitter for testimonial hearsay." *Prescott v. Reckitt Benckiser LLC*, No. 20-cv-02101-BLF, 2022 WL 3018145, at *7 (N.D. Cal. July 29, 2022) (citation omitted).

disagreement between the two reports rather than communicate any redundancy. *See id.* at 38 (Ibbs going on to say "I think they are consistent . . . he's looking at them in a different more detailed level . . . programming-wise than I am. But I think that in spirit that our opinions are consistent.").

Procore has not shown that Ibbs exceeded the scope of his expertise by opining on whether the source code ATSs derive value in the industry from secrecy.

**c. Almeroth**

Almeroth is Oracle's technical expert. A UC Santa Barbara computer science professor since 1997, his research focuses on data delivery between computing devices, large-scale data exchange systems, and API integration. ECF No. 338-5 ¶¶ 3-6, 20, 21, 27. More specifically, his "work has emphasized the exchange of content more efficiently across computer networks, including the scalable delivery of content to many users, mobile computing, satellite networking, delivering content to mobile devices, and network support for data delivery in wireless networks, and secure, reliable data exchange across distributed systems and cloud services." *Id.* ¶ 6. Moreover, Almeroth has "studied issues concerning how users choose content, especially when considering the price of that content." *Id.* ¶ 13. He co-founded a technology company and has worked with companies ranging from startups to IBM and Cisco. *Id.* ¶¶ 25-26.

Based on this experience, Almeroth opines that the trade secret files contain confidential technical information relating to Oracle's TPM software and ERP integrations. Procore asserts that Almeroth exceeded his expertise in opining on Textura's customer facing user interface and user manual, a PowerPoint presentation on the principles of construction accounting, labeled "Construction Accounting 101," and Textura's pricing. ECF No. 338-2 at 11 (referencing ECF No. 338-5 ¶¶ 231-43, 267-71, 524-27).

Materials adjacent to software developed by a company—including the user interface, user manual, and pricing—appear to be within Almeroth's expertise as someone who has extensive experience with the development and sale of software and the business development of tech companies more generally. "Construction Accounting 101" is a closer question. Oracle asserts that the construction accounting method contained in this file is implemented using Textura,

United States District Court
Northern District of California

which is software. ECF No. 379-3 at 10. But it is not clear whether the method depends on use of that software. *See* ECF No. 338-5 ¶ 267. And in asserting trade secret status, Oracle focuses not on the mechanics of the software, but its own "approach to processing payments and related tasks" and "how the process that Textura automates has been implemented at our clients." ECF No. 382-3 at 23. In other words, the focus is not on the development of software, about which Almeroth may be able to opine, but the development of an approach to implementing that software in the construction accounting context, about which Almeroth has no expertise. *See also* ECF No. 338-5 ¶ 271 (Almeroth report explaining that "the file describes an internal and confidential step-by-step process for how Oracle implements construction accounting, including describing certain functionalities such as how Oracle handles WIP reports"). The Court therefore strikes the portions of Almeroth's expert report concerning "Construction Accounting 101.pptx" as outside of his expertise. Otherwise, Procore has neither identified any impermissible overlap between the experts' opinions nor demonstrated that either exceeded his expertise on the grounds described above.

**2. Reliability of Ibbs's Industry Opinions**

"The reliability of opinions that are based on the expert's knowledge and experience, like the ones at issue here, 'depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" *In re Twitter, Inc. Securities Litigation*, No. 16-cv-05314-JST, 2020 WL 9073168, at *3 (N.D. Cal. Apr. 20, 2020). Ibbs properly drew on his experience to consider the evidence and evaluate whether each individual trade secret would be information that a company like Oracle would keep confidential and be valuable to a competitor in the industry. ECF No. 338-3 ¶¶ 47-231 (analyzing ATSs); *id*. ¶¶ 47 (explaining that his conclusions are based on his expertise and experience).

Courts routinely admit evidence based on the expert's experience in a field. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1043 (9th Cir. 2010) (permitting expert testimony on the "standard practice" based on the expert's "forty years of experience"); *Comet Techs. USA Inc. v. XP Power LLC*, No. 20-CV-06408-NC, 2022 WL 2442810, at *2 (N.D. Cal. Mar. 2, 2022) (in a trade secrets case, noting that "courts within the

Ninth Circuit have commonly allowed 'industry standards' testimony when supported by relevant experience" and allowing experts to testify on industry standards of confidentiality, standard of care, clean room procedures, and whether information qualified as a trade secret or was misappropriated); *see also In re Twitter*, 2020 WL 9073168, at *3 (stating that where an expert has "decades of relevant experience" and his "opinions are also based on his review of relevant" evidence, these alone are "sufficient to conclude that the opinions at issue are reliable"); *Tesoro v. Pac. Gas & Elec.*, No. 14-cv-00930-JCS, 2016 WL 158874, at *12 (N.D. Cal. Jan. 14, 2016) (expert could "testify based on his experience in the industry regarding industry standards and express an opinion as to whether FWM's systems were consistent with those standards").

Procore's cited cases are inapposite. ECF No. 338-2 at 14–15. In *Rambus Inc. v. Hynix Semiconductor Inc.*, for instance, the court rejected an expert's opinion for lack of analysis where "[h]is reasoning appears to be: the Manufacturers' products incorporate Rambus's claimed inventions; those products have been successful; *ergo* Rambus's inventions caused the products' success." 254 F.R.D. 597, 604–05 (N.D. Cal. 2008). And in *Rearden, LLC v. Walt Disney Pictures*, the Ninth Circuit rejected a damages expert who "failed to provide a cogent explanation of his methodology and repeatedly conceded that he lacked knowledge about MOVA technology." 152 F.4th 1058, 1078 (9th Cir. 2025). Unlike these conclusions concerning causality and damages, the conclusion that a certain type of information does or does not derive value in the industry from being publicly known or ascertainable does not require any particular type of analysis. That Ibbs's conclusions are more observational in nature does not make them unreliable.

It is true, as Procore points out, that the Ibbs Report repeats verbatim language in concluding that each trade secret derives value from its secrecy. ECF No. 338-2 at 15. But the report also summarizes the trade secrets, explains what aspect of the trade secret file would be kept confidential in the industry, ties the file information to Procore competitor product features, and addresses Procore's sources purporting to show that the file contents are not kept secret. *See, e.g.*, ECF No. 379-3 at 16; ECF No. 338-3 ¶¶ 56–216, 223–30. This analysis is sometimes thin. At the same time, the Court does not exclude an expert report under *Daubert* merely because it could be more robust. *See Primiano*, 598 F.3d at 564.

United States District Court
Northern District of California

### 3. Ibbs's Qualifications to Opine on Intent

The parties agree that Ibbs may not opine that Procore intended to target Oracle, that it conspired to target and take business from Oracle, or that it pursued a "strategy to target business directly from Textura." ECF No. 379-3 at 19–20; ECF No. 398-3 at 13–14. The corresponding paragraphs of his report, ECF No. 338-3 ¶¶ 409, 411, 413, are excluded.[3, 4]

### 4. Conclusion

The Court strikes the portions of Almeroth's expert report concerning "Construction Accounting 101.pptx" as outside of his expertise, but otherwise denies the motion. ECF No. 337.

## IV. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate only when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court "must draw all reasonable inferences supported by the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *see also Matsushita*, 475 U.S. at 587. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986).

### B. Statute of Limitations

On October 19, 2021, Mariano announced his intent to depart Oracle and begin employment at Procore. ECF No. 338-5 ¶ 639. He left Oracle on October 29, 2021, and joined Procore on November 1, 2021. *Id.* ¶¶ 51, 639. Oracle filed suit less than three years later, on

---

[3] Oracle argues that the "the remaining language in paragraphs 409, 411, and 413 is appropriate analysis," ECF No. 379-3 at 20, but these paragraphs do not contain expert analysis unrelated to Procore's intent. Rather, they contain recitations of fact evidence.

[4] Procore also seeks to strike paragraphs 416, 419, and 422 because they use the word "misappropriation." ECF No. 338-2 at 18. While Ibbs is unqualified to directly reach the legal conclusion that Procore misappropriated trade secrets, his errant use of the term "misappropriation" does not provide a basis for striking those entire paragraphs. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (holding that while "an expert witness cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law," "expert testimony concerning an ultimate issue is not per se improper" (citation omitted)).

October 25, 2024. ECF No. 1. Procore argues that the statute of limitations began to run on October 19, 2021, several days prior to the critical date of October 25, 2021.

**1. Timeliness**

A private civil action under the DTSA "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). For purposes of the statute of limitations, "a continuing misappropriation constitutes a single claim of misappropriation." *Id.*[5] The law is unsettled regarding whether the DTSA statute of limitations begins to run from the time that a reasonably diligent plaintiff should have begun an investigation into a possible violation, or from the time that a reasonably diligent plaintiff's investigation would have uncovered the facts underlying the cause of action. *See Insulet Corp. v. EOFlow, Co.*, 176 F.4th 1347, 1353–54 (Fed. Cir. 2026) (noting both possibilities without endorsing either).

In this Court's view, the plain text of the statute unambiguously supports the second rule.[6] It starts the statute of limitations clock from the time that the "misappropriation . . . by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). The use of the word "discovered" forecloses running the statute of limitations from the day the investigation should have begun, assuming that a reasonably diligent plaintiff's investigation would not have immediately—that is, instantly—uncovered the relevant evidence. And the focus on "the facts underlying the cause of action" forecloses commencing the limitations period before those facts could have reasonably been known.

[5] Where the defendant, "in a single course of alleged misappropriation, disclose[s] each asserted trade secret" for a common purpose, the "alleged misappropriations of the asserted trade secrets . . . constitute a single claim of misappropriation," the limitations period for which runs from the first instance of misappropriation. *Insulet Corp. v. EOFlow, Co.*, 176 F.4th 1347, 1358 (Fed. Cir. 2026).

[6] In a prior decision, this Court concluded that the date that the plaintiff "suspects or has 'reason to suspect' that the defendant could be misappropriating its trade secrets" triggers the duty to investigate and starts the statute of limitations period. *Chung v. Intellect Soft Grp. Corp.*, No. 21-CV-03074-JST, 2022 WL 20184655, at *13 (N.D. Cal. July 13, 2022). That conclusion aligned with the decisions of many peer courts. *See, e.g.*, *Alta Devices, Inc. v. LG Elecs., Inc.*, No. 18-CV-00404-LHK, 2019 WL 1924992, at *14 (N.D. Cal. Apr. 30, 2019); *Woodall v. Walt Disney Co.*, No. CV 20-3772-CBM(EX), 2024 WL 5329913, at *2 (C.D. Cal. Nov. 1, 2024). Those cases, however, did not confront the precise issues presented by the parties here.

"[T]he facts underlying the cause of action" may well refer merely to those facts necessary to state a claim, rather than all the facts necessary to prove the claim. Multiple courts have held as much. *See Insulet*, 176 F.4th at 1356 ("The relevant question is ultimately whether Insulet had sufficient knowledge to state a claim for trade secret misappropriation before the critical date, not whether it had sufficient evidence to prove misappropriation of its trade secrets."); *Woodall v. Walt Disney Co.*, No. CV 20-3772-CBM(EX), 2024 WL 5329913, at *2 (C.D. Cal. Nov. 1, 2024) ("A plaintiff need not be aware of the specific facts necessary to establish the claim; that is a process contemplated by pretrial discovery."). In *Insulet*, the court observed that a plaintiff states a claim for a violation of the DTSA when it alleges "access-plus-similarity": "the defendants' access to the trade secret and the similarity of the trade secret to the defendant's design." 176 F.4th at 1354, 1355. It therefore considered whether "Insulet knew or should have known of facts sufficient to plead access and similarity as to one of the asserted trade secrets before the critical date." *Id*. at 1358.

Here, the crux of the dispute between the parties is whether the clock started running on the date that Mariano resigned from Oracle and announced his intent to join Procore. Procore asserts that Mariano's resignation and announcement should have elicited suspicion and prompted an investigation; Oracle argues that his announcement at most elicited suspicion that he would misappropriate trade secrets in the future, which is insufficient to trigger the statute of limitations. Absent anything to suggest that Mariano had already begun funneling trade secrets to Procore, starting the limitations clock on October 19 is premature. Oracle's claims are timely.

Procore invokes the Federal Circuit's "access-plus-similarity" framework from *Insulet*. ECF No. 349-3 at 11–12. It argues that Mariano's resignation gave Oracle notice of Procore's access to Oracle's alleged trade secrets. *Id.* at 12–13. In support, Procore cites evidence that the Oracle leadership was concerned about Mariano's departure given his knowledge of "sensitive and confidential material," turned off his systems access, and made comments including "his knowledge of textura will crush us over there," "[Mariano] at procore scares me," "i worry more about his knowledge of tpm at procore." *Id*. at 13 (citing ECF Nos. 349-16, 349-17, 349-18). But Oracle employees' generic fears that Mariano's expertise in the hands of a competitor would be

damaging, and the routine step they took of turning of his systems access, do not suggest any particularized suspicion that Mariano was funneling trade secrets to Oracle. And even if these comments did evince an underlying suspicion of trade secret theft, that fear would have been unreasonable. Procore, in its motion, identifies no evidence of its own access to Oracle's trade secrets beyond the fact that Mariano had resigned and would soon join Procore. The mere fact that Mariano had resigned and intended to join a competitor is certainly insufficient to support an allegation that Procore could access Oracle's trade secrets through Mariano. Mariano was still an Oracle employee bound by his obligations to his employer. Procore has identified no basis for Oracle to believe, as of October 19, 2021, that Procore had access to its trade secrets.

Procore argues that the similarity prong is satisfied because Oracle knew, as of July 2020, that Procore was developing Procore Pay, and as of September 2021, that Procore Pay was "totally spec'd" and "mostly developed." ECF No. 349-3 at 14 (citing ECF Nos. 349-9, 349-10, 349-32). The problem is that Procore does not show any relationship between the similar product—Procore Pay—and Mariano's announcement. In *Insulet*, former employees with access to trade secrets moved to the competitor and there, worked on developing a similar product. 176 F.4th at 1359. The plaintiff had been on notice of potential misappropriation because its former employee had already been working with the competitor for years. *Id*. at 1359–60.[7] Here, Procore identifies no information suggesting that Mariano had been providing information to Procore before his resignation date, much less that Oracle was contemporaneously aware of it.[8] In the absence of such information, there is no connection between Procore's access to trade secrets and its similar

[7] Procore's reliance on *Insulet*'s observation that "it is not unexpected that a former employee will go to work for a competitor and that the competitor might thereby acquire trade secrets" is misplaced because the line is taken out of context. 176 F.4th at 1359; ECF No. 400-3 at 7. In context, the line supports only the proposition "that a trade secret owner's knowledge that a former employee . . . worked for the alleged misappropriator puts the trade secret owner on notice of access as a matter of law." *Id*. It does not support the proposition that an employee's stated intent to depart to work for a competitor establishes a suspicion of trade secret misappropriation, where the employee has not yet departed employment or begun work at the competitor.

[8] References to Oracle's post-hoc discovery responses asserting that "Mariano began exfiltrating trade secret materials in anticipation of his move to Procore," and that "Procore admitted that it began discussing Mariano's employment with Mariano in September 2021" do not suffice. ECF No. 349-3 at 16. They provide no evidence that Mariano was misappropriating trade secrets prior to the critical date and are even less informative on the critical question of whether Oracle had inquiry notice of the possibility of misappropriation at the time.

product, which was in development months before Mariano's resignation. The "access-plus-similarity" framework does not support starting the statute of limitations on October 19, 2021.

Procore marshals a few more facts intended to show that Oracle had inquiry notice prior to October 25, 2021, but none suffices. ECF No. 349-3 at 13. For example, "[a]fter Oracle cut off access to Mr. Mariano's Oracle email on October 19, 2021, he kept using his personal Gmail account to send and receive Oracle information without any protest from the Oracle personnel who directly communicated with his Gmail address." *Id*. at 13–14 (citing ECF Nos. 349-20, 349-21, 349-25, 349-26). These emails embody communications *with Oracle personnel* while Mariano was *still employed by Oracle* and therefore do not raise a suspicion that he was funneling trade secrets to Procore.

Procore also points to an Oracle interrogatory response identifying as an alleged act of misappropriation Mariano's modification of an Oracle trade secret file ("Viewpoint TLC Install Instructions.docx"), which occurred the same day he gave notice. ECF No. 349-3 at 13–14. But as Procore concedes, the fact that Mariano opened and modified the file was revealed by the forensic neutral examiner in discovery in this action. *Id*. at 14 ("Preliminary forensic logs from the forensic neutral examiner in this action show . . ."). Even if the fact of Mariano's opening and modifying the file were sufficient to raise a suspicion of trade secret misappropriation, Procore identifies no evidence that Oracle was aware that Mariano had done so at any time before it was revealed in discovery.[9]

The statute of limitations in a DTSA action begins running when the Plaintiff discovered or should have discovered the misappropriation. 18 U.S.C. § 1836(d). It does not, as Procore suggests, begin whenever the plaintiff employer has reason to suspect that a departing employee may misappropriate trade secrets in the future. The claims are timely.

**2. Waiver**

Even if Oracle's claims were barred by the statute of limitations, Procore has waived that defense. "In responding to a pleading, a party must affirmatively state any avoidance or

[9] The trade secret file at issue is also no longer asserted by Oracle in this action, so it is not clear that misappropriation of it could start the statute of limitations clock. ECF No. 349-3 at 13 n.2.

affirmative defense, including: . . . statute of limitations." Fed. R. Civ. P. 8(c)(1). An affirmative defense not raised in the first responsive pleading is deemed waived. *See Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005); *see also Chung v. Intellectsoft Grp. Corp.*, No. 21-CV-03074-JST, 2024 WL 813445, at *6 (N.D. Cal. Feb. 12, 2024) (finding that the defendant, "by failing to plead its statute of limitations defenses in a responsive pleading, has waived any such defense").

"However, the Ninth Circuit has softened this requirement, such that a defendant 'may raise an affirmative defense for the first time in a motion for summary judgment only if the delay does not prejudice the plaintiff.'" *Chung*, 2024 WL 813445, at *5 (quoting *Magana v. Com. of the N. Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997), as amended (May 1, 1997)); *see also Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993) ("In the absence of a showing of prejudice . . . an affirmative defense may be raised for the first time at summary judgment.").

Procore's answer asserts seven affirmative defenses, none of which mentions the statute of limitations. ECF No. 86 at 22–25. It raised the issue for the first time on the last day of fact discovery when it amended its responses to Oracle's interrogatories concerning the bases for Procore's affirmative defenses. ECF No. 382-5 at 8–9. Even then, Procore articulated a different theory than the one raised in the present motion, based largely on misappropriation of trade secrets unrelated to Mariano and predating his resignation by months. *Id.*

Oracle argues that it was prejudiced because it was prevented from taking discovery "into Oracle's lack of knowledge, Mariano's concealment of his theft, Procore's concealment of its theft and use of the trade secrets, and Mariano's activities between his notice date and his departure." ECF No. 382-3 at 13. Procore has no good response to this argument, and the Court accepts it. Indeed, the evidence in the record of Oracle's knowledge or lack thereof of facts raising a suspicion of trade secrets misappropriation is very thin. It is entirely reasonable to conclude, based on that paucity of evidence, that Oracle's ability to effectively rebut a statute of limitations defense was hampered by the fact that it was not raised until—at the earliest—the last day of fact discovery. As such, even if the Court had not already concluded that the DTSA claims are not time-barred, it would conclude that Procore had waived that defense by failing to comply with

United States District Court
Northern District of California

Rule 8(c).[10]

### C. DTSA Claim

A claim for trade secret misappropriation under the DTSA requires that: (1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff. *See Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 907 (N.D. Cal. 2023). A "trade secret" exists if (a) "the owner thereof has taken reasonable measures to keep such information secret"; and (b) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). To establish misappropriation, Oracle must prove that Procore "improperly acquired, disclosed, or used the trade secret." *Beluca Ventures LLC*, 660 F. Supp. 3d at 910.

#### 1. Identification and Secrecy

In its motion, Procore argues that Oracle's categorical identification of trade secrets (1) fails to identify the asserted secrets with sufficient particularity and as a result, (2) sweeps in information that is not secret.

"To show that information is a trade secret, a plaintiff 'may not simply rely upon 'catchall' phrases or identify categories of trade secrets.'" *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1087 (9th Cir. 2025) (quoting *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020)). "Instead, a plaintiff must prove that the claimed trade secret

[10] Oracle also argues that the statute of limitations should be tolled because Procore fraudulently concealed its theft. ECF No. 382-3 at 17 (citing *UA Loc. 343 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada, AFL-CIO v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1475 (9th Cir. 1994)). Because the statute only starts the limitations clock where the plaintiff knew or should have known about the theft, the fraudulent concealment doctrine appears largely redundant in this context. *N.L.R.B. v. O'Neill*, 965 F.2d 1522, 1526 (9th Cir. 1992) ("Where there is fraudulent concealment, the limitations period begins to run when the charging party knows or should have known of the concealed facts." (quoting *Ducane Heating Corp.*, 273 NLRB 1389, 1390 (1985)). In addition, the evidence Oracle identifies purporting to show fraudulent concealment is from 2023 and 2024. ECF No. 382-3 at 17–18. The effect of such evidence on the present dispute—concerning whether Oracle was on inquiry notice prior to October 25, 2021—is not immediately clear.

United States District Court
Northern District of California

has 'sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" *Id.* (quoting *InteliClear*, 978 F.3d 658). Identifying trade secrets with sufficient particularity is important because defendants need 'concrete identification' to prepare a rebuttal" and because courts lack "the requisite expertise to define what the plaintiff leaves abstract." *Id.* (quoting *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998)). "Whether a trade secret is identified with 'sufficient particularity' is a question of fact." *Quintara Biosciences*, 149 F.4th at 1087.

In several prior orders, the Court declined to require Oracle to define its trade secrets with greater particularity. ECF Nos. 76, 206, 242. However, "[a] party's burden to clearly identify its trade secrets at the summary judgment stage is greater than its burden at the pleading stage." *Double Eagle Alloys, Inc. v. Hooper*, No. 19-CV-243-JDR-CDL, 2024 WL 3166921, at *1 n.1 (N.D. Okla. June 25, 2024), *aff'd,* 134 F.4th 1078 (10th Cir. 2025) (citing *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1027 (E.D. Wis. 2010)); *see also Auris Health, Inc. v. Noah Med. Corp.*, No. 22-CV-08073-AMO (LJC), 2024 WL 5294698, at *2 (N.D. Cal. Nov. 23, 2024) (concluding that "precise, unambiguous boundaries for each alleged trade secret" are not required where "Defendants may explore the contours of the trade secrets in 30(b)(6) depositions"). This is because "[t]he question of whether a party has sufficiently identified its trade secrets is intertwined with the ultimate question of whether a jury could find in the plaintiff's favor." *Double Eagle Alloys, Inc.*, 2024 WL 3166921, at *1. "Failure to identify a trade secret is, therefore, a failure of proof." *Id.*

At summary judgment, courts ask whether the evidence is sufficient to allow a reasonable jury to identify the asserted trade secrets and determine whether they are protectable under the statute. *InteliClear*, 978 F.3d at 659; *see also Double Eagle Alloys*, 134 F.4th at 1097 ("At the summary-judgment stage, a plaintiff identifies a trade secret by producing sufficient evidence that could meet the definition of a trade secret under the DTSA and OUTSA. A failure to produce sufficient evidence amounts to a failure to identify a trade secret."). At the same time, a trade secret plaintiff need not "compose their identifications as if they were patent claims." *Auris Health*, 2024 WL 5294698, at *2 (quoting Sedona Conference Commentary on Proper

Identification of Asserted Trade Secrets in Misappropriation Cases, 22 SEDONA CONF. J. 223, 257 (2021)). At summary judgment, "[a] party seeking to claim trade-secret protection must, at a minimum, describe the boundaries of the trade secrets in a manner that would permit the Court to understand whether trade-secret protection is being claimed with respect to individual files or a combination thereof, evaluate whether the information (in whole or in combination) is publicly available, and rule on motions in limine and evidentiary challenges." *Double Eagle Alloys, Inc.*, 2024 WL 3166921, at *2.

The Seventh Circuit was presented with this issue in *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002). Its reasoning is instructive:

> According to IDX, "a 43–page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package" is specific enough. No, it isn't. These 43 pages describe the software; although the document was created for this litigation, it does not separate the trade secrets from the other information that goes into any software package. Which aspects are known to the trade, and which are not? That's vital under the statutory definition. Likewise, IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets. As we remarked in *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266 (7th Cir.1992), a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition. What is more, many of the items that appear in the 43–page description, such as the appearance of data-entry screens, are exceedingly hard to call trade secrets: things that any user or passer-by sees at a glance are "readily ascertainable by proper means."

*Id*. *IDX* therefore highlights another important point: where the asserted trade secret contains a substantial amount of publicly known content, defining the precise contours of the true trade secrets within may take on heightened importance. *See LivePerson, Inc. v. [24]7.ai, Inc.*, No. 17-CV-01268-JST, 2018 WL 5849025, at *10 (N.D. Cal. Nov. 7, 2018) (concluding that where it is "beyond dispute that portions of [the plaintiff's] code were widely known," "the lack of specificity as to which elements of [that] code remained secret and valuable impermissibly shifted the burden onto defendants to discern the portions of the code on which [the plaintiff] could plausibly base a trade secret claim") (citing *PaySys International, Inc. v. Atos Se*, No. 14-CV-10105 (KBF), 2016 WL 7116132, at *11 (S.D.N.Y. Dec. 5, 2016)).

United States District Court
Northern District of California

Procore therefore asks the Court to decide, for each category of asserted trade secrets, whether Oracle has "provided enough evidence identifying a concrete trade secret to create a triable issue as to whether [the defendant] misappropriated that trade secret." *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, No. 1:17-CV-8829, 2020 WL 2836778, at *3 (N.D. Ill. May 31, 2020), *aff'd*, 163 F.4th 1091 (7th Cir. 2026). With one exception, the answer is "yes": Oracle's trade secrets are defined with sufficient particularity.

**a. Category A(ii)**

Category A(ii) contains the exception. This category encompasses ATSs 6 through 10: an entry for "Textura's Workflows, Functionality, Structure, Architecture, User Interfaces, and Interconnections," two PowerPoints, an Excel spreadsheet, and a Word document. ECF No. 349-15 at 2.

"It is well established that publicly known information, including information that is disclosed in a published patent or patent application, cannot be protectable as a trade secret." *Chung*, 2024 WL 813445, at *7. And thereis no dispute that Oracle has publicized extensive information about "Textura's Workflows, Functionality, Structure, Architecture, User Interfaces, and Interconnections." It has done so through dozens of patent applications and over fifty video demonstrations published on its website and YouTube channel. *See* ECF Nos. 347-40, 347-43. One example, U.S. Patent 10,621,566, includes over 170 figures illustrating system architecture, workflows, and user interfaces for a construction payment-management system. ECF No. 347-41. Procore therefore argues that this ATS is specified with insufficient particularity. ECF No. 349-3 at 20.

In its opposition, Oracle argues that "Textura's Workflows, Functionality, Structure, Architecture, User Interfaces, and Interconnections" refers to "non-public aspects of TPM that no one else would have without signing an Oracle NDA, including specifics regarding Textura's manage draw participants functionality, how TPM approves and pays subsidiaries, and Textura's workflow between payments and compliance." ECF No. 382-3 at 22 (citing ¶¶ 76, 230-232). It argues that Procore accessed these specifics illicitly through (1) "a 2019 video-recorded demonstration of TPM's user-facing features by a Procore customer, Stiles"; Procore's access to

United States District Court
Northern District of California

live TPM software through acquired subsidiary INDUS.AI; and "a 2008 user-facing instruction manual for TPM." ECF No. 349-3 at 19; ECF No. 338-3 ¶ 80; ECF No. 338-5 ¶¶ 230–243. It explains that its expert reports highlight "specific confidential aspects not disclosed publicly." ECF No. 382-3 at 23. Indeed, the Almeroth report notes such confidential aspects as Textura's "[redacted]" ECF No. 338-5 ¶¶ 231–32, 238–39, 240. These descriptions are specific enough to allow the Court, Procore, and a jury to identify and adjudicate trade secret material. However, as the above enumeration of confidential features and functionalities makes clear, the ATS for "Textura's Workflows, Functionality, Structure, Architecture, User Interfaces, and Interconnections" is in fact composed of multiple distinct trade secrets. Oracle has been ordered to choose 36 trade secrets to assert at summary judgment and 24 to assert at trial. ECF Nos. 331, 277. It will not be allowed to again circumvent that order by asserting a composite trade secret, but must break this ATS into its component parts and assert each underlying trade secret individually.

Procore next argues that the "Construction Accounting 101.pptx" document—ATS 8—is not a trade secret because many of the construction accounting principles contained therein are taught in Ibbs's university courses and published in Oracle blog posts such as "Construction Accounting 101: Expert Guide for Contractors." ECF No. 349-3 at 21–22. Oracle responds that while some of the principles contained within the document may be publicly known, the file as a whole reflects "Oracle's confidential approach to processing payments and related tasks" and is the product of "years of work in us helping to organize in a very thoughtful way how the process that Textura automates has been implemented at our clients." ECF No. 382-3 at 23. Oracle does not explain how that confidential approach differs from or iterates on what is publicly taught and known about construction accounting, or how the approach is greater than the sum of its parts, or

United States District Court
Northern District of California

why the sequencing and presentation of elements matters, or what value the confidential approach adds, or anything that would allow the Court to conclude that Construction Accounting 101.pptx is a trade secret and not merely a straightforward teaching tool concerning widely known and practiced accounting techniques. As Procore argues, Oracle's failure to do so at this stage is dispositive because it prevents the Court from determining whether the DTSA elements are satisfied.

The remaining ATSs in this category survive summary judgment. Oracles characterizes ATS 7, "[redacted] Slides.pptx," as "describ[ing] an overview, product demo, and implementation strategy for TPM" and "consist[ing] of a detailed integration strategy that Oracle developed for its customers." ECF No. 348-9 at 427–28. ATS 9 is "a document containing an Oracle Work in Process (WIP) report example," *id*. at 590, and ATS 10 is "a document that explains Textura compliance mapping" that Procore received from a customer, *id*. at 528. Procore asserts that "Oracle never explains what within any of these documents is the purported secret," but Procore identifies evidence describing the features of each ATS that make them secret. ECF No. 349-3 at 22; ECF No. 382-3 at 24.

**b. Category A(i)**

Category A(i), labeled TPM Solution Source Code, covers ATS 1 through 5. Procore complains that Oracle "identif[ies] the file by name, provide[s] a sentence describing its functionality," and states, in broad and repetitive terms, its role in the TPM ecosystem. ECF No. 349-3 at 23. Procore fails to explain why this type of description is insufficiently specific. And while Procore also argues that none of Procore's code contains Oracle source code and Procore's software languages are incompatible with Procore's code, these arguments go to the merits of the misappropriation issue—which Procore has not challenged—rather than whether the disclosure is sufficiently particular. ECF No. 349-3 at 23.

**c. Category B**

Category B, pertaining to Textura integrations with Oracle's own ERP software, Netsuite, contains a Word document, a Powerpoint, and a Microsoft OneNote file (ATS 11 through 13). ECF No. 349-15 at 2. Procore asserts that "Oracle's experts do not explain how any information

in the file qualifies as a trade secret[]" and points out that (1) the files contain links to public information and (2) related information is published on Oracle's public help site. ECF No. 349-3 at 24. As Oracle correctly points out, this is not disqualifying. *See United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016), *overruled on other grounds by Lagos v. United States*, 584 U.S. 577, 584 (2018) ("[A] trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources."). The question is whether the document as a whole can still be considered a trade secret or whether the trade secrets contained within can be discerned. The Almeroth report explains that trade secret information includes "how Oracle developed [the] integrations, how Oracle solved specific problems related to those integrations" and "how to develop those integrations." ECF No. 349-34 ¶ 81. He describes the purpose and value of the compiled information presented in the documents. *Id*. ¶¶ 310–23. Procore has not met its burden to show the absence of a fact dispute that these files are trade secrets or that the trade secrets within can be discerned.

**d. Category C**

Category C, covering ATS 14 through 23, pertains to Textura's integrations with third-party ERPs including CMiC, Sage, and Viewpoint. ECF No. 349-15 at 2–3. Procore contends that "Oracle's treatment of each file is nearly identical to that in the Oracle ERP Integrations Category," Category B. ECF No. 349-3 at 25. Procore therefore raises similar arguments that fail for similar reasons. It points out that support information regarding TPM's ERP integrations is publicly posted on Oracle's help sites. ECF No. 349-3 at 25. As to ATS 22, Procore also points out that it contains some information made public by CMiC and other ERP providers. *Id*. at 26. Oracle responds by highlighting the expert evidence that the files are secret because they capture how Oracle implemented its Textura integration to work with those ERPs. ECF No. 382-3 at 25. Again, Procore has not met its burden to show the absence of a fact dispute that the files as a whole are not trade secrets or that the trade secret information contained within is insufficiently discernable.

**e. Category D**

Category D, "Cross-Platform Integrations," contains ATS 24 through 29, which are "files

outlining Oracle's CEGBU[11] business strategies, designs, functions, architectures, [and] implementations for cross-platform integrations between Primavera, Aconex, and/or Textura." ECF No. 348-9 at 34; ECF No. 349-24 ¶ 87. Procore objects that Oracle's experts explain why these files are trade secrets in a conclusory or circular manner. ECF No. 349-3 at 27. Procore therefore appears to challenge this category on the grounds that Oracle has not established that the files are trade secrets at all (rather than that Oracle has not defined the secrets with sufficient particularity). In response, Oracle states that it "provides significant detail in its trade secret disclosures and expert reports regarding these trade secrets." ECF No. 382-3 at 26. It highlights expert evidence of valuable confidential information contained in the files. *Id.* at 26–27. Procore has not shown the absence of a fact dispute concerning whether the files asserted in Category D qualify for trade secret protection.

**f. Category E**

This category, for "Customer Information," contains three files "outlining pricing, cost, and margin information; client contract terms; client presentations or client-specific plans and strategies; and technology and service solutions and configurations for actual or prospective clients." ECF No. 349-15 at 3; ECF No. 348-9 at 34.

Procore faults Oracle for not identifying "anything specific secret within" these files, but Oracle identifies expert testimony concerning why the files are secret, including that they contain "customer specifics and requirements for several functionalities, including change orders and invoice distribution," ECF No. 338-5 ¶ 523, a "list of clients and their corresponding project status, along with the functions and features implemented for each," *id.* ¶ 515, the research Oracle developed for prioritizing product requirements for specific customers, *id.* ¶¶ 518–20, and internal Oracle notes regarding a key customer, providing details into Oracle's customer strategies, *id.* ¶ 521–23. Procore has not shown the absence of a fact dispute either that these ATSs are sufficiently specified or that they meet the statutory requirements for trade secret protection.

[11] The briefing does not define "CEGBU."

**g. Category F**

Category F (ATS 33 and 34), "Internal Business Information," relates to confidential pricing information. Procore asserts that it is "undisputed" that the pricing information contained therein is publicly available, but Oracle identifies evidence to the contrary. *Compare* ECF No. 349-3 at 28–29 *with* ECF No. 382-3 at 28. For instance, Procore asserts that the information contained in ATS 33 and 34 is available publicly through a Textura rate card published by the City & County of Denver, but a review of those documents shows that they include distinct information. *Compare* ECF No. 349-48 *with* ECF No. 347-71. Procore has not justified summary judgment as to the two files asserted in this category.

**2. Independent Economic Value**

"[A] plaintiff seeking to prove ownership of a protectable trade secret must . . . demonstrate that its purported trade secrets derive independent economic value, actual or potential, from not being generally known in the public or to other persons who can obtain economic value from its disclosure or use." *Chung*, 2024 WL 813445, at *8. The information must be "sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Id*. (quoting *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 564 (2007)); *see also Calendar Research LLC v. StubHub, Inc.*, No. 17-cv-04062, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017). "The standard to show that trade secrets derive economic value is not a high standard." *Id*. at *4. A trade secret owner may demonstrate independent economic value through "circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access." *Religions Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1253 (N.D. Cal. 1995). To justify summary judgment on this issue, Procore must establish the absence of a genuine dispute of material fact concerning Oracle's ability to meet its burden.

Oracle identifies evidence of economic value in two expert reports. For each ATS, the Almeroth report asserts that it contains certain information that "would be highly valuable information for any player when creating payment and compliance management solutions for construction companies." *See* ECF No. 349-34 ¶¶ 100, 105, 111, 123, 148, 234, 263, 271, 295,

299, 316, 320, 323, 347, 357, 375, 403, 409, 419, 425, 431, 434, 457, 480, 487, 491, 501, 504, 508, 517, 520, 523, 527, 534. Each paragraph includes a one-sentence description of the "highly valuable" information.[12] As Procore points out, these statements are conclusory. Nonetheless, the report is lengthy and contains other information potentially establishing independent economic value. Oracle provides the example of the "dao.py" trade secret, which the Almeroth report describes as "the result of years of work," with functionality "relevant to multiple different ERPs," whose publicization would "provide details regarding Textura's implementation that are not public and would be valuable to a competitor," including because the file "[redacted]" ECF No. 382-3 at 29. And Procore does not establish an absence of genuine dispute for any particular trade secret, rather challenging in broad strokes the "boilerplate" and "conclusory" nature of the expert reports. ECF No. 349-3 at 30. Because at least some evidence is not merely boilerplate and conclusory, and Procore fails to identify any particular trade secrets for which the evidence is merely boilerplate and conclusory, summary judgment is not warranted on this ground.

Oracle also points to the Ibbs report, which provides explanations of similar detail. *See* ECF No. 349-8 ¶ 56 ("The Trade Secrets in this category, in my opinion, would be kept confidential and have independent economic value from not being generally known because the source code and non-source code files detail how to implement TPM functionality (such as invoice management, compliance, payments, job costing, and integration middleware) and this functionality is key to customers in the industry. By having the information in this category, a

---

[12] Examples include "the source code excerpts related to the functionality of Oracle's integration between TPM and TexturaLink ERP adapter," *id.* ¶¶ 100, 105, 111, 123, 148; "confidential functionality for Oracle TPM," *id.* ¶ 234; "internal and confidential TPM integration capabilities," *id.* ¶ 263; "an internal and confidential step-by-step process for how Oracle implements construction accounting, including describing certain functionalities such as how Oracle handles WIP reports," *id.* ¶ 271; "information related to creating Oracle WIP reports," *id.* ¶ 295; "information on Textura's specific compliance mapping," *id.* ¶ 299; "confidential information related to Oracle NetSuite's functionality," *id.* ¶ 316; "integration workflow information for TPM, as well as its confidential pricing for its customers," *id.* ¶ 320; "the source code excerpts related to Oracle Textura's integration with" Netsuite ERP or Sage 100 ERP, *id.* ¶¶ 323, 347; and "information relating to Textura's integration with Spectrum," *id.* ¶ 357.

competitor could unfairly compete with Oracle."); *id.* ¶¶ 61–77 ("[S]ource code showing how to integrate [compliance, payment, subcontract-record, owner-funding-checks, change-order, etc.] information for ERP integration middleware are kept confidential in the industry and is something that would be considered (in the industry) independently valuable from not being generally known or readily ascertainable."). The Court cannot conclude that these and similar explanations so lack substance as to fail to raise any genuine issue of material fact about the independent economic value of the asserted trade secrets.

Moreover, each case Procore cites granting summary judgment for failure to prove independent economic value is distinguishable. In *Chung*, the court concluded that "what Plaintiffs may have paid to develop software using their alleged trade secrets tells the Court nothing about the cost to develop the secrets themselves and is therefore irrelevant to the ultimate question of what independent economic value, if any, the alleged trade secrets derive from not being generally known." 2024 WL 813445, at *9. In *United Auto Credit Corp. v. Stewart*, the "dealer grades" (scores allowing determination of risk and pricing for loans for each car dealer) and customer lists at issue were stale, according to undisputed evidence that such information only retains competitive value for about three months. No. 8:25-CV-00065-RGK, 2026 WL 638853, at *8–9 (C.D. Cal. Feb. 19, 2026). And in *Synopsys, Inc v. Risk Based Sec., Inc.*, the plaintiff relied on "[the plaintiff company's] purchase price and the percentage of revenue stemming from [a database within which many of the asserted trade secrets were contained]." 70 F.4th 759, 769 (4th Cir. 2023). The court held that "[p]ermitting evidence of the value of the whole entity to substitute as value of a particular component part (the trade secrets) would defeat the obligation of proving that the alleged trade secrets themselves have independent economic value." *Id.* at 771–72. Here, Oracle has identified evidence explaining why the individual trade secrets derived independent economic value from secrecy.

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

## CONCLUSION

Procore's motion for summary judgment, ECF No. 342, and its Motion to Strike the Expert Reports of William Ibbs and Kevin Almeroth, ECF No. 337, are granted in part and denied in part as set forth above.

**IT IS SO ORDERED.**

Dated: August 21, 2026

JON S. TIGAR
United States District Judge