United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ORACLE AMERICA, INC., et al.,
Plaintiffs,

v.

PROCORE TECHNOLOGIES, INC., et al.,
Defendants.

Case No. 24-cv-07457-JST

**ORDER DENYING MOTIONS TO STRIKE OR EXCLUDE**

Re: ECF Nos. 289, 340, 344

Before the Court are three motions by Defendants Procore Technologies, Inc. and Procore Payment Services, Inc. to strike or exclude portions of the expert reports of Melissa Bennis and Andrew Crain. ECF Nos. 289, 340, 344. The Court will deny all three motions.

## I. BACKGROUND

Plaintiffs Oracle America, Inc., Oracle International Corporation, and Textura Corporation ("Oracle") filed the complaint on October 25, 2024. ECF No. 1. Oracle alleges a single count of trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836(b), 1839 et seq.[1] *Id.* ¶¶ 73–92. In short, Oracle alleges that Procore misappropriated its trade secrets related to Textura Payment Management ("TPM"), construction project payment software, to develop a competitor product called Procore Pay. *Id.* ¶¶ 47, 66, 74. The alleged misappropriation largely stems from an Oracle employee named Mark Mariano's move to Procore in October and November of 2021. ECF No. 349-34 ¶¶ 51, 639.

Oracle's Fifth Amended Trade Secret Disclosures, served on March 16, 2026, disclosed more than 450 alleged trade secrets. *See generally* ECF No. 345-3. Two weeks later, Oracle

---

[1] A second count for breach of contract was originally alleged against an individual defendant named Mark Mariano, but he has since been dismissed. ECF No. 1 ¶¶ 93–105; ECF No. 165.

served a pared down list of 110 alleged trade secrets. *See* ECF No. 345-4. Oracle then further narrowed to 70 and then 34 trade secrets on June 1 and June 5, respectively. *See* ECF Nos. 331, 345-5, 345-6.

Oracle's alleged trade secrets are organized into six categories: (A) TPM Solution (51, now 10 trade secrets); (B) Oracle Enterprise Resource Planning ("ERP") Integrations (5, now 3 trade secrets); (C) Third-Party ERP Integrations (39, now 10 trade secrets); (D) Cross Platform Integrations (9, now 6 trade secrets); (E) Customer Information (3 trade secrets); and (F) Internal Business Information (3, now 2 trade secrets).

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III. LEGAL STANDARD

### *A. Daubert*

Under Federal Rule of Evidence 702, the District Court acts as a "gatekeep[er]," preventing expert testimony from reaching the jury that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). To survive a *Daubert* challenge, "[t]he expert's testimony must be 'based upon sufficient facts or data,' 'the product of reliable principles and methods,' and the expert must 'appl[y] the principles and methods reliably to the facts of the case.'" *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1191–92 (9th Cir. 2007) (quoting Fed. R. Evid. 702). "Expert opinion testimony is . . . reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (citation omitted). The reliability of non-scientific testimony may "depend[] heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (emphasis removed).

"Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th

Cir. 2010), *as amended* (Apr. 27, 2010). "Simply put, '[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether [their] testimony has substance such that it would be helpful to a jury.'" *Canty v. DePuy Orthopaedics Inc.*, No. 14-CV-05407-JSW, 2024 WL 2852213, at *2 (N.D. Cal. June 5, 2024) (*quoting Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013)).

It is Oracle's burden to establish that its expert testimony is admissible under FRE 702. *See Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

**B. Rules 26 and 37(c)**

Under Federal Rule of Civil Procedure 26(a), "a party must, without awaiting a discovery request, provide to the other parties . . . a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii). Expert reports must disclose, among other things, "a complete statement of all opinions . . . and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). Rule 26(e) imposes a continuing duty to supplement those disclosures "in a timely manner." Fed. R. Civ. P. 26(e)(1)–(2).

Federal Rule of Civil Procedure 37(c) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). "Rule 37 'gives teeth' to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed." *Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)). It is "a self-executing, automatic sanction designed to provide a strong inducement for disclosure." *Id.* (internal quotation marks and citations omitted).

"[T]he burden is on the party facing sanctions to prove harmlessness." *Yeti by Molly*, 259 F.3d at 1107. In assessing harmlessness, courts consider: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the

United States District Court
Northern District of California

likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Gryglak v. HSBC Bank USA, N.A.*, 2023 WL 3243998, at *2 (9th Cir. May 4, 2023) (internal quotation marks omitted).

## IV. DISCUSSION

### A. Motion to Exclude the Expert Opinion of Melissa A. Bennis

Melissa Bennis is Oracle's damages expert. The DTSA "authorizes three separate measures of damages: (1) 'damages for actual loss caused by the misappropriation of the trade secret'; (2) 'damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss;' or (3) 'in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret.'" *Sonoma Pharms., Inc. v. Collidion Inc.*, No. 17-CV-01459-EDL, 2018 WL 3398940, at *6 (N.D. Cal. June 1, 2018) (citing 18 U.S.C. § 1836(b)(3)(B)).

Procore seeks to exclude Bennis's report under *Daubert* on four grounds: (1) that it fails to apportion damages by individual asserted trade secret, rather than by trade secret category; (2) that its price erosion opinion lacks any independent basis; (3) that its reasonable royalty opinion is unreliable; and (4) that the asserted damages period lacks any reliable basis. ECF No. 344. None of these objections justifies exclusion.

#### 1. Failure to Apportion Value or Damages Among the Asserted Trade Secrets

A jury verdict requires a reasonable basis in the evidence. *See Flores v. City of Westminster*, 873 F.3d 739, 757 (9th Cir. 2017). As such, should the jury conclude that fewer than all asserted trade secrets have been misappropriated, it must be able to calculate the damages attributable only to the misappropriated ATSs. *See Trinseo Eur. GmbH v. Kellogg Brown & Root, L.L.C.*, 165 F.4th 399, 410 (5th Cir. 2026) ("Trade secret damages—whether measured by a reasonable royalty or lost profits—must, like patent damages, 'reflect the value attributable to the infringing features of the product, and no more.'"). *02 Micro Int'l Ltd. v. Monolithic Power Sys.,*

*Inc.* illustrates this principle. 399 F. Supp. 2d 1064, 1076 (N.D. Cal. 2005).[2] There, the damages expert "provided the jury with a damages calculation based on an assumption that all of the trade secrets were misappropriated," but the jury "found that only five of the eleven trade secrets were misappropriated, and that only the misappropriation of one of them resulted in [the defendant] being unjustly enriched." *Id.* Although there was some evidence in the record that the one trade secret resulting in unjust enrichment was of particular importance to the plaintiff, that evidence did not interact with the expert's damages analysis and as such did not provide a basis for apportioning the total amount. *Id.* at 1076–77. The court granted the defendant's motion for judgment as a matter of law that the plaintiff failed to prove unjust enrichment damages. *Id.* at 1077.

Bennis's report apportions damages among the six trade secret categories disclosed by Procore, but not by individual trade secret file within those categories.[3] This is particularly

---

[2] This case has the following subsequent history: *amended sub nom. O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070 (N.D. Cal. 2006), *aff'd,* 221 F. App'x 996 (Fed. Cir. 2007), and *aff'd,* 221 F. App'x 996 (Fed. Cir. 2007).

[3] Oracle states that "Bennis structured her opinions and calculations so that if particular trade secrets within a category or entire categories are dropped, any adjustment can be transparently made." ECF No. 385-3 at 8 (citing ECF No. 345-7 ¶¶ 280, 297–298, 306, 313, 316, 332–334, 336; ECF No. 345-8 at 248). This does not accurately characterize the report, which does not enable apportionment among individual trade secrets within a category. Paragraph 280 is an introductory summary paragraph asserting Bennis's intent to "consider[] what should occur in the event that fewer than all the Oracle trade secrets are found to be misappropriated and [to] provide[] calculations for those scenarios." ECF No. 345-7 ¶ 280. Paragraphs 297 and 298 discuss options for apportioning Procore's profits among three trade secret categories (TPM Solution, Third-Party ERP Integrations, and Customer Information) based on which Procore Pay functionalities they relate to, but these paragraphs do not discuss methods for apportioning profit-based damages among specific trade secret files should fewer than all in a category be found to have been misappropriated. *Id.* ¶¶ 297–98. Paragraph 306 calculates ill-gotten profits for each of Procore Pay's Accounting Integrations, but does not apportion Procore's profits among Oracle's allegedly misappropriated trade secrets. *Id.* ¶ 306. Paragraph 313 likewise apportions profits across Procore's tools, but not across Oracle trade secrets. *Id.* ¶ 313 ("To the extent that only a subset of the tools are found to be misappropriated, my calculation allows for a tool-specific ill-gotten profit margin."). Paragraph 316 is a table showing ill-gotten profits by Procore product and Oracle Trade Secret category, but not by particular trade secret. *Id.* ¶ 316. Paragraph 332 discusses R&D total expenditures for the TPM Solution trade secret and the integrations trade secrets collectively. *Id.* ¶ 332. Paragraphs 333 and 334 discuss apportioning the R&D for integrations trade secrets equally across third party ERP platforms, but not how to apportion them among individual trade secret files. *Id.* ¶ 333. This is especially problematic given that different

United States District Court
Northern District of California

problematic, in Procore's view, because Bennis's damages report analyzed the 110 trade secrets at issue at that stage, rather than the maximum of 24 trade secrets that will remain when the case goes to trial. ECF No. 345-2 at 9. The Court will nonetheless not strike Bennis's report on this basis.

First, in the ordinary case, insufficient damages apportionment among trade secrets does not necessarily mean that a damages report is unhelpful, unreliable, or based on insufficient facts or data. *See* Fed. R. Evid. 702. The court in *02 Micro International* acknowledged as much: rather than excluding the damages report pretrial, it cautioned the plaintiffs that "you can have that kind of damage evidence if you want to. I'm just warning you that if you do and you don't win on all 12 of your trade secrets, you'll have no damages." 399 F. Supp. 2d at 1076. Adequate evidence from outside the damages report may also provide a means for apportioning damages. For instance, the Ninth Circuit recently upheld a jury award of half of the total unjust enrichment amount where only one of nine asserted trade secrets was misappropriated. *See EchoSpan, Inc. v. Medallia, Inc.*, No. 24-4751, 2025 WL 3046753, at *2 (9th Cir. Oct. 31, 2025). Because the jury had before it evidence "including an expert opinion regarding [the defendant's] total unjust enrichment from creating a 360-degree review product that it could sell, expert guidance that the jury should consider 'value drivers,' and testimony about the main drivers of value in [the plaintiff's] 360-degree review product," its award was upheld. *Id.*

Courts exclude damages opinions for failure to apportion where they lack any utility to the jury. *LivePerson, Inc. v. [24]7.AI, Inc.* is one example. No. 17-CV-01268-JST, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018). In that case, the damages expert's opinion was "excluded because he [did] not apportion trade secret misappropriation damages among particular

---

numbers of asserted trade secret files relate to each third-party ERP: at least four CMIC trade secret files are asserted at this stage, but only 2 Sage files, one Yardi file, etc. ECF No. 349-15 at 2–3. Paragraph 336 states that "[a]s illustrated below, I have considered what should occur in the event that fewer than all the Oracle trade secrets are found to be misappropriated and have provided calculations for those scenarios." *Id.* ¶ 336. The accompanying chart, however, apportions avoided R&D only by trade secret category, not individual trade secret. *Id.* Finally, the table at page 348 of Exhibit 6 (ECF No. 345-8) likewise apportions ill-gotten profits by trade secret category but not trade secret.

alleged trade secrets, and offer[ed] no methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets in the case." *Id*. This was especially damning because "the initial trial is a bellwether trial in which only 15 of the 28 alleged trade secrets will be at issue," so "the jury's verdict will necessarily encompass fewer than all of the alleged trade secrets." *Id*.

Procore contends that this case is exactly like *LivePerson* because Oracle will be allowed to assert only 24 of the 110 trade secrets discussed in Bennis's report. ECF No. 345-2 at 9. But unlike in *LivePerson*, Oracle does offer some "methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the . . . alleged trade secrets in the case." 2018 WL 6257460, at *2. The report provides both (1) justifications for awarding the total damages for the full category even if only some trade secrets contained therein are misappropriated and (2) in some cases, means for apportioning damages further within a category.

Oracle's primary argument is that further apportionment may not be warranted if Procore "still has no alternatives to the remaining trade secrets (lost profits, royalty)." *See* ECF No. 385-3 at 9; *see* ECF No. 345-7 ¶¶ 204, 368. Where a given trade secret is demonstrably necessary to Procore's ability to develop and sell the competing product, awarding the full lost profits or ill-gotten sales may be justified if those profits or sales would not have occurred but for the appropriation of that trade secret. ECF No. 385-3 at 15 ("Because Procore could not offer Procore Pay without any one of the Procore Pay-related trade secrets, misappropriation of any one of those trade secrets justifies the full amount of lost profits; further apportioning is not "economically logical" because Oracle "cannot lose a portion of a sale." (quoting *Sprint Commc'ns v. Charter Commc'ns*, No. 17-1734-RGA, 2021 WL 982732, at *13 (D. Del. Mar. 16, 2021)). Indeed, as courts have held in the patent context, "[l]ost profit damages do not depend on the number of [trade secrets misappropriated] by one single product." *See Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l*, 246 F.3d 1336, 1357 (Fed. Cir. 2001). As to avoided R&D costs, Oracle's expert and fact witnesses explain "that development of the TPM technology was an iterative process, such that the TPM components and integrations build on each other and earlier R&D," which could justify awarding aggregate, unapportioned damages figures for

misappropriation of mere subsets of trade secrets. ECF No. 385-3 at 12–13; ECF No. 345-20 ¶¶ 543, 547.

The Bennis report also provides evidence enabling some apportionment. For instance, if the jury finds that only a certain subset of Oracle trade secrets were misappropriated such that only one or two of Procore's workflow, budget, and direct costs Project Financials tools were developed as the result of misappropriation, then Bennis explains how to divide Procore's ill-gotten sales appropriately. ECF No. 345-7 ¶ 313. As another example, Oracle asserts that Bennis's R&D estimates can easily be adjusted by time frame, e.g., if "2021 files are dropped . . . the 2021 R&D spend can be removed from [Bennis's] calculation." ECF No. 385-3 at 13–14.

Because it is not possible to peer into alternate universes to compare profits and losses given each permutation of misappropriated trade secrets, trade secret damages are inherently imprecise. The Bennis report is precise enough to enable a jury to award damages in a variety of scenarios. At the same time, the Court does not suggest that the Bennis report will necessarily provide sufficient evidence. Indeed, like the plaintiffs in *02 Micro International*, Oracle may come to the end of trial and face reversal of a jury award that the evidence did not justify. But Procore has not justified excluding the report now based on apportionment issues.[4]

**2. Reliability of Price Erosion Opinion**

Bennis opines that Oracle lost $[redacted] million due to price erosion because it would have raised its subcontractor fee percentage for TPM from [redacted]% to [redacted]% of contract value in January 2023 but did not do so because of Procore Pay's anticipated market entry. ECF No. 345-7 ¶¶ 261–73. Procore argues that this price erosion opinion ought to be excluded (1) because it is based on a made-for-litigation Oracle spreadsheet reflecting historical Textura sales and (2) because it does not account for elasticity of demand. ECF No. 345-2 at 13–17. Neither argument justifies striking this portion of the report.

[4] Procore also suggests that the Bennis report could lead the jury to double-count the same damages if more than one trade secret is found to be appropriated, but nothing about Bennis's analysis requires double counting and juries are capable of understanding the basis for a damages estimate and avoiding crediting the same basis more than once when inappropriate. ECF No. 345-2 at 11. This issue can also be addressed through the jury instructions if the Court concludes that it is necessary.

**a. Reliance on Oracle's Sales Spreadsheet**

In calculating price erosion for TPM, Bennis relied on testimony from Mike Antis, Global VP of Textura, that Oracle considered including the subcontractor percent-of-contract value fee [redacted] basis points, from 0.22% to [redacted] or [redacted], but declined to do because of Procore Pay. ECF No. 345-7 ¶¶ 262; ECF No. 385-8 at 8–9. She considered data from 2011, 2014, and 2019 showing that before Procore Pay entered but while other competitors like GCPay and Flashtract were on the market, Oracle increased its percent-of-contract-value pricing [redacted] basis points. ECF No. 345-7 ¶¶ 260–62. Antis explained that little to no attrition or customer pushback resulted from those price increases, reflecting an inelastic market. *Id.* ¶¶ 262, 270. Bennis also considered the general inflation rate across the relevant period, concluding that Oracle's proposed fee increase would have been in line with inflation. *Id.* ¶ 269. Bennis then analyzed data provided by Oracle applying the higher fee to its actual sales. *Id.* ¶¶ 264–66. She also interviewed and reviewed the deposition of Michael Russo, the Oracle employee who prepared the data. *Id.* ¶¶ 261–70; ECF No. 385-6 at 10. Procore also deposed Russo. *See* ECF No. 385-10.

Procore raises several objections. First, Procore repeatedly implies that the sales data upon which Bennis bases her price erosion opinion is unreliable because it was compiled for the purpose of litigation. ECF No. 345-2 at 13–14. That data was compiled for litigation does not alone make it unreliable and Procore does not identify any authority to the contrary. Procore cites *In re Imperial Credit Industries, Inc. Securities Litigation*, for instance, but that case concluded that an expert may not "rely upon excerpts from opinions developed by another expert for the purposes of litigation" because such opinions lack "independent indicia of reliability." 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005). Here, Oracle does not rely on "excerpts from opinions developed by another expert for the purposes of litigation," but merely "facts and data" which happen to have been compiled for the purpose of litigation. *Id.* Notably, had Bennis somehow gathered the sales data herself, it still would have been compiled for the purpose of litigation. And although Procore deposed Russo, it does not raise any specific concern about the veracity of the data he put together. *See* ECF No. 385-10.

Second, Procore asserts that "Bennis did not scrutinize Oracle's spreadsheet, and instead adopted it in full and projected further damages using the same sales figures from 2025." ECF No. 345-2 at 13. "She did not isolate the impact (if any) of the alleged misappropriation and did not account for customer attrition, reduced usage, or lawful competition." *Id*. at 13–14. But as outlined above, Bennis did consider multiple factors, including evidence of the historic behavior of Oracle's customers, in determining whether it would be appropriate to estimate price erosion by simply multiplying actual sales by the would-be price increase. *See also* ECF No. 385-6 at 9. The fact that Oracle's employee applied that multiplication to a spreadsheet before she did is immaterial.

Third, Procore argues that reliance on the spreadsheet may have resulted in an inflated price erosion estimate, because Bennis did not take into account evidence of the pricing pressure exerted by competitors like GCPay and the discounts Oracle was offering to customers. ECF No. 345-2 at 14. But these are mere fact disputes, not reasons to exclude Bennis's report as unreliable under *Daubert*. *See Alaska Rent-A-Car*, 738 F.3d at 969 ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").

**b. Elasticity of Demand**

In assuming inelastic demand, Bennis relied on testimony from Oracle fact witnesses concerning Oracle customers' historic behavior given similar price increases. ECF No. 345-7 ¶¶ 262, 270; ECF No. 385-6 at 10. The extent to which Bennis's price erosion calculation should have nonetheless accounted for demand elasticity is a quintessential fact question to be raised in cross-examination and resolved by the jury. *See Ericsson. v. Harris Corp.*, 352 F.3d 1369, 1378–79 (Fed. Cir. 2003) (upholding damages award based on evidence of inelastic market and noting that the jury presumably resolved any elasticity issues).

**3. Reliability of Reasonable Royalty Opinion**

Bennis's royalty damages opinion of $[redacted] million is the sum of two numbers: $[redacted] million of allegedly avoided R&D for the TPM Solution, Oracle ERP Integrations, Third Party ERP Integrations, Cross-Platform Integrations, and Customer Information categories, and $[redacted]

million for the Internal Business Information category, which is the estimated amount of price erosion. ECF No. 345-7 ¶¶ 378–379; ECF No. 346-7 at 40, 43–44.

Procore first argues that this figure is unreliable because it propagates the deficiencies already discussed in the component parts. ECF No. 345-2 at 17–18. The Court has already concluded, however, that neither the data source and methodology of the price erosion calculation nor the aggregate, unapportioned nature of the R&D calculation provides a basis for striking those sections of the report. Procore also argues more broadly that "Bennis's apportionment failure is on starkest display in her reasonable royalty analysis," but the Court has likewise already explained why the failure to apportion does not here present a basis for striking the report. ECF No. 345-2 at 18–19.

Procore next suggests that Bennis's analysis of the *Georgia-Pacific*[5] factors, which consider what reasonable royalty would result from a hypothetical negotiation between parties, are conclusory because she uses them to rationalize the figure pre-derived by summing price erosion and R&D costs. ECF No. 345-2 at 18. To the contrary, Bennis explains why application of the *Georgia-Pacific* factors would arrive at the same result. ECF No. 345-7 at 354–374. Courts have routinely rejected arguments like Procore's. *See, e.g.*, *Willis Elec. Co. v. Polygroup Ltd.*, 166 F.4th 1363, 1385–86 (Fed. Cir. 2026) ("It is sufficient for an economic expert to explain how qualitative considerations [under *Georgia-Pacific*] influence where a royalty should fall within an already-apportioned numerical range."); *Atl. Inertial Sys. v. Condor Pac. Indus. of Cal.*, No. 2:08–cv–02947–CAS (PJWx), 2015 WL 3825318, at *15 (C.D. Cal. June 18, 2015) (applying the *Georgia-Pacific* factors to validate a quantitatively-derived royalty figure). Bennis's royalty estimate is not unreliable under *Daubert*.

**4. Reasonable Basis for Damages Period**

Procore finally argues that Bennis's asserted damages period, which runs through trial, is unsupported by any evidence that Procore would not have been able to develop and launch Procore Pay independently before that cut-off. ECF No. 345-2 at 20. But Bennis's damages

---

[5] *See Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

United States District Court
Northern District of California

period was supported by the Almeroth report, which opined that Procore to this day has not independently developed the trade secrets, has no alternatives to them, and would not have been able to achieve Procore Pay in a "commercially reasonable time" without the trade secrets. See ECF No. 346-9 ¶¶ 582–604. That evidence is sufficient to support her opinion that damages should be calculated through the date of trial.

The motion to exclude the expert opinion of Melissa Bennis is denied in full. ECF No. 344.

**B. Motion to Exclude Opinions of Andrew Crain**

Oracle retained Andrew Crain as its forensics expert. ECF No. 286-2 ¶ 1. He has "25 years of experience performing forensic imaging and analysis of computer hard drives and other electronic storage media, advising clients regarding e-discovery and forensics issues, and providing expert testimony." *Id.* ¶ 2. He has "led and conducted hundreds of computer forensics investigations (often involving numerous computers, devices, and massive amounts of data in a single case) . . . in the context of a wide range of legal matters." *Id.* ¶ 5. Procore seeks to strike three aspects of his report under *Daubert*: (1) his inclusion of "stub" placeholder files in his description of the files "existing on" Mariano's devices, (2) his attribution to Mariano of intent to destroy evidence and a pattern of transferring and using trade secret files, and (3) his imputation of certain conduct to Procore. ECF No. 340. Each objection is largely semantic and none justifies excluding portions of the report.

**1. Stub Files**

Procore seeks to "narrow[ly] exclude Crain's "repeated use of stub files to inflate the count of Asserted Trade Secrets that 'existed on' a device." ECF No. 396-2 at 6. A basic review of the relevant passages, however, shows that the Crain report is fastidious in distinguishing stub files from full files. Stub files "are not actual files, but rather electronic placeholders for files whose contents never left the Cloud." ECF No. 341-2 at 6. The Crain report acknowledges this distinction, explaining that:

> The majority of the iCloud related files on the Procore MacBook A2251 are placeholder files, or 'stubs'; these are small files automatically created by iCloud during synchronization and stored on

> the local computer, indicating that Mr. Mariano indeed retained access to these Asserted Trade Secret files through the Procore MacBook A2251 computer. These stubs provide a visual representation of the files that exists in the cloud, such that the user can "browse" their iCloud files and folders just as if they were stored locally. By default, stubs mirror several metadata values from iCloud, but do not contain the file's content until the file is opened, previewed, copied, expressly chosen for download, etc. In such an event, the computer will retrieve the file's contents from iCloud and the local 'stub' is replaced by the substantive file (lacking the prepended "." and the ".icloud" extension).

ECF No. 341-3 ¶ 62. In his deposition, Crain testified that "if the synchronized file exists in stub form only, we can infer or determine that the user has not done anything with the file." ECF No. 341-10 at 41.

Procore moves to strike Paragraphs 87, 94, 113, and Exhibit C. Paragraph 87 explains that "many of the Asserted Trade Secret files exist on the Mariano iPhone in the form of iCloud stubs (indicating that Mr. Mariano indeed retained access to these Asserted Trade Secret files through the iPhone), while the substantive versions of two Asserted Trade Secret files are locally stored on the device, showing they were downloaded from iCloud in order [to] complete an action such as opening, copying, printing, emailing, etc." *Id.* ¶ 87. Paragraph 113 claims that "62 of Plaintiff's Asserted Trade secrets existed on the Mariano Mac Mini. . . . [A] significant number of the Asserted Trade Secret files resided on the Mariano Mac Mini as iCloud stubs, while the substantive copies (i.e., not stubs) of 4 Asserted Trade Secret files were locally stored on the device." *Id.* ¶ 113. And Paragraph 94 states "that 70 of Plaintiff's Asserted Trade secrets existed on the Procore MacBook Pro A2251 . . . via several means, including at least iCloud synchronization, downloads from Google Drive, Gmail, and LinkedIn," summarizing Exhibit C. *Id.* ¶ 94. Exhibit C, finally, lists storage locations and access history for the asserted trade secret files, differentiating between full files and stub filed with an "X" or "XX" notation. ECF No. 286-2 at 76–83; ECF No. 341-2 at 9 n.6.

Procore's quarrel is with Crain's description of stub files as "existing on" a certain device. Based on the definition of stub files provided above, the use of the verb phrase "exists on" is plausibly accurate. In addition, the identified passages provide the ample additional context reproduced above, which cures any confusion engendered by the use of the term "exists on."

Procore has identified nothing inaccurate or even misleading about these passages. The request to strike them is denied.

**2. Mariano's Intent**

Procore next seeks to exclude two passages on the grounds that they impermissibly opine on Mariano's intent. ECF No. 341-2 at 12. In Paragraph 33, Crain explains that a factory reset is "not a routine maintenance task, nor is it a step that a user would perform in the daily course of operating a MacBook Pro," but "a measure that completely and irreversibly erases all data stored on the machine" and that "cannot be explained by any standard software update, system optimization, or disk management routine." ECF No. 286-2 ¶ 33. It "requires a user to take multiple concrete steps as described above, and this process does not occur accidentally" but "reflects a decision made to destroy the data and activity history residing on that machine, and it is consistent with an effort to eliminate evidence of what was stored on or interacted with using the computer rather than any routine housekeeping or troubleshooting." *Id*. Procore takes issue with the suggestion that Mariano made a "decision . . . to destroy" data. ECF No. 341-2 at 12. But the passage only explains that a factory reset, by its nature, results from a deliberate decision to destroy data. It is a technical opinion based on the technical features of a factory reset, drawing inferences only from the details of its implementation and implications. It does not bear on Mariano's reasons for resetting his computer. Procore's cited orders prohibiting certain experts from opining on "intent, motive, or state of mind" therefore do not apply. *See, e.g.*, *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, No. 16-cv-01393-JST, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018).

Procore also objects to Crain's use of the word "pattern" to describe certain conduct by Mariano. In Paragraph 16(g), Crain opines that "[a]fter starting at Procore, Mr. Mariano engaged in a pattern of transferring and using Asserted Trade Secret files on his personal devices and Procore devices," including because the "Construction Accounting 101.pptx" trade secret "was modified in his Google Account, as well as downloaded, opened, and used on a Procore MacBook Pro . . . through at least March 2023." ECF No. 286-2 ¶ 16(g). Again, Procore has identified nothing inaccurate or outside of Crain's expertise. ECF No. 341-2 at 13. Procore may explore

any imprecision in the descriptive term "pattern" during cross-examination. *See In re Lidoderm Antitrust Litig.*, No. 14-md-02521, 2017 WL 679367, at *28 (N.D. Cal. Feb. 21, 2017).

**3. Imputation to Procore**

Procore finally objects to the section headings[6] stating that "Procore permanently destroyed forensic evidence" and "Procore obtained and used plaintiff's asserted trade secret files." ECF No. 341-2 at 16 (citing ECF No. 286-2 at 3). As Procore argues, "whether Procore's employees' actions, including those of Mr. Mariano, are attributable to Procore the company is a legal question, not a forensic one." *Id.* However, use of the subject "Procore" is a reasonable and accurate way to capture the facts "that one of the individuals whose electronic devices and accounts were forensically analyzed (Mr. Mariano) was a Procore Director [who] transferred Oracle's documents to his Procore computer and disseminated Oracle's documents to his Procore coworkers." ECF No. 376-3 at 17. Nothing about that factual statement prevents Procore from parsing and contesting which actions by Mariano or other Procore employees are or are not legally attributable to the company as a whole. The entirety of the motion to exclude portions of the expert report of Andrew Crain, ECF No. 340, is denied.

**C. Motion to Strike Portions of the Expert Report of Andrew Crain**

Procore also moves to strike portions of the Crain report on the grounds that they rely on forensic images of two Oracle laptops and that those images should have been, but were not, timely produced to Procore. ECF No. 289.

**1. Supplemental Background**

Discovery disputes in this case were referred to Magistrate Judge Laurel Beeler. ECF No. 66. In a March 21, 2025 order adjudicating a discovery letter brief, Judge Beeler rejected wholesale production of device images—which contain voluminous personal, third-party, privileged, and unrelated confidential information—and ordered the parties to enter into a Forensic Inspection Protocol Agreement. ECF No. 68 at 2; ECF No. 74. The Agreement, filed on April 8,

[6] In a footnote, Procore also identifies paragraphs 14, 23, 54, and 121 as containing similarly problematic language. ECF No. 341-2 at 7 n.4. To the extent that Procore also seeks to strike these passages, the request is denied for the reasons explained above.

United States District Court
Northern District of California

2025, governs "documents, files, accounts, and devices . . . subject to forensic examination." *Id.* at 1. The parties jointly engaged "a neutral and independent forensic examiner . . . to carry out" the Agreement. *Id.* ¶ 1. The neutral would image certain enumerated "Forensic Devices," including Oracle MacBook and Lenovo laptops used by Mariano, maintain the images, and "not provide or disclose the contents of the digital forensic images to the Parties or to any third party except as provided herein." *Id.* ¶¶ 3, 4(a); *see also id.* ¶ 21 ("Except as explicitly set forth in this Protocol, the Forensic Examiner shall not provide any information regarding the Producing Party's Devices or the contents thereof to the Requesting Party."). The Agreement circumscribed what information could be exchanged: the neutral's reports based on agreed search terms, *id.* ¶¶ 6–10, and the underlying "files, documents, or emails" identified by those reports, *id.* ¶ 11.

Paragraph 22 of the Forensic Agreement provides that "nothing in this Protocol prevents any Producing Party from conducting forensic collections, examinations, or inspections on any Forensic Device or other item, source, thing, or device in its possession, custody, or control, including forensic collections, examinations, or inspections that may be protected as attorney work product or other applicable privilege." *Id.* ¶ 22.

The parties conducted discovery based on what the Forensic Agreement allowed and the neutral produced. ECF No. 289 at 8–9. Issues over production requests perceived to be outside of the Forensic Agreement were aggressively litigated and submitted to Magistrate Judge Beeler for resolution. *See, e.g.*, ECF No. 253.

Separately, Procore served Request for Production No. 44 on April 15, 2025, demanding: "All Documents and Things provided by Mr. Mariano to Plaintiffs after his departure, including, but not limited to, his personal Google Drive and iCloud accounts and the two computers referenced in paragraph 37 of the Complaint, whether it was forensically collected by Stroz Friedberg on Your behalf or otherwise." ECF No. 289-7 at 15 (referring to the MacBook and Lenovo Oracle laptops Mariano kept after his termination, *see* ECF No. 1 ¶ 37, both of which are Forensic Devices under the Agreement).

Oracle had in its possession forensic images of the Oracle laptops, including evidence not appearing in the Forensic Reports. It never produced the images in response to RFP No. 44,

apparently because of the Forensic Agreement. ECF No. 289 at 9. It nonetheless gave the images to Crain to rely on in his opening report. *See id.* at 10. Procore did not learn of this fact until the Crain report was served on April 8, 2026, including a paragraph stating that "[Crain's firm] was provided access to forensic images of Oracle's corporate-owned devices issued to Mr. Mariano . . . . Certain artifacts from each of these images, as described in this report, form the basis of [Mr. Crain's] opinions with respect to these devices." ECF No. 341-3 ¶ 19.

On April 16, 2026, Procore's counsel asked Oracle to withdraw the impacted paragraphs of the Crain report based on the unproduced laptop images (and the emails, asserted trade secret files, forensic material, and other information they contain). ECF No. 289-3 at 6. Oracle instead produced the withheld images to Procore on April 17, 2026. *Id.* at 3; ECF No. 319-3 at 2. On May 18, 2026, Oracle served its rebuttal expert report which included a forensic analysis of the forensic images at issue in Procore's motion, and which responded to Mr. Crain's opinions on those images. *Id.* at 2. On May 27, 2026, Oracle filed a notice with the Court informing it of this development and arguing that any prejudice to Procore had been cured. *Id.* Procore did not move for leave to respond to this notice.

**2. Discussion**

Oracle violated Rule 26 in allowing its expert to analyze the forensic images of the laptops without producing them to Procore. Nonetheless, because the untimely production to Procore appears to have cured any meaningful prejudice, the motion to strike certain portions of the Crain report is denied. ECF No. 289.

Oracle provided the forensic images to its expert for use in his expert report—to advance its core claims—while simultaneously failing to produce those images to Procore under Rule 26 or in response to Request for Production No. 44. In doing so, it violated Rule 26(a)(1)(A)(ii), requiring that a party provide to the other parties "all . . . electronically stored information, and tangible things that the disclosing party has in its possession . . . and may use to support its claims or defenses," and Rule 26(e)(1)(A), requiring that a 26(a) disclosure be supplemented "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete." *United States v. North East Medical Services* is instructive. No. 10-CV-01904-CW (JCS), 2014

WL 7208627, at *7 (N.D. Cal. Dec. 17, 2014). There, the Court struck a supplemental production and corresponding expert report that defendant had introduced after the close of fact discovery because "Rule 34 required [the defendant] to produce documents responsive to the [plaintiff's] requests for production, Rule 26(a)(1) required [the defendant] to produce or disclose documents relevant to its defenses, and Rule 26(e)(1) required [the defendant] to supplement its production and/or disclosure in a timely manner if it later learned that it was incomplete." *Id.* at *5–7. Oracle circumvented the Forensic Agreement[7] and, like the defendant in *North East Medical Services*, and violated the Federal Rules of Civil Procedure by allowing its expert to rely on the forensic images without producing them to Procore.

Relying on the terms of the Forensic Agreement, Procore understood that both its discovery and Oracle's would be cabined by the agreement and limited to the neutral's productions. In Oracle's defense, it explains that it provided the forensic images to the forensic neutral. ECF No. 294 at 9. But providing the images to the neutral was no substitute for providing them to Procore, especially because the neutral was not authorized to pass them on to Procore. *See* ECF No. 74 ¶¶ 3, 21. Oracle also argues that Procore could have requested "whatever additional discovery and forensic analysis of those laptops and their images it deemed necessary." ECF No. 294 at 10. Paragraph 12 of the Agreement provides that "[s]hould a party require additional forensic information regarding a specific time-period or file, it shall provide a written request, specifying (1) the specific forensic information requested, and (2) the basis for

[7] Oracle asserts that it was authorized by Paragraph 22 of the Forensic Agreement to provide the forensic images to its forensic expert. ECF No. 294 at 11. Procore responds that Paragraph 22 "was intended for consulting or work-product inspections for internal purposes, not to license sharing party information that was never produced during fact discovery." ECF No. 289 at 13. The critical point is this: the Forensic Agreement was designed to cabin and replace unfettered exchange of the devices and device images. Because of the Forensic Agreement, Oracle did not provide the device images to Procore. At the same time, Oracle used the device images—not the reports produced by the neutral's examination of the images—as the basis for its expert report. Even if authorized by Paragraph 22, doing so triggered obligations under Rule 26 and Request for Production 44. Oracle cannot—as it does in its opposition—maintain that the Forensic Agreement allowed it to use the raw device images as the basis for its own claims but simultaneously prohibited it from providing those images to Procore in discovery. Any such interpretation of the Agreement would defy logic.

relevance of the requested information, including any applicable support." ECF No. 74 ¶ 12. To the extent that Procore failed to utilize this provision, that failure is irrelevant. Unaware that Oracle had circumvented the Agreement and provided the forensic images to its expert, Procore would have no reason to seek discovery of those images in particular. In any case, Oracle's insistence that "Procore chose not to request any additional materials or inspections during the fact discovery process" is confusing at best, given that Procore did request such materials through RFP No. 44. ECF No. 294 at 12.

The burden is on Oracle "to show that the failure was substantially justified or harmless." *M.H. v. Cnty. Of Alameda*, No. 11-cv-02868-JST, 2015 WL 14073366, at *2 (N.D. Cal. Feb. 1, 2015). Here, it appears that while withholding the images prejudiced Procore, that prejudice has been cured by the production on April 17 and the likelihood of disruption of the trial is negligible. *See Gryglak*, 2023 WL 3243998, at *2 (listing factors courts consider in assessing harmlessness).

In its motion, Procore argues that it was deprived of the opportunity "to depose Oracle's witnesses, prepare its own witnesses, or issue discovery based on the Oracle device images." ECF No. 289 at 6. Had it timely received the files, it would have "pursued targeted document requests, questioned witnesses about the artifacts, emails, and files extracted from the laptops, cross-examined custodians, and prepared its own witnesses accordingly." *Id.* But Procore identifies no specific learnings from the forensic images that would have affected its approach to fact discovery. It also does not argue that Oracle's approach to fact discovery was affected by the forensic images in any particular way. Rather, the primary utility of the forensic images appears to have been through the forensic experts and both experts had the opportunity to consider the forensic images in forming their opinions. Under these circumstances, Oracle has met its burden to establish harmlessness. *See, e.g.*, *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-CV-03428 LHK, 2012 WL 13234023, at *37 (N.D. Cal. Sept. 18, 2012) (affirming denial of motion to strike where prejudice was "uncertain").

Oracle violated the forensic protocol and circumvented the forensic neutral by providing the forensic images to Crain. Having done so, it exposed those images to the requirements of Rule 26, with which it failed to comply. Nonetheless, because the failure to produce the images was

United States District Court
Northern District of California

rendered harmless by their belated production, the motion to strike certain portions of the Crain report, ECF No. 289, is denied.

**CONCLUSION**

The motion to exclude portions of the Bennis report and the two motions to exclude and strike portions of the Crain report are denied in full. ECF Nos. 289, 340, 344.

**IT IS SO ORDERED.**

Dated: September 25, 2026

JON S. TIGAR
United States District Judge